# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
### (Souther Division: Montgomery County)

| | |
|---|---|
| AMERICAN ASSOCIATION OF PHYSICIANS FOR HUMAN RIGHTS, INC. d/b/a GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ+ EQUALITY, 1629 K Street NW, Suite 300 Washington, DC 20006; | |
| DR. CARL STREED, JR.; | |
| DR. SEAN ARAYASIRIKUL; | |
| DR. MICHELLE BIRKETT; | |
| DR. GREGORY PHILLIPS II; | |
| DR. KURT RIBISL; | Civil Action No. _____ |
| DR. NOEL BREWER; | |
| DR. SETH NOAR; | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| DR. KRISTEN HASSMILLER; | |
| DR. LAURA GRAHAM HOLMES; | |
| DR. HEATHER LITTLETON; | |
| DR. GABRIEL MURCHISON; | |
| DR. SARAH PEITZMEIER, Montgomery County, MD; | |
| DR. DEBRA UMBERSON; | |
| DR. PHOEBE POE; | |
| DR. RACHEL ROE; and | |
| DR. SUSANA SOE, | |
| *Plaintiffs*, | |
| v. | |

* Plaintiffs are filing a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs Dr. Phoebe Poe, Dr. Rachel Roe, and Dr. Susana Soe to proceed under pseudonyms.

NATIONAL INSTITUTES OF HEALTH,
9000 Rockville Pike
Bethesda, MD 20892 (Montgomery County);

JAY BHATTACHARYA, *in his official*
*capacity as Director of the National Institutes*
*of Health*,
9000 Rockville Pike
Bethesda, MD 20892 (Montgomery County);

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue SW
Washington, DC 20201; and

ROBERT F. KENNEDY, JR., *in his official*
*capacity as Secretary of the U.S. Department*
*of Health and Human Services*,
200 Independence Avenue SW
Washington, DC 20201,

                    *Defendants.*

LGBTQI+ people[1] have faced a long and unique history of hostility, neglect, bigotry, and erasure by the institutions charged with safeguarding their health. In recent years, though, these institutions have taken significant strides to address the health needs of LGBTQI+ people, acknowledging the historical barriers this population has faced in accessing care. But in a startling and devastating about-face, the federal government is once again trying to make discrimination the norm. Following President Trump's executive orders and directives targeting LGBTQI+ people—particularly those who are transgender—for discrimination, the National Institutes of Health ("NIH") and other Defendants abruptly cancelled hundreds of research grants—more than $800 million in funding—dedicated to the health of LGBTQI+ Americans, decreeing that the government will not fund research addressing their health needs. This case challenges these discriminatory and unlawful agency actions.

## INTRODUCTION

1.      In the United States, scientific research is structured around, and relies heavily on, federal funding. For decades, NIH has funded cutting-edge medical research—supporting over 300,000 researchers at more than 2,500 universities, medical schools, and research institutions. For years, this has included Plaintiffs' research focused on health disparities and the health needs of sexual and gender minorities ("SGM"). NIH disburses over 80% of its more-than $45 billion annual budget through a competitive, peer-reviewed grant-making process that until now was based on scientific merit, not politics. NIH-funded breakthroughs have earned over 100 Nobel Prizes and contributed to 99.4% of new drug approvals from 2010 to 2019. NIH's historical role in protecting and furthering the health of Americans cannot be overstated.

2.      But in recent months, NIH—at the behest of the new administration—has declared

---

[1] LGBTQI+ refers to lesbian, gay, bisexual, transgender, queer, and intersex people. LGBTQI+ people are also considered sexual and gender minorities.

1

that research aimed at improving the health of LGBTQI+ people "no longer effectuates agency priorities." Relying on sweeping executive orders and directives, NIH has stripped or denied critical funding for evidence-based studies involving LGBTQI+ people that address topics like mental health, antibiotic resistance, aging, suicide prevention, HIV/AIDS care, gender dysphoria treatment, eating disorders, drug use, and intimate partner violence.

3.     NIH's grant terminations and constructive denials have not only upended the lives of scientists and healthcare providers who have devoted years of specialized education, training, and research to this work, but have also endangered countless LGBTQI+ people whose lives depend on inclusive, data-driven health research. Without intervention, NIH's betrayal of both its mission and funding commitments will result in incalculable harm, including the midstream abandonment of life-saving research and the silencing of vital academic voices.

4.     NIH's conduct is not just unconscionable; it is unlawful. The abandonment of this research is a transparent act of overt discrimination against LGBTQI+ people. Though the administration may prefer to deny the existence of LGBTQI+ Americans, the Constitution and federal law do not permit the federal government to erase an entire population from its research agenda out of animus or political expediency.

5.     For one, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, requires federal agencies—including HHS, NIH, and NIH's Institutes and Centers ("ICs")—to act rationally, transparently, and in accordance with the law. Defendants have done the opposite here. Their clawbacks of already-approved grants violate the congressional mandate to fund research addressing health disparities among LGBTQI+ people. Defendants took these actions without notice, reasoned explanation, or any opportunity for public input or scientific review.

6.     Additionally, Defendants' conduct runs afoul of Section 1557 of the Affordable

2

Care Act (ACA), 42 U.S.C. § 18116, which prohibits discrimination based on race, color, national origin, sex, age, or disability in federally funded health programs, including in clinical and health research administered or funded by HHS.

7.     Beyond their statutory infirmities, Defendants' actions violate core constitutional protections. The Fifth Amendment's guarantee of equal protection bars the federal government from targeting a group for disfavored treatment, including based on sex, sexual orientation, and transgender status. And yet the government has done precisely that—placing LGBTQI+ health research in a category unworthy of support, defunded simply for centering the experiences and needs of sexual and gender minorities, including those living with HIV.

8.     Defendants' actions also violate the Due Process Clause, by depriving grantees and participants of constitutionally protected interests in what is statutorily required to be a fair and scientifically driven grantmaking process. Researchers, many of whom relocated, hired teams of staff, and built research infrastructure based on multi-year awards, have seen their projects terminated midstream with no process, no explanation, and no legitimate recourse.

9.     Defendants' actions cannot be viewed in isolation. For decades, the government neglected or outright refused to attend to LGBTQI+ people's health needs. This includes during the HIV/AIDS crisis, when an untold and disproportionate number of gay men and transgender women, particularly people of color, suffered and died as their government looked the other way.

10.     Only recently did our federal government begin reckoning with that legacy through modest but meaningful increases in congressionally mandated funding for health issues impacting LGBTQI+ people, public acknowledgments of past failings, and the creation of programs to foster equity in medical research. NIH specifically prioritized these kinds of programs in the past five years. Defendants' stark and blatantly political reversal—without explanation, process, or

justification—represents a deliberate reassertion of the injustice they pledged to correct.

11.    The human toll is already unfolding. Community health interventions and clinical trials relating to LGBTQI+ people's health that depend on NIH funding have stalled. Lifesaving studies into LGBTQI+ youth suicide and mental health have been halted mid-stream. Promising scientists devoted to tackling LGBTQI+ health disparities are losing the funding that supported their livelihoods. Researchers will be unable to shift into different specialized fields without new education and training. The ripple effects of these actions will echo for decades.

12.    The federal government cannot pick and choose whose health matters based on politics or prejudice. Scientific inquiry, particularly in the service of public health, must be guided by evidence, ethics, and need—not by the ideological whims of officials who seek to score political points at the expense of marginalized lives. At a time when anti-LGBTQI+ rhetoric and violence are rising nationwide, Defendants' actions send an unmistakable message: LGBTQI+ people, and in particular transgender people, are not worthy of study, investment, or care.

13.    Plaintiffs bring this action to prevent irreparable harm to researchers and to the LGBTQI+ populations they serve and care for. Plaintiffs seek injunctive relief to stop the federal government from enforcing or continuing to implement the discriminatory directives at issue and to stop and set aside the terminations of grant funding for Plaintiffs' research based on its focus on improving the health of LGBTQI+ people. Preliminary injunctive relief is necessary to preserve the *status quo ante litem* while this Court evaluates the (il)legality of Defendants' actions.

14.    The stakes of this case could not be higher. At its core, this lawsuit is about whether the federal government may single out an already-marginalized group for exclusion from the nation's public health agenda. Under our Constitution and laws, the answer must be no.

15.    Plaintiffs respectfully request that the Court act swiftly to prevent the rollback of

hard-won progress and to affirm a simple but essential truth: LGBTQI+ lives are worth studying, worth supporting, and worth the full protection of the law.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361, as this action arises under federal laws and the U.S. Constitution.

17.     This Court has authority to issue the requested relief pursuant to 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. 706, Federal Rules of Civil Procedure 57 and 65, and its equitable powers.

18.     Plaintiffs do not seek money damages or an order mandating specific performance of any particular contract. Instead, Plaintiffs seek an order declaring as unlawful Defendants' sweeping termination of grants, or the withholding of review of applications therefor, because they relate to LGBTQI+ health, in violation of Plaintiffs' constitutional, statutory, and regulatory rights, and enjoining Defendants from rescinding, terminating, denying, refusing to consider, or withholding from review grants on such prohibited bases.

19.     Venue is proper in the District of Maryland pursuant 28 U.S.C. § 1391(e) because all defendants in this action are officers and/or agencies of the United States, because at least two defendants reside in this judicial district, a substantial part of the events giving rise to this action occurred in this district, and at least one plaintiff resides in Montgomery County within this district.

## PARTIES

### A. Plaintiffs

20.     Plaintiff **GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA")** is a national nonprofit membership organization. GLMA's mission is to ensure health equity for LGBTQI+ people and equality for LGBTQI+ health professionals in their work and learning environments. Its membership includes approximately 1,000 physicians, researchers and academics, health-profession students, and other health professionals across the country. Several

GLMA members have had their NIH research grants or other funding terminated by Defendants or have had their applications for such funding denied, delayed, or withheld from review. GLMA asserts its claims on behalf of both its members whose research grants or grant applications relating to LGBTQI+ health have been terminated or withheld from review by Defendants on the challenged bases, and on behalf of its healthcare provider members' patients, whose care will suffer due to defendants' terminations and withholding of those grants.

21.    Plaintiff **Dr. Carl Streed, Jr.** is the Research Director for the Gender Care Center at Boston Medical Center, an Associate Professor at Boston University School of Medicine, and a member of GLMA. Dr. Streed has received multiple NIH awards over the past five years. In March 2025, NIH terminated two of his K01 grants as well as an R01 grant in which he is a co-investigator, citing the studies' connection to gender identity. Dr. Streed is also a healthcare provider to LGBTQI+ patients who are negatively impacted by Defendants' actions.

22.    Plaintiff **Dr. Sean Arayasirikul** is an Associate Professor in the Department of Health, Society, and Behavior at University of California, Irvine. They are a member of GLMA. Dr. Arayasirikul has received multiple NIH awards over the past five years. In February and March 2025, NIH terminated two of their awards (a DP2 award and an R25 award, respectively), citing the studies' connection to gender identity. In March 2025, NIH terminated another R25 award to Dr. Arayasirikul, citing the project's connection to diversity, equity, and inclusion ("DEI").

23.    Plaintiff **Dr. Michelle Birkett** is an Associate Professor in the Department of Medical Social Sciences at Northwestern University. Dr. Birkett directs the CONNECT Complex Systems and Health Disparities Research Program within the Institute for Sexual and Gender Minority Health and Wellbeing. Dr. Birkett has received seventeen NIH awards over the course of her career. In 2015, she received the NIH Career Award for her work on racial disparities in HIV

within young men who have sex with men. In March 2025, NIH terminated Dr. Birkett's R01 award, citing its connection to DEI.

24.     Plaintiff **Dr. Gregory Phillips, II** is an Associate Professor in the Department of Medical Social Sciences at Northwestern University. He is a member of GLMA. Dr. Phillips has received ten NIH awards over his career and worked on fifteen NIH-funded projects. In March 2025, NIH terminated two of his R01 grants, citing the studies' connection to gender identity.

25.     Plaintiff **Dr. Kurt M. Ribisl** is the chair and a Professor in the Department of Health Behavior at the Gillings School of Global Public Health at the University of North Carolina at Chapel Hill ("UNC") and a member of GLMA. He is also the program leader for Cancer Prevention and Control at UNC's Lineberger Comprehensive Cancer Center. Dr. Ribisl has been the recipient of multiple NIH awards over the past 28 years. In March 2025, NIH terminated a U54 grant to Dr. Ribisl, citing the study's connection to DEI. Four sub-projects, co-led by additional Plaintiffs Dr. Brewer, Dr. Noar, and Dr. Hassmiller, comprise the project funded by the U54 award.

26.     Plaintiff **Dr. Noel Brewer** is the Gillings Distinguished Professor of Public Health at the Gillings School of Global Public Health and a member of GLMA. He has received multiple NIH awards over the past twenty years and leads a center dedicated to improving communication about vaccinations, funded by a $12 million grant from the National Cancer Institute. In March 2025, NIH terminated the U54 grant he worked on with Dr. Ribisl, citing its connection to DEI.

27.     Plaintiff **Dr. Seth Noar** is a Professor at the UNC Hussman School of Journalism and Media, a member of UNC's Lineberger Comprehensive Cancer Center, and the director of the Communicating for Health Impact (CHI) Lab. Dr. Noar has received multiple NIH grants over the last twenty-three years. In March 2025, NIH terminated the U54 grant he worked on with Dr. Ribisl, citing the study's connection to DEI.

28.    Plaintiff **Dr. Kristen Hassmiller** is a professor in the Department of Health and Policy Management at the UNC Gillings School of Global Public Health. Dr. Hassmiller has received or worked on multiple NIH-funded projects during her career. In March 2025, NIH terminated the U54 award she worked on with Dr. Ribisl, citing the study's connection to DEI.

29.    Plaintiff **Dr. Laura Graham Holmes** is an Assistant Professor at the Silberman School of Social Work at Hunter College at CUNY. She is a member of GLMA. In March 2025, NIH terminated a K23 award to Dr. Holmes, citing the study's connection to gender identity.

30.    Plaintiff **Dr. Heather Littleton** is a Professor of Psychology at the University of Colorado, Colorado Springs, and Director of Research Operations at the Lyda Hill Institute for Human Resilience. Dr. Littleton has been the recipient of multiple NIH awards over the past twenty years. In March 2025, NIH terminated her R34 grant, a pilot clinical trial, citing the study's connection to gender identity. The award was paid in full at the clinical trial's initiation, and NIH is now requesting the return of funds awarded in a prior fiscal year.

31.    Plaintiff **Dr. Gabriel Murchison** is an Assistant Professor at Boston University School of Public Health. He is a member of GLMA. Dr. Murchison has been the recipient of multiple NIH awards over the past few years. In March 2025, NIH terminated his K99/R00 grant, citing the study's connection to gender identity.

32.    Plaintiff **Dr. Sarah Peitzmeier** is an Assistant Professor of Behavioral and Community Health at the University of Maryland School of Public Health. She is a member of GLMA. Dr. Peitzmeier has been the recipient of multiple NIH awards over the past eight years. In March 2025 NIH terminated an R25 award on which Dr. Peitzmeier worked, citing the study's connection to DEI. NIH has also delayed decision-making on two long-pending applications of Dr. Peitzmeier's, one to transfer a grant concerning HIV and violence prevention among

8

transgender women of color, and another seeking approval for a grant concerning sexual assault prevention for transgender undergraduates.

33.    Plaintiff **Dr. Debra Umberson** is a Professor of Sociology and Director of the Center on Aging and Population Sciences ("CAPS") at The University of Texas at Austin. Dr. Umberson has been the recipient of multiple NIH awards over the last 38 years. In March 2025, NIH terminated her R37 grant, citing the study's connection to DEI.

34.    Plaintiff **Dr. Phoebe Poe** is a professor and researcher in the field of LGBTQI+ health at a higher education institution in Tennessee. Dr. Poe has been the recipient of multiple NIH awards over the past 10 years. In February 2025, NIH terminated her R01 grant, citing the study's connection to gender identity.

35.    Plaintiffs **Dr. Rachel Roe** is a physician and a researcher at a hospital and higher education institution in Virginia. In March 2025, NIH terminated her K23 award, citing the study's connection to gender identity. Dr. Roe is also a healthcare provider whose patients include sexual and gender minority patients who are negatively impacted by Defendants' actions.

36.    Plaintiff **Dr. Susana Soe** is a psychologist and an executive at a health-related nonprofit. She is a member of GLMA. In February 2025, NIH terminated her award, citing the study's connection to gender identity.

37.    Plaintiffs Dr. Streed, Dr. Roe, and healthcare provider members of Plaintiff GLMA are collectively referred to as "**Healthcare Provider Plaintiffs**." They bring claims on their own behalf as well as on behalf of their LGBTQI+ patients, who face barriers to asserting their own claims and protecting their own interests.

38.    Defendants' actions have caused professional, academic, financial and reputational harm to each of the individual Plaintiffs and to the health researcher members of GLMA, as well

as negatively impacted the LGBTQI+ patients of Healthcare Provider Plaintiffs.

**B. Defendants.**

39.    Defendant **National Institutes of Health ("NIH")** is an agency of the United States within the Department of Health and Human Services. It is the primary federal agency responsible for conducting and supporting biomedical and health research in the United States. The NIH includes twenty-seven Institutes and Centers ("ICs").

40.    Defendant **Dr. Jay Bhattacharya** is the NIH Director. He is sued in his official capacity. As NIH Director, he is responsible for setting policy for NIH and for planning, managing, and coordinating the programs and activities of all NIH components.

41.    Defendant **U.S. Department of Health and Human Services ("HHS")** is an executive department of the United States Government. It houses and oversees NIH. HHS is responsible for the administration of federal health programs, including via research funding.

42.    Defendant **Robert Kennedy, Jr.,** is the HHS Secretary. He is sued in his official capacity. As HHS Secretary, he is responsible for all aspects of the operation and management of HHS, including implementing HHS's duties under federal law.

## FACTUAL ALLEGATIONS

**NIH's Evolving History with the LGBTQI+ Community**

43.    Our federal government's treatment of sexual and gender minorities has continually evolved, from fraught beginnings to greater recognition and respect in recent years, to today's retreat and rollback of protections for the LGBTQI+ community. Due to its past commitment to science and disregard for politics, however, NIH once stood out in its treatment of LGBTQI+ people.

44.    The case of HIV/AIDS provides an apt illustration. In its early stages, AIDS was perceived not as a national health problem but as a problem for "homosexuals" and intravenous

drug users. Throughout most of the 1980s, AIDS was seldom acknowledged by the federal government. Research and prevention efforts were hampered by the stigma associated with being gay. Virtually no attention was paid to infection rates in the transgender community until the mid-1990s, because transgender people were not included in federal research efforts.

45.     Beginning in 1981, NIH provided its first HIV/AIDS funding. The next year, Congress passed its first bill funding HIV/AIDS research. In 1988, Congress established NIH's Office of AIDS Research to coordinate NIH activities aimed at stopping the epidemic.

46.     In 1993, Congress passed the NIH Revitalization Act, which directed NIH to ensure that women and "members of minority groups" are included in the clinical research it funds. 42 U.S. Code § 289a-2(a). The Revitalization Act specified that "minority group" includes "subpopulations of minority groups," as further defined by the Director of NIH. *Id*. § 289a-2(g)(2).

47.     In 2010, NIH requested that the Institute of Medicine ("IOM") conduct intensive research into LGBT health, including mental health, biostatistics, clinical medicine, adolescent development, aging, parenting, behavioral sciences, HIV/AIDS, demography, racial and ethnic disparities, and healthcare access. This work culminated in the 2011 publication of a report entitled *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*.[2] Among other recommendations, the report identified several areas as being "especially important" for future research, including research into "social influences on the lives of LGBT people," "inequities in healthcare," and "transgender-specific health needs."

48.     In 2015, the NIH created the Sexual and Gender Minority Research Office ("SGMRO"), coordinating research for "sexual and gender minorities." The next year, NIH formally designated sexual and gender minorities as a health disparity population for research

---

[2] *See* https://perma.cc/2V9E-ZUNM. The 2011 report is incorporated herein by reference.

purposes. The effect of this designation was to prioritize funding to address health disparities faced by those communities. NIH also began its "All of Us" Research Program, authorized by the 21st Century Cures Act in 2016, which now boasts the "largest and most accessible data from LGBTQIA+ people for health research," with data from nearly 40,000 LGBTQIA+ participants.

49.    In 2020, the National Academies of Sciences, Engineering, and Medicine ("National Academies") followed up on the IOM's prior report with a consensus study report entitled *Understanding the Well-Being of LGBTQI+ Populations*.[3] The comprehensive report noted, among other things, that while "[r]esearch on LGBT health ha[d] burgeoned" since 2011, "there is still much to learn." It recommended that the federal government and other relevant stakeholders "fund and conduct methodological research to develop, improve, and expand measures that capture the full range of sexual and gender diversity in the population … as well as determinants of well-being for sexual and gender diverse populations."

50.    That same year, NIH launched a *Strategic Plan to Advance Research on the Health and Well-being of Sexual and Gender Minorities: Fiscal Years 2021-2025* (the "SGM Strategic Plan"), emphasizing its commitment to LGBTQI+ health research. A copy of the SGM Strategic Plan is attached as **Exhibit A**. The SGM Research Strategic Plan, which set NIH priorities through 2025, stated that "the NIH is committed to its core mission of turning discovery into health for all Americans, including those who identify as sexual and gender minorities."

51.    The SGM Strategic Plan set four goals: 1) to advance rigorous research on the health of SGM populations; 2) to expand SGM health research by fostering partnerships and collaborations; 3) to foster a skilled and diverse workforce in SGM health research; and 4) to encourage data collection related to SGM populations in research.

---

[3] *See* https://perma.cc/74HF-U6YG. The 2020 report is incorporated herein by reference.

52.     In 2022, at the behest of NIH, the National Academies issued a consensus study report entitled *Measuring Sex, Gender Identity, and Sexual Orientation*.[4] This report noted that "LGBTQI+ populations experience differential and inequitable treatment and outcomes in many areas of everyday life, including in health," and that "[a] lack of data on the characteristics, needs, and experiences of LGBTQI+ populations is a major barrier [] to better understandings of these disparities." Accordingly, it set forth "recommendations for how best to measure the concepts of sex, gender identity, and sexual orientation in the United States."

53.     By 2022, NIH had funded more than a thousand unique awards relating to sexual and gender minority health over the previous decade, grants totaling more than $491 million in first-year funding. Still, this amount represented only 0.8% of NIH's funding portfolio.

**NIH's Structure and Its Congressional and Statutory Mandates**

54.     Congress authorizes NIH's funding of extramural research through statutory directives and appropriations. Section 301 of the Public Health Service Act (PHSA) of 1944, 42 U.S.C. § 241, directs NIH to conduct and sponsor research and to provide research grant funding. *See* 42 U.S.C. §241(a), (a)(1); *see also* 42 U.S.C. §284(b).

55.     NIH must allocate its congressional funding toward fulfilling Congress' statutory directives and priorities. Congress mandates that NIH research funding address health inequalities and disparities among minority communities. *See* 42 U.S.C. § 282(b)(8)(d)(ii).

56.     Congress also expressly directed NIH to fund research related to LGBTQI+ people, namely, to "encourage efforts to improve research related to the health of sexual and gender minority populations," including by "increasing participation of sexual and gender minority populations in clinical research" and by "facilitating the development of valid and reliable methods

---

[4] *See* https://perma.cc/7XD2-GVK2. The 2022 report is incorporated herein by reference.

for research relevant to sexual and gender minority populations." 42 U.S.C. §283p.

57.    Congress requires NIH to develop and publish a Strategic Plan ("Strategic Plan") every six years. The purpose of the Strategic Plan is to "provide direction to the biomedical research investments" made by NIH, "to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine." 42 U.S.C. § 282(m)(1). By law, NIH's Strategic Plan must "consider . . . biological, social, and other *determinants of health that contribute to health disparities*." 42 U.S.C. §§ 282(m)(2)(A), (m)(2)(B)(iii).

58.    The current operative NIH Strategic Plan (fiscal years 2021–2025) states that "NIH prioritizes research that addresses the needs of underserved populations to address the factors that contribute to health disparities" for these populations, and provides that "NIH-wide efforts will continue to focus on developing and testing interventions to reduce health disparities, identifying key gaps in prevention science related to health disparities, and promoting targeted research on appropriately tailored public health, clinical, and community preventive services in diverse settings and contexts." It identifies "sex and gender" as key to health outcomes and disparities.

59.    The operative NIH Strategic Plan also identifies five key "Crosscutting Themes" that "span all aspects of NIH's Strategy." The first "Theme" is "Improving Minority Health and Reducing Health Disparities." Recognizing that "LGBTQ+ persons" have "distinct health needs and often experience disparities in health outcomes," NIH committed that LGBTQ+ people "should be included in all relevant research, such that there is sufficient representation of each population to conduct relevant analyses." It further stated that "[t]o promote health equity, NIH remains committed to supporting a robust program of research examining how biological, behavioral, environmental, sociocultural, and other factors interact with and shape individuals' health trajectories across the lifespan."

60.    Various ICs also prepare Strategic Plans which, like the NIH Strategic Plan, prioritize research on health disparities among diverse populations.

**NIH Grant Classifications**

61.    NIH uses three-character codes to distinguish its varying types of grants and programs. The first character, usually a letter, identifies the broad category of funding.

62.    R-series grants are used for research and development. For example, R01 grants are "Research Project" grants supporting a discrete, specified, circumscribed project to be performed by the named investigator(s) in an area of their specific interest and competencies. Other R-series grants can be tailored to certain kinds of projects.

63.    In contrast to R-series grants, which are usually dedicated to singular and specific projects, T-, F-, K-, P-, and U-series grants can be awarded to professionals or institutions for development, training, and recruitment. For example, a K99 award provides mentorship and support for promising postdoctoral research scientists and helps secure independent research positions. Similarly, K23 awards provide individuals who have a clinical doctoral degree with an intensive, supervised, patient-oriented research experience.

**NIH Grantmaking Process**

64.    NIH's grant application and review process is highly rigorous, competitive, and standardized. NIH sets priorities, invites researchers to submit proposals that advance those priorities, and intensively reviews proposals to determine which projects will receive NIH funds.

65.    NIH's rigorous grant-making process ensures that only the most promising research proposals get funded. NIH follows a well-established procedure governed by the Public Health Services Act, NIH Grants Policy Statement, the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards (45 C.F.R. Part 75), and other regulations.

66.    **Researchers' Applications.** In accordance with research priorities set out in their

Strategic Plans, NIH and its ICs solicit applications for grants through notices of funding opportunities ("NOFOs")—public announcements that outline the conditions for applying for grant funding. In response to these NOFOs, applicants submit proposals through the NIH electronic system. These applications discuss the proposal's objectives and methodology and the significance of the research to be performed. They must also conform to 45 C.F.R. Part 75, which sets forth requirements regarding budget and facilities, and—according to NIH policy—must include a discussion of how the research will be inclusive of gender, minority groups, and "individuals across the lifespan."[5] Applications take months to prepare and are often hundreds of pages long, requiring a significant amount of effort and scientific rigor as well as detailed research planning, budgeting, and funding justification.

67.    **NIH Grant Evaluation.** NIH's evaluation and award process is structured to uphold scientific integrity and accountability. It involves a two-stage review, designed to ensure applications are evaluated fairly, equitably, and efficiently, in a manner that strives to eliminate bias. First, initial review of a proposal's scientific merit is made by an Integrated Review Group or Scientific Review Group ("SRG"), peer-review groups organized by discipline. These groups score proposals according to defined criteria. Second, applications with sufficiently high scores are presented to the relevant IC National Advisory Council or Board, which considers the application's scientific and technical merit and connection to the relevant IC's programs and priorities. The Councils recommend whether or not to fund a proposal, or to defer it for re-review.

68.    The success rate for grant applications is low. In 2022, the NIH overall funding rate for new Research Project grants was about 21%.

69.    Once a grant has been awarded, recipients are authorized to recover their actual

---

[5] *See* Nat'l Insts. of Health, *NIH Grants Pol'y Statement* (Apr. 2024), which is incorporated herein by reference.

costs for the research conducted. When the project spans more than a year, NIH conducts noncompetitive renewals each year to confirm additional funding.

### The Typical NIH Grant Termination Process

70.    While historically rare, grant terminations are governed by HHS regulations, which permit terminations (i) due to non-compliance with award terms, (ii) for cause, or (iii) if mutually agreed between the researcher and NIH staff.

71.    NIH must follow a formal process to terminate a grant. *See* 2 C.F.R. Parts 200.340 through 200.343. It must provide written notice to the recipient stating the reasons for termination and the effective date. 45 C.F.R. § 75.373; 2 C.F.R. § 200.340(a)(3). Recipients then can object and provide information challenging the termination decision. 2 C.F.R. § 200.342.

72.    Recipients have the right to appeal adverse decisions, as outlined in the NIH Grants Policy Statement and 45 C.F.R. Part 16. Recipients may first appeal to the NIH official specified in the termination notice within 30 days of receipt. If dissatisfied with the first-level decision, recipients can appeal to the Departmental Appeals Board, which provides an independent review.

### The Attacks Against LGBTQI+ People and Erasure of Transgender People.

73.    On his first day in office, President Trump began issuing sweeping executive orders and directives targeting LGBTQI+ people for discrimination, with a particular emphasis on transgender people. As part of these actions, he took aim at myriad federal initiatives aimed at understanding and improving the health of LGBTQI+ individuals.

74.    On day one, President Trump issued Executive Order 14168 (the "Gender EO"), which, under the guise of "defend[ing] women's rights," expresses a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity.

75.    The Gender EO defines what it terms "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all

17

institutions of society to regard this false claim as true." Gender EO § 2(f).

76.    The Gender EO demands that agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and prohibits the use of federal funds "to promote gender ideology," directing agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* §§ 3(e), (g).

77.    The Gender EO directs all federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and to "cease issuing such statements, policies, regulations, forms, communications[,] or other messages." *Id.* § 3(e).

78.    The Gender EO is far from the only action by this administration to target LGBTQI+ people. As Defendants stated, "SGM individuals may encounter SGM-specific health inequities, as well as inequities stemming from other facets of their identity." These other facets may include race, color, ethnicity, ability status, age, income level, English language proficiency, geographical location, and HIV status, in addition to sexual orientation and transgender status.

79.    Yet, through Executive Order 14151 ("DEI-1 EO"), President Trump directed agencies to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." The DEI-1 EO specifically requires the termination of all "'equity-related' grants or contracts," falsely declaring such initiatives to be "illegal and immoral discrimination programs."

80.    The next day, President Trump issued Executive Order 14173 ("DEI-2 EO") to combat purported "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and

accessibility' (DEIA)[.]" The DEI-2 EO requires federal officials to "excise references to DEI and DEIA principles" from federal grants and to "terminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

81.     On January 27, the Office of Management and Budget issued a memorandum, "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs," directing all federal agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by" the Gender, DEI-1, and DEI-2 EOs, specifically targeting DEI and "woke gender ideology."

82.     In addition to the Gender, DEI-1, and DEI-2 EOs, the Trump Administration has taken a series of actions seeking to eliminate or restrict existing protections for LGBTQI+ people and has implemented myriad affirmative policies to discriminate against transgender people in all aspects of public life, including education, employment, health care, and housing, to name a few.[6]

83.     Our Nation's researchers and scientists have also been ordered to remove any mention of transgender people or recognition of gender identity from any federally funded research. The CDC, for example, has instructed its scientists to remove references to or mentions of certain "forbidden" terms, including: "Gender, transgender, pregnant person, pregnant people, LGBT, transsexual, nonbinary, nonbinary, assigned male at birth, assigned female at birth, biologically male, biologically female." NIH has demanded a halt to a large-scale study examining ways to prevent HIV infections in transgender youth of color. And a federal scientific journal blocked publication of a paper discussing the value of teaching transgender health. This is an all-

---

[6] *See, e.g.*, Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025); Exec. Order No. 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025); Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025).

out assault on the lives and health of transgender Americans.

**HHS's and NIH's Unlawful Implementation of Trump's Orders**

84.     In the wake of President Trump's unlawful and discriminatory Executive Orders,
Defendants issued an onslaught of directives to purge grants and funding aimed at supporting or
studying the LGBTQI+ population. On February 10, the Acting HHS Secretary issued a directive
decreeing that "grants that support DEI and similar discriminatory programs" were now
"inconsistent with the Department's policy of improving the health and well-being of all
Americans." A copy of the directive is attached as **Exhibit B**. The Acting Secretary then directed
all agency personnel to "pause all payments" to "grantees related to DEI and similar programs."

85.     On February 12, NIH issued a memorandum entitled "NIH Review of Agency
Priorities Based on the New Administration's Goals." In it, NIH's Deputy Director for Extramural
Research stated that NIH would soon provide "additional details on future funding actions related
to the agency's goals" through separate memoranda. The next day, the Deputy Director provided
"supplemental guidance" placing "hard restrictions on awards . . . where the program promotes or
takes part in [DEI] initiatives."  These restrictions applied to "new and continuation awards made
on or after February 14, 2025," and were to "remain in place until the agency conducts a review"
of whether "funding of the activities/programs are . . . consistent with current policy priorities."

86.     On February 21, the NIH Director issued a "Directive on NIH Priorities." A copy
of the directive is attached as **Exhibit C**. The directive proclaims that NIH's mission requires it
"to ensure that it is not supporting low-value and off-mission research programs, including but not
limited to studies based on diversity, equity, and inclusion (DEI) and gender identity" and that
"this description of NIH's mission is consistent with recent Executive Orders issued by the
President." It proclaimed that "research programs based on gender identity are often unscientific,
have little identifiable return on investment, and do nothing to enhance the health of many

20

Americans," and that "[r]esearch programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness." Accordingly, the directive declared that "it is the policy of NIH not to prioritize such research programs" and instructed "NIH personnel … [to] ensur[e] NIH grants, contracts, cooperative agreements, and other transactions do not fund or support … DEI and gender identity research activities and programs."

87.    On February 28, NIH doubled down on its attack, announcing that it would "no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI)" and demanding that DEI be "completely excise[d] from its grant awards." A copy of the February 28 Guidance is attached as **Exhibit D**. Per the directive, NIH mandates that grants for which the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity)" be terminated altogether. For grants which only "partially support[] DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope)," NIH required that such grants be reworked to remove DEI-related content or be terminated. The same went for grants that do "not support DEI activities, but may contain language related to DEI."

88.    NIH instructed grant officials to terminate these awards by using boilerplate language: "This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated [Refer to Appendix 3 for language provided by NIH by HHS.]"

89.    Appendix 3 of the February 28 guidance specifically directed NIH to cease all

research related to "DEI" or "transgender issues," which it described as follows:

a.      "**DEI:** Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ('DEI') studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harm the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

b.      "**Transgender issues:** Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs."

90.      On March 25, NIH issued more revised guidance, reiterating that it would "no longer prioritize research and research training programs that focus on [DEI]." A copy of the March 25 Guidance is attached as **Exhibit E**. In reviewing grants, NIH directed its officials to tell grantees whose awards were being terminated that "it is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g. China or South Africa, etc.]." Appendix 3 of that guidance listed "DEI" and "Transgender issues" as forbidden research subjects.

91.      This Complaint refers to all this internal HHS and NIH guidance in February and March 2025 as the "**Agency Directives**."

92.      Pursuant to the Agency Directives, in February 2024, NIH began its anti-LGBTQI+

purge of grants. NIH sent nearly identical termination notices to all impacted grantees. All in all, hundreds of research grants relating to LGBTQI+ people's health and wellbeing were terminated.

93.      Each notice for the termination of an LGBTQI+-related grant included virtually identical justifications. Each stated that "This award no longer effectuates agency priorities" and then inserted either the "Transgender Issues" or "DEI" language from Appendix 3 of the February 28 guidance. In some instances, the language was followed by: "NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria."

94.      Several notices included language making clear that administrative appeals would be futile: "[N]o corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities."

95.      The justifications provided in the notices of termination were nonspecific and included generalized pejorative descriptions of entire swaths of research as "antithetical to the scientific inquiry," as having "little identifiable return on investment," as "ignor[ing] … biological realities," and as failing to "enhance health, lengthen life, or reduce illness." They made no effort to explain how *the specific project at issue* met any such descriptor or otherwise failed to "effectuate agency priorities," leaving the terminated grantees to guess at how their research, which NIH had deemed beneficial to science and worthy of funding, had suddenly lost favor.

96.      Nor did the termination notices contend with the fact that NIH-commissioned experts had *already* rigorously examined each project during the award-making process and chosen these projects among many applicants, thereby determining that each met agency priorities. As stated above, multiple panels of scientists, academics, and experts in the grantee's field reviewed the now-terminated projects against criteria that included alignment with the IC's

strategic priorities.

97.    On information and belief, no scientific input or consideration governed the selection of projects for termination.

98.    The notices also demonstrate that Defendants did not consider the significant downstream impacts of these terminations. They did not address the impact on the researchers themselves who relied on this funding in structuring their lives and careers, on LGBTQI+ study participants, on impacts to staffing or facilities, or any other downstream consequence.

99.    Together, "gender identity," "transgender issues," "diversity," "equity," "equity objectives," "inclusion," "accessibility," "DEI," "LGBTQI+ health," "sexual orientation," and "gender ideology" are referred to as the "**Banned Topics**." The terminations, suspensions, or withholding of grants and/or related funding, and the denials, delays, refusals to consider, or withholding from review of applications or renewal applications for grants and/or related funding because the research relates to the Banned Topics are collectively referred to as the "**Challenged Agency Actions**."

**The Impact of the Agency Directives and Challenged Agency Actions**

100.    Defendants' mass termination of research grants that relate to the Banned Topics, and their refusal to consider applications therefor, have had a devastating impact on individual Plaintiffs, GLMA's members, LGBTQI+ people's health and wellbeing, and public health at large. There is no substitute for federal funding of health research and life science.

101.    Defendants' actions leave health researchers like Plaintiffs, many of whom are LGBTQI+ themselves, unable to meet academic obligations and forced to dissolve entire research teams, leading to eliminations of jobs and the ending of their projects. The infrastructure built over the years to support LGBTQI+ research has crumbled overnight. For established researchers, Defendants' actions dismantle decades of scholarly work. For early career researchers,

Defendants' actions abruptly cut off promising career paths in health research.

102.    The impact of Defendants' actions also extends to LGBTQI+ people more broadly and the public health. The Agency Directives and Challenged Agency Actions decree that transgender people's health and the intersectional health needs of LGBTQI+ people are not worthy of consideration or study and essentially eliminates the ability to study these topics. Without longitudinal data and ongoing inquiry, we are left with gaps that both impede health innovation and reinforce stigma by suggesting that LGBTQI+ lives and experiences are not worthy of study.

103.    Moreover, pursuant to the Agency Directives, hundreds of HIV research grants have been terminated, threatening to halt decades of progress. The return on investment in HIV research goes well beyond HIV itself: HIV research involving LGBTQI+ people laid the foundation for curative therapies for hepatitis C and treatments for cancer. By turning their back on this research because it considers the experiences of LGBTQI+ people and racial minorities, Defendants have left everyone more vulnerable to HIV and other infectious diseases.

104.    In addition, Defendants' actions have negatively affected the LGBTQI+ people who participated in the studies for which funding has been terminated. Many received benefits that have now disappeared, including health screenings, medical treatment, or stipends. Participants who were relying on this engagement for critical health care or income have been left in limbo, and in many cases, without the treatment or resources they were counting on.

105.    Plaintiff Dr. Streed's institution received a boilerplate grant termination letter from NIH on March 21, 2025, terminating his K01 grants that funded research concerning cardiovascular health in transgender and gender diverse persons, and dementia in transgender populations. These terminations have set back cardiovascular health research for both transgender and cisgender populations, impacted the scope of Dr. Streed's research, harmed Dr. Streed's

finances, and inhibited his ability to present research, work with collaborators, and mentor other researchers. Dr. Streed's institution has appealed this decision, but because NIH has discouraged appeals, this administrative appeal is likely futile. In addition, NIH terminated an R01 grant for which Dr. Streed is a co-investigator, citing its connection to gender identity, and has withheld or unreasonably delayed review of two of his grant applications that relate to LGBTQI+ health.

106.    Plaintiff Dr. Arayasirikul received the same boilerplate grant termination letter from NIH on February 28, 2025, terminating their DP2 grant, which funded research exploring the effect of stigma on HIV prevention in sexual and gender minorities of color. Dr. Arayasirikul also received letters of termination for two other grants meant to train and mentor early career scientists, students, and providers. These three terminations have stalled the progression of their research career as well as that of others and caused the abandonment of research that could greatly impact sexual and gender minorities at risk of acquiring HIV. Dr. Arayasirikul's institution appealed the terminations, but because NIH discouraged appeals, such administrative appeals are likely futile. In addition, Dr. Arayasirikul has a multi-year grant for which funding had already been approved, but NIH has withheld or unreasonably delayed the notice of award for year two.

107.    Plaintiff Dr. Birkett received the same boilerplate grant termination letter from NIH on March 12, 2025, terminating her R01 grant, which funded research into the drivers of high rates of HIV. Because of this termination, Dr. Birkett has experienced tremendous setbacks in her research, which is fundamentally designed to enhance health, lengthen life, and reduce illness. Her institution has appealed the termination, but this administrative appeal is likely futile.

108.    Plaintiff Dr. Phillips received the same boilerplate grant termination letter from NIH on March 21, 2025, terminating two of his R01 grants. The first study filled an important gap in existing research by studying the impact of alcohol use on high-school age sexual minorities, a

demographic often overlooked in research. The second aimed to improve measures of sex, sexual orientation, and gender identity, which could lead to improvements in research methodologies, more accurate measures of health disparities among sexual and gender minorities, and improved interventions to achieve health equity. Because of these terminations, important gaps addressed by these projects will remain unresolved, to the detriment of LGBTQI+ people. Further, the terminations have impacted Dr. Phillips' income, led to cuts in staff, interrupted his and his team members' careers, and deprived LGBTQI+ youth of continued participation in research. Dr. Phillips's institution appealed the terminations, but such administrative appeals are likely futile. Dr. Phillips has several grant applications planned that relate to LGBTQI+ health, including youth and transgender women, that he would submit if not for the Agency Directives.

109.    Plaintiffs Dr. Brewer, Dr. Hassmiller, Dr. Noar, and Dr. Ribisl received the same boilerplate grant termination letter from NIH on March 21, 2025, terminating the U54 grant for which Dr. Ribisl is the principal investigator and Dr. Brewer, Dr. Hassmiller, and Dr. Noar lead sub-projects. The project entitled *Advancing Tobacco Regulatory Science to Reduce Health Disparities* was designed to understand the impact of regulations and communication campaigns for tobacco products and e-cigarettes on communities disadvantaged by tobacco use disparities, including sexual minorities. Because of this termination, Dr. Brewer, Dr. Hassmiller, Dr. Noar, and Dr. Ribisl have experienced tremendous setbacks in their research. They have also experienced financial restraints on salaries, significant staffing cuts, as well as impediments in their ability to secure future grants. UNC has not appealed this decision because the letter of termination discouraged appeals and because the university believes any such appeal would be futile.

110.    Plaintiff Dr. Holmes's institution received the same boilerplate grant termination letter from NIH on March 18, 2025, terminating her K23 grant, which funded work to develop and

test an affirming psychosocial intervention for sexual and gender minority autistic people to improve their mental health and quality of life. Because of this termination, Dr. Holmes has experienced significant setbacks to her research, including not being able to pay her autistic collaborators. The termination has also inhibited Dr. Holmes's ability to develop professional expertise, relationships, and leadership as a newer researcher, the very purpose of a K23 grant. The termination was appealed, but this administrative appeal is likely futile.

111.    Plaintiff Dr. Littleton received the same boilerplate grant termination letter from NIH on March 21, 2025, terminating her R34 grant, which funded research into reducing teen dating violence and alcohol use among LGBTQI+ youth. Because of this termination, Dr. Littleton cannot complete her research and lost a significant portion of her salary. Dr. Littleton's institution has not appealed this decision because the termination letter discouraged appeals and because an administrative appeal would likely be futile. Dr. Littleton also has a R01 proposal relating to sexual and gender minorities that received a 7th percentile score in July 2024 and was recommended for funding after the IC Council's review in October 2024. Though an NIH grants manager informed Dr. Littleton the award was set to be issued by March 2025, no notice of award has been issued.

112.    Plaintiff Dr. Murchison received the same boilerplate grant termination letter from NIH on March 21, 2025, terminating his K99/R00 grant, which funded research on the impact of stigma on adverse relationship experiences (such as intimate partner violence) and resulting alcohol misuse and mental illness in transgender and nonbinary young adults. Because of this termination, Dr. Murchison cannot finalize or publish his work, which significantly impacts his long-term career goals. Dr. Murchison's institution appealed the termination decision, but an administrative appeal will likely be futile. Dr. Murchison is also a co-investigator in a R01 proposal, submitted to NIH in October 2024, that was scheduled to be reviewed by an SRG in

February or March 2025, but that was pulled from review and is no longer assigned to any SRG.

113.    Plaintiff Dr. Peitzmeier received the same boilerplate grant termination letter from NIH on March 21, 2025, terminating an R25 grant for which she was a co-investigator and which funded research on perinatal intimate partner violence. No appeal was taken because the institutional decisionmakers believed it to be futile. In addition, Dr. Peitzmeier has outstanding applications to transfer an existing K01 grant and to obtain a R21 grant, which explore partner violence and sexual assault in transgender populations. Both applications remain pending due to prolonged NIH inaction despite assurances by NIH career staff prior to the directives that the paperwork was in order. Because of grant termination and NIH inaction on pending applications, Dr. Peitzmeier's income and career progression have been impacted.

114.    Plaintiff Dr. Umberson received the same boilerplate grant termination letter from NIH on March 21, 2025, terminating her R37 grant, which extended longstanding R21 grant funding for research designed to understand how married partners affect one another's health and how those benefits vary across same-sex and different-sex couples. Because of this termination, Dr. Umberson is unable to complete data collection for the third wave of her research and has been forced to terminate four graduate research assistant positions and one postdoctoral position. Dr. Umberson's institution appealed the terminations, but such administrative appeals are likely futile. Dr. Umberson also has a separate application for P30 funding pending to renew NIH's support for the Center on the Demography and Economics of Aging. This application includes an optional core focusing on LGBTQI+ aging, which Dr. Umberson fears will lead NIH to deny the funding.

115.    Plaintiff Dr. Poe received the same boilerplate grant termination letter from NIH on February 28, 2025, terminating her R01 grant, which funded a longitudinal study on the impact of social networks and policy on older LGBTQI+ populations. In addition, on March 7, NIH pulled

the application for renewal of this grant from review notwithstanding that it had received a favorable score from the SRG. Because of this termination and withholding of review, Dr. Poe lost a portion of her salary, years of completed research, and opportunities for continued study. Dr. Poe's institution has not appealed the termination, believing that an appeal would likely be futile. Dr. Poe is also an investigator on two proposals that NIH has removed from the typical SRG review process and assigned to atypical *ad hoc* panels. Lastly, Dr. Poe planned other proposals relating to LGBTQI+ health, including a T32, that she has not submitted due to the Agency Directives.

116.    Plaintiff Dr. Roe received the same boilerplate grant termination letter from NIH on March 18, 2025, terminating her K23 grant, which funded research on disordered eating behaviors in transgender and gender-diverse youth. Because of this termination, Dr. Roe's career prospects, such as becoming a tenured professor, have been diminished. She believes that the termination will inherently create bias against sexual and gender minorities within research literature. Dr. Roe's institution has not appealed because the termination letter discouraged appeals and because the institution believes any such appeal will be futile.

117.    Plaintiff Dr. Soe received a grant termination letter from NIH on February 28, 2025, which was updated on March 18, 2025, terminating her grant. This grant funded research exploring how social determinants of health impact sexual and gender minorities in southern Florida. Because of this termination, Dr. Soe has lost the majority of her nonprofit's operating budget and 25% of her and her staff's salary, and she has been forced to lay off employees. Dr. Soe has administratively appealed the termination, but any such appeal is likely futile.

118.    The termination letters received by Plaintiffs and/or their institutions contained no justification for the terminations, other than the awards no longer aligned with agency priorities because they related to either "gender identity" or "diversity, equity, and inclusion (DEI)."

## CLAIMS FOR RELIEF

### COUNT I: Violation of Equal Protection Component of the Fifth Amendment
### (All Plaintiffs Against All Defendants)

119.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

120.    The Fifth Amendment prohibits the federal government from discriminating against individuals and/or groups based on sex, including sexual orientation and gender identity.

121.    The Agency Directives and Challenged Agency Actions intentionally discriminate against Plaintiffs based on sex, sexual orientation, and transgender status by depriving them of funding because they research, study, and care for LGBTQI+ people.

122.    The Agency Directives and Challenged Agency Actions also discriminate based on sex, sexual orientation, and transgender status against the LGBTQI+ people whom Healthcare Provider Plaintiffs care for.

123.    Healthcare Provider Plaintiffs assert claims on their own behalf and on behalf of the LGBTQI+ patients they care for. These patients face barriers to asserting their own claims and protecting their own interests

124.    The Agency Directives and Challenged Agency Actions are, by their very terms, rooted in prejudice and animus.

125.    There is no government interest—compelling, important, or even legitimate—that justifies the Defendants' differential treatment of scientific research because it is aimed at improving the health and welfare of LGBTQI+ individuals.

126.    Because it facially discriminates based on sex, sexual orientation, and transgender status, Defendants' conduct is subject to heightened scrutiny, which it cannot withstand. Defendants' actions terminating funding for research simply because it relates to the health of LGBTQI+ people does not serve any important government objective. And even if the government

31

were able to articulate such a purpose, the haphazard cancellation of hundreds of grants simply because they reference certain "magic words" would lack any substantial relation to that objective.

127.    Even if rational basis review applied here—and it does not—Defendants' actions lack any legitimate state interest. Bias and political considerations cannot justify the government disadvantaging a disfavored group, regardless of whether it constitutes a recognized protected class. This principle is particularly salient here, where the government has cancelled funding for research seeking to improve health outcomes for a population that indisputably faces unique health-related challenges. And again, even if disfavoring LGBTQI+ individuals could constitute a legitimate government objective, the haphazard cancellation of hundreds of grants simply because they reference certain "magic words" has no reasonable, rational connection to that interest.

128.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered violations of their constitutional rights, and professional, academic, and financial harm.

### COUNT II: Violation of Section 1557 of the Affordable Care Act
### (All Plaintiffs Against Defendants NIH and HHS)

129.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

130.    Section 1557 of the ACA, 42 U.S.C. § 18116(a), provides that "an individual shall not … be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits [or] subsidies … or under any program or activity that is administered by an Executive Agency," on the basis of race, color, national origin, sex, age, or disability.

131.    Section 1557 also prohibits discrimination against an individual or entity based on the respective race, color, national origin, sex, age, or disability of an individual with whom the individual or entity has a relationship or association.

132.    Defendants HHS and NIH are covered entities under Section 1557 and engaging in

health or clinical research is a health program or activity under Section 1557.

133.    By terminating federal funding for research that relates to the Banned Topics, Defendants NIH and HHS have terminated, suspended, and/or are denying applications, including for renewal, of grants and/or related funding for health and clinical research, at least in part, based sex or disability because the research relates to "transgender issues," gender identity, LGBTQI+ health, or the health disparities affecting LGBTQI+ people.

134.    As a direct and proximate result of Defendants' acts of discrimination, Plaintiffs have suffered economic harm; reputational and academic injury; loss of professional, research, academic, and/or advancement opportunities; and other damages.

135.    As a direct and proximate result of Defendants' acts of discrimination, the LGBTQI+ patients of Healthcare Provider Plaintiffs are denied the benefits of federally funded health and clinical research that addresses their health needs.

136.    The conduct of Defendants NIH and HHS constitutes unlawful discrimination that violates Section 1557 of the Affordable Care Act and its implementing regulations.

137.    Plaintiffs are therefore entitled to an order and judgment, and injunctive and declaratory relief, that holds the actions of Defendants NIH and HHS are unlawful, rescinds or leaves without effect the termination of their grants, reinstates grant eligibility, and ensures that Plaintiffs' future or pending grant applications are not subjected to similar unlawful discrimination.

### COUNT III: Violation of the Fifth Amendment's Due Process Clause
### Deprivation of Protected Interests Without Required Procedure
### (All Plaintiffs Against All Defendants)

138.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

139.    Plaintiffs have constitutionally protected liberty and property interests in their continued participation in NIH-funded research grants or programs, their professional and academic reputations, and their right to fair, impartial, and rules-driven administrative processes.

140.    Defendants deprived Plaintiffs of these interests via their termination (or express or implied threat of termination) of research and/or other grant funding without providing notice, without providing a statement of rationale, and without providing a legitimate opportunity to be heard or to appeal these administrative decisions.

141.    The lack of process afforded to Plaintiffs was constitutionally inadequate and failed to comply with the fundamental requirements of due process.

142.    Defendants terminated Plaintiffs' grants without using neutral procedures or the baseline safeguards ordinarily afforded to grantees under Defendants' regulations and practices.

143.    As a direct and proximate result of these violations of due process, Plaintiffs have suffered concrete injuries, including the loss of critical funding, reputational and academic damage, and the disruption of ongoing scientific research.

144.    Plaintiffs are therefore entitled to an order and judgment, and a preliminary and permanent injunction, holding unlawful and setting aside Defendants' grant terminations and the Challenged Agency Actions underlying them.

### COUNT IV: Violation of the Fifth Amendment's Due Process Clause
### Void for Vagueness
### (All Plaintiffs Against All Defendants)

145.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

146.    Government actions are unconstitutionally vague under the Fifth Amendment when they fail to provide fair notice of what conduct is permitted or prohibited.

147.    In this case, Defendants terminated Plaintiffs' grants citing simply that each grant "no longer effectuate[d] agency priorities" based on its connection to "gender identity" or "DEI."

148.    Much of the language in the Agency Directives and terminations of Plaintiffs' grants is unconstitutionally vague. For example, researchers with NIH funding (and those seeking it) have no reasonable way to determine whether their proposed research will be terminated or

34

prohibited based on its purported relation to the Banned Topics—or whether the grant award "give[s] the perception that NIH funds can be used to support these activities." The vagueness of these undefined and often subjective terms deprives grantees of constitutionally required fair notice and encourages the type of arbitrary and discriminatory enforcement that has occurred here.

149.    Similarly, the notices of termination provided to Plaintiffs failed to explain how the *specific grants in question* violated the Agency Directives at all. They failed to explain how *the Plaintiffs'* terminated grants, for example, "support[ed] unlawful discrimination" or "ignore[d] biological realities." Without such explanation, it was impossible for Plaintiffs to know what aspect of their grants Defendants found fault with, and therefore impossible to effectively counter the reasons for termination via appeal.

150.    Plaintiffs are therefore entitled to an order and judgment, and a preliminary and permanent injunction, declaring that the termination of their grants and/or refusal to consider future grants under the "no longer effectuates agency priorities" standard—or because those grants relate to the Banned Topics—is unconstitutional and void for vagueness.

### COUNT V: Violation of the APA – Arbitrary and Capricious Agency Action
### (All Plaintiffs Against All Defendants)

151.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

152.    The APA requires that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that were taken "without observance of procedure required by law." 5 U.S.C. § 706(2).

153.    The Agency Directives and Challenged Agency Actions are "arbitrary and capricious" because Defendants have relied on factors that Congress did not intend for them to consider, entirely failed to consider important aspects of these grants, offered explanations for their decisions that run counter to the evidence, and are so implausible that they cannot be described as

a product of agency expertise.

154.    Under the APA, the Agency Directives and Challenged Agency Actions constitute final agency actions for which there is no other adequate remedy.

155.    The Agency Directives and Challenged Agency Actions failed to provide adequate reasoning to explain how any of Plaintiffs' research projects fell below federal standards for scientific research, including (1) how or why any specific project failed to meet agency priorities; (2) when, how, or why the alleged change in priorities had occurred; or (3) any data-based explanation as to why the subject grants no longer met agency standards.

156.    The Agency Directives and Challenged Agency Actions failed to consider the consequences of such directives and actions, including how they negatively impact researchers (including Plaintiffs), their institutions, their study participants, their fields of academic study, the body of research to which their grant-funded projects contributed, the communities or populations that would benefit from any of that research, or the reliance interests of each of these stakeholders.

157.    The Agency Directives and Challenged Agency Actions contradict specific portions of the Strategic Plans, policy guidelines, grant termination guidelines, other regulatory pronouncements of NIH and HHS, as well as congressional mandates.

158.    Defendants have purported to rely on a purported change in priorities that they have not sufficiently explained, and that rests on conjecture and generalized, unsupported claims regarding the alleged lack of scientific value of research aimed at improving the health of certain disfavored populations.

159.    Defendants also failed to follow their own policies in adopting the Agency Directives and taking the Challenged Agency Actions.

160.    Plaintiffs are therefore entitled to an order and judgment, and a preliminary and

permanent injunction, holding unlawful and setting aside Defendants' grant terminations and the Challenged Agency Actions underlying them.

## COUNT VI: Violation of the APA – Contrary to Law
### (All Plaintiffs Against All Defendants)

161.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

162.    The APA instructs courts to hold unlawful and set aside agency actions that are contrary to law. 5 U.S.C. § 706(2)(A).

163.    Defendants terminated Plaintiffs' grants, or have refused to consider applications for funding, in light of the Agency Directives and on the grounds that the research projects "no longer effectuate[] agency priorities."

164.    The Agency Directives and Challenged Agency Actions directly contradict congressional mandates that NIH must support such research. For instance, NIH must "encourage efforts to improve research related to the health of sexual and gender minority populations" in the research it supports. 42 U.S.C. § 283p. Congress also requires NIH to pay "special consideration to biological, social, and other determinants of health that contribute to health disparities," 42 U.S.C. § 282(b)(8)(d)(ii), and to consider "biological, social, and other determinants of health" when determining objectives for biomedical research, 42 U.S.C. § 282(m)(2)(b)(iii).

165.    In addition, the Agency Directives and Challenged Agency Actions contradict Congress's requirement for NIH to "develop, modify, or prioritize polices" to "promote opportunities for new researchers and earlier research independence," including "policies to . . . enhance workforce diversity." 42 U.S.C. §283*o*(b)(2).

166.    The Agency Directives and Challenged Agency Actions also directly contradict congressional mandates requiring NIH and its ICs to prepare and submit to Congress Strategic Plans that consider "biological, social, and other determinants of health that contribute to health

disparities," 42 U.S.C. § 282(m)(1), and to "ensure" that NIH resources "are sufficiently allocated for research projects identified in [those] strategic plans," *id.* at § 282(b)(6).

167.    The Agency Directives and Challenged Agency Actions also contravene 42 U.S.C. § 285t, which mandates that the NIMHD "shall in expending amounts appropriated … give priority to conducting and supporting minority health disparities research."

168.    Congress also appropriates funds to NIH to carry out Congress's respective statutory purposes and priorities, and when grants are terminated without reallocation, such action violates the statutory authorizations underlying Congress's appropriations.

169.    In addition, for the reasons described in Count II, Defendants' actions are contrary to Section 1557 of the Affordable Care Act and its implementing regulations.

170.    Because Defendants' actions contradict Congressional mandates, Plaintiffs are entitled to declaratory and injunctive relief, holding unlawful and setting aside Defendants' grant terminations and the Agency Directives underlying them.

### COUNT VII: Violation of the APA – Contrary to Regulation
### (All Plaintiffs Against All Defendants)

171.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

172.    Courts must hold unlawful and set aside agency actions that are contrary to federal regulations or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

173.    Federal regulations further establish a mandatory process Defendants must follow to terminate a grant. *See* 2 C.F.R. Parts 200.340 through 200.343. These required procedures include a notice providing legitimate grounds for termination (*e.g.*, 45 C.F.R. § 75.373), and a meaningful opportunity for grantees to appeal (2 C.F.R. § 200.342). Defendants did not follow any of these required procedures and made clear that no appeal would succeed.

174.    The Court must therefore hold Defendants' actions unlawful and set them aside.

**COUNT VIII: Violation of the APA – Unlawfully Withheld or Unreasonable Delay**
**(Applicant Plaintiffs Against All Defendants)**

175.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

176.    An agency must "proceed to conclude a matter presented to it," 5 U.S.C. § 555(b); accordingly, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

177.    Defendants' refusal to consider submitted grant applications pursuant to the Agency Directives constitutes final agency actions under the APA.

**COUNT IX: Violation of the APA – Contrary to Constitutional Right**
**(All Plaintiffs Against All Defendants)**

178.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

179.    The APA requires courts to "hold unlawful and set aside" any agency action that is taken "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

180.    For the reasons described in Count I (Equal Protection) and Counts III and IV (Due Process), the Agency Directives and Challenged Agency Actions are contrary to Plaintiffs' constitutional rights. In addition, as set forth in Counts VI (APA – Contrary to Law) and Count X (Separation of Powers), the Agency Directives and Challenged Agency Actions unlawfully usurp congressional authority in violation of the Separation of Powers required by the Constitution.

181.    The Court must therefore hold those actions unlawful and set them aside.

**COUNT X: Violation of the Separation of Powers**
**(All Plaintiffs Against All Defendants)**

182.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

183.    Article I of the Constitution vests Congress with the powers to make laws and control the public fisc. *See* U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1.

184.    Congress has not conditioned the federal funds for the grants administered or

disbursed by NIH or any of its ICs on research not being related to or based on the Banned Topics.

185.    Defendants' actions unlawfully usurp congress's authority, including by running counter to the NIH's statutory mandates, as outlined in Count VI (APA – Contrary to Law).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.    Enter judgment declaring as unlawful or unconstitutional (i) the Agency Directives and any other agency guidance prohibiting federal research funding, and (ii) the Challenged Agency Actions, because the research relates to the Banned Topics;

B.    Issue preliminary and permanent injunctive relief enjoining Defendants, including the ICs, their employees, agents, and successors and those in active concert or participation with them, from either: (i) implementing, enforcing, or effectuating the Agency Directives or any agency guidance setting forth "agency priorities" prohibiting federal funding, or (ii) taking any of the Challenged Agency Actions, because the research relates to the Banned Topics;

C.    Order that the terminations of Plaintiffs' affected NIH-funded grants be deemed without effect and be vacated, and that Defendants immediately reinstate Plaintiffs' affected NIH-funded grants and restore full access to all funds unlawfully withheld;

D.    Order Defendants to review all properly submitted applications as required by law;

E.    Order Defendants to expunge any and all adverse findings or designations in agency records related to application of the Agency Directives to Plaintiffs' affected NIH-funded grants;

F.    Enjoin Defendants, and those in concert or participation with them, from imposing any negative consequences on Plaintiffs or on GLMA's members for involvement in this litigation;

G.    Waive the requirement for the posting of a bond;

H.    Award Plaintiffs their reasonable attorneys' fees and costs; and

I.    Grant any other or further relief the Court may deem just and proper.

Dated: May 20, 2025

Respectfully submitted,

*/s/ Ruben F. Reyna*

Justin D. Kingsolver*
**Bryan Cave Leighton Paisner LLP**
1155 F St. NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
justin.kingsolver@bclplaw.com

Elizabeth P. Hecker*
Anuj Vohra*
Ruben F. Reyna (D. Md. Bar 14949)
Heather Sanborn*
Tai Williams*
**Crowell & Moring LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
ehecker@crowell.com
avohra@crowell.com
rreyna@crowell.com
hsanborn@crowell.com
taiwilliams@crowell.com

Alexis Ward*
**Crowell & Moring LLP**
515 South Flower Street, 41st Floor
Los Angeles, CA 90071
Telephone: (213) 622-4750
Facsimile: (213) 622-2690
award@crowell.com

Michael Vine*
**Crowell & Moring LLP**
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 263-8400
Facsimile: (949) 263-8414
mvine@crowell.com

Omar Gonzalez-Pagan**
**Lambda Legal Defense
   and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense
   and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nathan Maxwell*
**Lambda Legal Defense
   and Education Fund, Inc.**
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Telephone: (312) 663-4413
Facsimile: (855) 535-2236
nmaxwell@lambdalegal.org

Pelecanos*
**Lambda Legal Defense
   and Education Fund, Inc.**
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017
Telephone: (213) 351-6051
Facsimile: (855) 535-2236
pelecanos@lambdalegal.org

K. Lee Marshall*
Carlie Tenenbaum*
**Bryan Cave Leighton Paisner LLP**
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111

Alexander Rosen*
Jacob Zucker*
**Crowell & Moring LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
Facsimile: (212) 223-4134
arosen@crowell.com
jzucker@crowell.com

Telephone: (415) 675-3400
Facsimile: (415) 675-3434
lee.marshall@bclplaw.com
carlie.tenenbaum@bclplaw.com

* *Pro hac vice* applications forthcoming.

** Admission to the bar of the D. Md. has
been approved; swearing in pending.