**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division: Montgomery County)**

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF PHYSICIANS FOR HUMAN RIGHTS, INC. d/b/a GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ+ EQUALITY; *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL INSTITUTES OF HEALTH; *et al.*, <br><br> *Defendants.* | Civil Action No. 8:25-cv-01620-LKG |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION & STAY PENDING JUDICIAL
REVIEW PURSUANT TO 5 U.S.C. § 705**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND....................................................................................2

I.      NIH & Its History with LGBTQI+ Community ..........................................2

II.     Defendants' Anti-LGBTQI+ Actions .........................................................2

        A.      The President's Executive Orders.........................................................2

        B.      The Challenged Agency Directives .....................................................4

        C.      The Challenged Agency Actions: Plaintiffs' Grant Terminations
                and the Withholding of Review of Grant Applications ........................5

ARGUMENT .........................................................................................................7

I.      Legal Standard .........................................................................................7

II.     Plaintiffs Have Standing to Sue Over the Agency Directives and
        Challenged Agency Actions. ....................................................................7

        A.      Each Individual Plaintiff Has Standing................................................7

        B.      GLMA Has Associational Standing.......................................................8

        C.      Plaintiffs' Claims Are Ripe..................................................................9

III.    This Court—Not the Court of Federal Claims—Has Jurisdiction Over This
        Case..........................................................................................................10

        A.      Under *Bowen*, the Availability of Payment under the Tucker Act is
                Not An "Adequate Remedy" Where Plaintiffs Seek Primarily
                Equitable Relief. ................................................................................11

        B.      The Supreme Court's *Per Curiam* Order in *Department of
                Education v. California* Did Not Overrule *Bowen*...............................13

        C.      Whereas *California* Considered Only APA-based Claims,
                Plaintiffs Bring Claims Based upon Numerous Constitutional and
                Statutory Violations. ..........................................................................14

        D.      This Court's Decision in *Hometown Connections* Does Not
                Compel a Different Result. .................................................................16

        E.      Grants Are Not Contracts, and Are Not Subject to the Court of
                Federal Claims' Tucker Act Jurisdiction Except in Rare
                Circumstances. ...................................................................................17

IV.     Plaintiffs Have Established a Likelihood of Success on the Merits. ...........18

A.     The Agency Directives and Challenged Agency Actions Violate the Equal Protection Component of the Fifth Amendment [Count I]...........................................................................................18

       1.     The Challenged Actions Discriminate Based on Sex, Transgender Status, and Sexual Orientation and Thus Warrant Heightened Scrutiny. ...............................................18

       2.     The Agency Directives and Challenged Agency Actions Fail Heightened Scrutiny. .......................................22

       3.     The Agency Directives and Challenged Agency Actions Fail Even Rational Basis Scrutiny. .........................23

V.     The Agency Directives and Challenged Agency Actions Violate Section 1557 of the Affordable Care Act [Count II]. ...................................25

VI.    The Agency Directives and Challenged Agency Actions Violate the Constitutional Separation of Powers [Count X]. ...........................................28

VII.   The Agency Directives and Challenged Agency Actions Violate the Administrative Procedure Act.......................................................30

A.     The Agency Directives and Terminations Constitute Final Agency Action.......................................................................30

B.     Defendants' Directives and Terminations Are Arbitrary and Capricious [Count V]......................................................31

C.     The Agency Directive and Challenged Agency Actions Are Contrary to Both Federal Law and Regulation [Counts VI and VII]...............................................................................33

D.     Defendants Violate the APA by Unlawfully Withholding Applications from Review and Unreasonably Delaying NOAs [Count VIII]...........................................................35

E.     Defendants' Directives and Terminations Are Contrary to Constitutional Rights or Powers [Count IX]........................37

VIII.  Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction. ......................37

IX.    The Balance of Equities and the Public Interest Favor a Preliminary Injunction. .......................................................................39

CONCLUSION...........................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
    2025 WL 1380421 (D.D.C. May 13, 2025) .......................................................14, 17

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
    2025 WL 833917 (D. Md. Mar. 17, 2025) ..............................................31, 32, 35

*Am. Bar Ass'n v. Dep't of Just.*,
    2025 WL 1388891 (D.D.C. May. 14, 2025) ..............................................................16

*Am. Fed. of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
    2025 WL 868953 (D. Md. Mar. 20, 2025) ................................................................40

*Ashtari v. Pompeo*,
    496 F. Supp. 3d. 462 (D.D.C. 2020) ........................................................................36

*Ass'n of Am. Publishers, Inc. v. Frosh*,
    586 F. Supp. 3d 379 (D. Md. 2022) .........................................................................39

*Begum v. U.S. Dep't of State*,
    2022 WL 16575703 (D. Md. Oct. 31, 2022) ...........................................................36

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................30

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ............................................................................................30

*Bishop v. Smith*,
    760 F.3d 1070 (10th Cir. 2014) ..............................................................................21

*Bostic v. Schaefer*,
    760 F.3d 352 (4th Cir. 2014) ..................................................................................20

*Bostock v. Clayton Cnty., Ga.*,
    590 U.S. 644 (2020) ..........................................................................................19, 27

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ..........................................................................................*passim*

*Brown & Williamson Tobacco Corp. v. FDA*,
    153 F.3d 155 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) .....................................34

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*,
   2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ...............................................26

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*,
   536 F.Supp.3d 791 (W.D. Wash. 2021)...............................................................26

*California v. Dep't of Educ.*,
   2025 WL 725103 (D. Mass. Mar. 6, 2025)...........................................................15

*Casa de Md., Inc. v. Wolf*,
   486 F.Supp.3d 928 (D. Md. 2020).........................................................................7

*Charter Fed. Sav. Bank v. Off. of Thrift Supervision*,
   976 F.2d 203 (4th Cir. 1992) .................................................................................9

*Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of the L. v.
   Martinez*,
   561 U.S. 661 (2010)..............................................................................................20

*Cincinnati Soap Co. v. United States*,
   301 U.S. 308 (1937)..............................................................................................28

*City & Cnty. of S.F. v. Azar*,
   411 F.Supp.3d 1001 (N.D. Cal. 2019) ...................................................................8

*City & Cnty. of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) .............................................................................28

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)........................................................................................21, 24

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
   2025 WL 1393876 (9th Cir. May 14, 2025) .........................................................16

*Coleman v. Kendall*,
   74 F.4th 610 (4th Cir. 2023) ..........................................................................11, 13

*Colorado v. HHS*,
   2025 WL 1426226 (D.R.I. May 16, 2025) ............................................................14

*Columbus Reg'l Hosp. v. United States*,
   990 F.3d 1330 (Fed. Cir. 2021)............................................................................11

*Darden v. Peters*,
   488 F.3d 277 (4th Cir. 2007) ...............................................................................33

*Deese v. Esper*,
   483 F.Supp.3d 290 (D. Md. 2020)........................................................................33

*Dekker v. Weida*,
679 F.Supp.3d 1271 (N.D. Fla. 2023), appeal argued, No. 23-12155 (11th Cir.
Nov. 22, 2024) ........................................................................................................24

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................................7, 8, 31

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ...................................................................................................33

*Department of Education v. California*,
145 S. Ct. 966 (2025) .............................................................................................13

*Evancho v. Pine-Richland Sch. Dist.*,
237 F.Supp.3d 267 (W.D. Pa. 2017) ......................................................................19

*Fain v. Crouch*,
545 F. Supp. 3d 338 (S.D.W. Va. 2021) .................................................................26

*Fain v. Crouch*,
618 F. Supp. 3d 313 (S.D.W. Va. 2022), *aff'd sub nom. Kadel*, 100 F.4th 122
(4th Cir. 2024)........................................................................................................26

*Falls v. Prince George's Hosp. Ctr.*,
1999 WL 33485550 (D. Md. Mar. 16, 1999)..........................................................28

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...............................................................................................31

*FDA. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024).................................................................................................7

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...............................................................................................34

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) ..............................................................................19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................................................................8

*Giovani Carandola, Ltd. v. Bason*,
33 F.3d 507 (4th Cir. 2002) ...................................................................................39

*Gonzalez v. Cuccinelli*,
985 F.3d 357 (4th Cir. 2021) .................................................................................36

*Grabowski v. Ariz. Bd. of Regents*,
   69 F.4th 1110 (9th Cir. 2023) ...............................................................................27

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir.) ........................................................................................19

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
   551 F. Supp. 3d 567 (D. Md. 2021), *appeal filed*, No. 23-1394 (4th Cir. 2023) ....................27

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir.) ......................................................................................19

*HIAS, Inc. v. Trump*,
   415 F. Supp. 3d 669 (D. Md. 2020) .....................................................................39

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ...........................................................................7, 37

*Hively v. Ivy Tech Cmty. Coll. of Ind.*,
   853 F.3d 339 (7th Cir. 2017) (*en banc*) ..............................................................28

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ...............................................................................................8

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ............................................................................29

*Just Puppies, Inc. v. Frosh*,
   565 F.Supp.3d 665 (D. Md. 2021), *aff'd sub nom. Just Puppies, Inc. v. Brown*,
   123 F.4th 652 (4th Cir. 2024) ..............................................................................23

*Kadel v. Folwell*,
   100 F.4th 122 (4th. Cir. 2024) ..........................................................19, 22, 23, 27

*Kadel v. Folwell*,
   2022 WL 17415050 (M.D.N.C. Dec. 5, 2022), *aff'd*, 100 F.4th 122 .....................26

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
   56 F.3d 279 (D.C. Cir. 1995) ..........................................................................11, 15

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   570 U.S. 595 (2013) .............................................................................................28

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) .............................................................................................12

*Lawrence v. Texas*,
   539 U.S. 558 (2003) .............................................................................................20

*Leaders of Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ....................................................................39, 40

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ....................................................................................30

*Maine v. U.S. Dept. of Agric.*,
  2025 WL 1088946 (D. Me. Apr. 11, 2025) ...............................................14

*Massachusetts v. Kennedy*,
  2025 WL 1371785 (D. Mass. May 12, 2025) .......................................14, 31

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
  682 F.3d 1 (1st Cir. 2012) ..........................................................................21

*Mathews v. Lucas*,
  427 U.S. 495 (1976) ....................................................................................23

*Md. Shall Issue, Inc. v. Hogan*,
  971 F.3d 199 (4th Cir. 2020) ........................................................................7

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ..............................................................10, 16

*Middle E. Broad. Networks, Inc. v. United States*,
  2025 WL 1378735 (D.C. Cir. May 7, 2025) (*en banc*) .............................14

*Miller v. Brown*,
  462 F.3d 312 (4th Cir. 2006) ...................................................................9, 10

*Miranda v. Garland*,
  34 F.4th 338 (4th Cir. 2022) .......................................................................37

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ....................................................................................22

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ......................................................................37

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  2025 WL 573764 (D. Md. Feb. 21, 2025) ..................................................40

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  763 F. Supp. 3d 36 (D.D.C. 2025) ..............................................................30

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) ........................................................................30

*NFIB v. OSHA*,
  595 U.S. 109 (2022)................................................................30

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)................................................................35

*Obergefell v. Hodges*,
  576 U.S. 644 (2015)................................................................20

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002)................................................................8

*Palmore v. Sidoti*,
  466 U.S. 429 (1984)................................................................8

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981)................................................................28

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979)................................................................21

*PFLAG, Inc. v. Trump*,
  2025 WL 685124 (D. Md. Mar. 4, 2025)........................................ *passim*

*Randall v. United States*,
  95 F.3d 339 (4th Cir. 1996) ................................................................13

*Reed v. Reed*,
  404 U.S. 71 (1971)................................................................19

*Rhode Island v. Trump*,
  2025 WL 1303868 (D.R.I. May 6, 2025), *appeal filed*, No. 25-1477 (1st Cir.
  May 20, 2025)................................................................15, 16

*Romer v. Evans*,
  517 U.S. 620 (1996)................................................................21, 24, 25

*S.F. Unified Sch. Dist. v. AmeriCorps*,
  2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) ................................................................15

*Sierra Club v. Dep't of Interior*,
  899 F.3d 260 (4th Cir. 2018) ................................................................31, 32, 33

*SmithKline Beecham Corp. v. Abbott Lab'ys*,
  740 F.3d 471 (9th Cir. 2014) ................................................................20

*Solutions in Hometown Connections v. Noem*,
  2025 WL 1103253 (D. Md. Apr. 14, 2025)................................................................16, 17

*South Dakota v. Dole,*
    483 U.S. 203 (1987)........................................................................................28

*Southern Education Foundation v. Department of Education,*
    2025 WL 1453047 (D.D.C. May 21, 2025), *appeal filed*, No. 25-5144 (D.C.
    Cir. Apr. 24, 2025)............................................................................14, 16

*Strickland v. United States,*
    32 F.4th 311 (4th Cir. 2022) ............................................................19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023)..........................................................................8

*T.S. by & through T.M.S. v. Heart of CarDon, LLC,*
    43 F.4th 737 (7th Cir. 2022) ............................................................26

*Telecomms. Rsch. & Action Ctr. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ............................................................36

*Thomasson v. Perry,*
    80 F.3d 915 (4th Cir. 1996) ............................................................20

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973)....................................................................21, 22

*U.S. Dept. of Navy v. Fed. Lab. Rels. Auth.,*
    665 F.3d 1339 (D.C. Cir. 2012) ........................................................28

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
    517 U.S. 544 (1996)..........................................................................9

*United States v. Virginia,*
    518 U.S. 515 (1996)....................................................................19, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)..........................................................................24

*Warth v. Seldin,*
    422 U.S. 490 (1975)..........................................................................9

*Washington v. Davis,*
    426 U.S. 229 (1976)..........................................................................18

*Washington v. Trump,*
    2025 WL 659057 (W.D. Wash. Feb. 28, 2025) ..................................8

*Weinberger v. Wiesenfeld,*
    420 U.S. 636 (1975)..........................................................................18

*Whitewood v. Wolf,*
   992 F. Supp. 2d 410 (M.D. Pa. 2014) ...................................................................20

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
   485 F.Supp.3d 1 (D.D.C. 2020) .................................................................8, 40

*Widakuswara v. Lake,*
   2025 WL 1166400 (D.D.C. Apr. 22, 2025) ...........................................................14

*Williams v. Kincaid,*
   45 F.4th 759 (4th Cir. 2022) ...............................................................................27

*Windsor v. United States,*
   699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) .................................20, 21

*Zarda v. Altitude Express, Inc.,*
   883 F.3d 100 (2d Cir. 2018) (*en banc*), *aff'd sub nom. Bostock*, 590 U.S. 644
   (2020) ...............................................................................................................27

**Statutes**

5 U.S.C. § 555(b) ...........................................................................................................35

5 U.S.C. § 702 ................................................................................................................10

5 U.S.C. § 704 .........................................................................................................10, 30

5 U.S.C. § 705 ..................................................................................................................7

5 U.S.C. § 706(1) ...........................................................................................................35

5 U.S.C. § 706(2)(A) ......................................................................................................33

5 U.S.C. § 706(2)(B) ......................................................................................................37

5 U.S.C. § 706(2)(C) ......................................................................................................33

28 U.S.C. § 1491(a)(1) ...................................................................................................17

31 U.S.C. § 1301(a) .......................................................................................................28

31 U.S.C. § 6301, *et seq* ................................................................................................18

31 U.S.C. § 6304 ............................................................................................................18

42 U.S.C. § 241 ..............................................................................................................29

42 U.S.C. § 282(b) .........................................................................................................29

42 U.S.C. § 282(b)(8)(d)(ii) ...................................................................................29, 32, 34

42 U.S.C. § 282(m)(1) ...............................................................................................33, 34

42 U.S.C. § 282(m)(2)(A) ..............................................................................................2, 34

42 U.S.C. § 282(m)(2)(B)(iii) ..........................................................................2, 29, 32, 34

42 U.S.C. § 282(m)(4) ........................................................................................................33

42 U.S.C. §283p ................................................................................................2, 29, 32, 34

42 U.S.C. § 284(b) ..............................................................................................................29

42 U.S.C. § 284(b)(1) ........................................................................................................29

42 U.S.C. § 284a(a) ............................................................................................................36

42 U.S.C. § 284a(e) ............................................................................................................36

42 U.S.C. § 289a .........................................................................................................29, 36

42 U.S.C. § 289a-2(a) ..........................................................................................................2

42 U.S.C. § 18116(a) ...................................................................................................25, 26

**Regulations**

42 C.F.R. § 52.5 ..................................................................................................................36

42 C.F.R. § 52h.7 ................................................................................................................36

45 C.F.R. pt. 16 ..................................................................................................................35

45 C.F.R. § 75.374(a) .........................................................................................................35

45 C.F.R. § 92.4 ..................................................................................................................26

45 C.F.R. § 92.101(a) .........................................................................................................27

45 C.F.R. § 92.209 ..............................................................................................................27

FAR § 2.101 ........................................................................................................................18

**United States Constitution**

U.S. Const. art. I, § 9, cl. 7 ................................................................................................28

U.S. Const. art. II, § 3 ........................................................................................................29

**Other Authorities**

EO No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90
Fed. Reg. 8237 (Jan. 20, 2025) ................................................................................24

EO No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to
Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025) ...........................................24

EO No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg.
8757 (Jan. 27, 2025) ..................................................................................................24

EO No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg.
8853 (Jan. 29, 2025) ..................................................................................................24

EO No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5,
2025) ..........................................................................................................................24

*Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522 (May
6, 2024) ................................................................................................................26, 27

## INTRODUCTION

The National Institutes of Health ("NIH") has long been the global leader in funding the world's most important medical research, which for years, included Plaintiffs' research focused on health disparities and the health needs of LGBTQI+ people, also known as sexual and gender minorities ("SGM"). Recently, however, the President issued several executive orders and directives targeting LGBTQI+ people—particularly those who are transgender—for discrimination, including by barring diversity, equity, and inclusion initiatives. Following these actions, NIH and other Defendants abruptly cancelled hundreds of research grants—totaling more than $800 million in funding—dedicated to the health of LGBTQI+ people (*see* **Exs. 6 and 26**) and decreed that the government will not fund such research.[1]

These research grants, which provided critical funding for evidence-based research on mental health, suicide prevention, intimate partner violence, youth development, autism, cancer, tobacco use, antibiotic resistance, pregnancy outcomes, and HIV/AIDS care (to name just a few), were terminated because they related in some way to studying or improving the health and well-being of LGBTQI+ people. Defendants' actions in this regard have not only upended the lives of scientists and healthcare providers who have devoted years of specialized education, training, and research to this work, but have also endangered countless LGBTQI+ people whose lives depend on inclusive, data-driven health research. Without intervention, NIH's betrayal of both its mission and funding commitments will result in incalculable harm, including the midstream abandonment of life-saving research and the silencing of vital academic voices.

Plaintiffs ask this Court to intervene to stop Defendants' unconscionable, unlawful, and unconstitutional actions by enjoining Defendants' implementation and enforcement of their

---

[1] Unless otherwise noted, all exhibits cited in this brief are to the Declaration of Omar Gonzalez-Pagan.

discriminatory guidance, their discriminatory grant terminations, and their discriminatory suspension of application processes for grants related to LGBTQI+ health research.

## FACTUAL BACKGROUND

### I.    NIH & Its History with LGBTQI+ Community

Despite the federal government's checkered history of hostility and neglect towards sexual and gender minorities, NIH had stood out in its equitable treatment of LGBTQI+ people. In 1993, Congress directed NIH to ensure that women and "members of minority groups" are included in the clinical research it funds through the NIH Revitalization Act. 42 U.S.C. § 289a-2(a). In the decades since, NIH has reiterated the need for research focused on LGBTQI+ health multiple times. **Ex. 11**.

For example, in the decade preceding 2022, NIH and its component Institutes and Centers ("ICs") had funded more than a thousand unique awards relating to sexual and gender minority health, totaling more than $491 million in first-year funding. **Ex. 21**. In 2016, Congress specifically directed NIH to fund research aimed toward studying and improving the health of the LGBTQI+ community. *See* 42 U.S.C. §283p.

In addition, by law, NIH's Strategic Plan must "consider … biological, social, and other determinants of health that contribute to health disparities." 42 U.S.C. § 282(m)(2)(A), (B)(iii). The operative Strategic Plan identifies five key "Crosscutting Themes" that "span all aspects of NIH's Strategy." **Ex. 10** at 32. The first of these is "Improving Minority Health and Reducing Health Disparities," under which NIH commits to including LGBTQI+ people "in all relevant research, such that there is sufficient representation of each population." *Id.*

### II.    Defendants' Anti-LGBTQI+ Actions

#### A.    The President's Executive Orders

In his first two days in office, President Trump issued three sweeping executive orders

("EOs") targeting LGBTQI+ people for discrimination, with a particular emphasis on transgender people. On day one, President Trump issued Executive Order 14168 (the "Gender EO") (**Ex. 1**), which, under the guise of "defend[ing] women's rights," expresses a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity. The Gender EO defines what it terms "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." Gender EO § 2(f). The Gender EO demands that agencies, *inter alia*, "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and prohibit the use of federal funds "to promote gender ideology." *Id.* §§ 3(e), (g).

And though "SGM individuals may encounter SGM-specific health inequities, as well as inequities stemming from other facets of their identity," such as race, ethnicity, ability status, age, and HIV status, in addition to sexual orientation and transgender status, **Ex. 11** at 5, through Executive Order 14151 ("DEI-1 EO") (**Ex. 2**), President Trump directed agencies to "coordinate the termination of all . . . 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." DEI-1 EO §2(a). The DEI-1 EO specifically requires the termination of all "'equity-related' grants or contracts," falsely declaring such initiatives to be "illegal and immoral discrimination programs."

On January 21, President Trump issued Executive Order 14173 ("DEI-2 EO") (**Ex. 3**), which requires federal officials to "excise references to DEI and DEIA principles" from federal grants and to "terminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities[.]" DEI-2 EO § 3(B)(c)(ii), (iii).

On January 27, pursuant to the EOs, the Office of Management and Budget "temporarily pause[d] all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by" the Gender, DEI-1, or DEI-2 EOs, specifically targeting financial assistance for DEI and "woke gender ideology." **Ex. 13**.

B.    **The Challenged Agency Directives**

On February 10, the acting HHS Secretary issued a directive ordering agency personnel to review and terminate "grants that support DEI and similar discriminatory programs," which she labeled newly "inconsistent with the Department's policy." **Ex. 4**.  She directed agency personnel to "pause all payments" until it could be determined whether grants were "consistent with current policy priorities," and specifically noted that "grants may be terminated." *Id.* On February 12 and 13, NIH leadership issued a series of internal memoranda placing "hard restrictions on awards … where the program promotes or takes part in [DEI] initiatives," pending a review of whether "funding of the activities/programs are … consistent with current policy priorities." **Ex. 22**; *see also* Exs. 23 and 24. NIH leadership commanded that any grant supporting DEI "must be fully restricted." **Ex. 24.**

On February 21, the NIH Director issued a "Directive on NIH Priorities." **Ex. 5**. The directive proclaims that NIH's mission requires it "to ensure that it is not supporting low-value and off-mission research programs, including but not limited to studies based on diversity, equity, and inclusion (DEI) and gender identity" and that "this description of NIH's mission is consistent with recent Executive Orders issued by the President." The directive declared that "it is the policy of NIH not to prioritize such research programs" and instructed "NIH personnel … [to] ensur[e] NIH grants, contracts, cooperative agreements, and other transactions do not fund or support … DEI and gender identity research activities and programs."

On February 28, NIH leadership went further, directing that three categories of "DEI

related" awards had to be "completely excise[d]." **Exs. 6, 19, and 20**. Along with instructions to terminate grants whose "purpose" was "DEI related," NIH leadership provided boilerplate language for personnel to use in termination notices.  NIH leadership instructed personnel to say:

> "This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities.  It is the policy of NIH not to further prioritize these research programs.  Therefore, the award is terminated . . . [.]"

On March 25, NIH leadership issued more internal guidance, reiterating that "NIH will no longer prioritize research and research training programs that focus on [DEI]." **Ex. 8**. In it, NIH leadership told agency staff that "it is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g. China or South Africa, etc.]." *Id.*

Plaintiffs refer to these internal NIH directives and guidance as the "**Agency Directives**."

### C.   The Challenged Agency Actions: Plaintiffs' Grant Terminations and the Withholding of Review of Grant Applications

To effectuate the EOs and the Agency Directives, NIH began its anti-LGBTQI+ purge of grants. **Exs. 6 and 26**. NIH sent nearly identical termination notices to all impacted LGBTQI+-research-related grantees, with the same boilerplate language provided in the February 28 Directive. For example, notices terminated grants that NIH deems relate to "transgender issues" contained the same boilerplate language:

> This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.[2]

---

[2] *See*, *e.g.*, Arayasirikul Decl. ¶¶ 16, 18, 20; Beccia Decl. ¶ 12; Garofalo Dec. ¶ 14; Holmes Decl. ¶ 13 & Exhibit B at 5; Littleton Decl. ¶ 12; Moe Decl. ¶¶ 10, 17; Murchison Decl. ¶ 12; Phillips Dec. ¶ 24; Poe Decl. ¶¶ 13, 15, & Exhibit A at 5; Roe Decl. ¶ 14; Soe Decl. ¶ 19 & Exhibit E at 5; Spinelli Decl. ¶ 12; Streed Decl. ¶ 15.

Other notices terminated grants the NIH appears to have considered "DEI-related" stated:

> This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.[3]

Several termination notices contained language making clear that appealing the termination would be futile: "[N]o corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities."[4]

Under these same directives, Defendants have withheld decisions on pending applications, removed submitted applications from study sections, or withheld Notices of Award ("NOA") on previously approved submissions.[5]

Together, "gender identity," "transgender issues," "diversity," "equity," "equity objectives," "inclusion," "accessibility," "DEI," "LGBTQI+ health," "sexual orientation," and "gender ideology" are referred to as the **Banned Topics**." The terminations, suspensions, or withholding of grants, and the denials, delays, refusals to consider, or withholding from review of applications or renewal applications for grants and/or related funding because the research relates to the Banned Topics are collectively referred to as the **Challenged Agency Actions**."

---

[3] *See* Birkett Decl. ¶ 11; Brewer Decl. ¶ 15; Garofalo Decl. ¶¶ 11, 17, 20, 23; Hassmiller Decl. ¶ 15; Noar Decl. ¶ 12; Peitzmeier Decl. ¶ 12; Phillips Decl. ¶ 17; Poe Decl. ¶ 20; Ribisl Decl. ¶ 14; Umberson Decl. ¶ 10.

[4] *See, e.g.*, Arayasirikul Decl. ¶¶ 16, 18, 20; Beccia Decl. ¶ 20; Birkett Decl. ¶ 15; Brewer Decl. ¶ 15; Garofalo Decl. ¶¶ 11, 14, 17, 20, 23, 26, 29; Hassmiller Decl. ¶ 15; Holmes Decl. ¶ 18; Littleton Decl. ¶ 17; Moe Decl. ¶¶ 14, 22; Murchison Decl. ¶ 12; Noar Decl. ¶ 12; Peitzmeier Decl. ¶ 12; Phillips ¶ 25; Poe Decl. ¶ 26; Ribisl Decl. ¶ 14; Roe Decl. ¶ 15; Soe Decl. ¶ 19; Spinelli Decl. ¶ 12; Streed Decl. ¶¶ 15, 16; Umberson Decl. ¶ 12.

[5] *See, e.g.*, Streed Decl. ¶ 25; Arayasirikul Decl. ¶ 26; Littleton Decl. ¶ 23; Murchison Decl. Fn. 2; Peitzmeier Decl. ¶¶ 18-19; Umberson Decl. ¶ 18; Poe Decl. ¶¶ 10, 21-24.

**ARGUMENT**

I.    **Legal Standard**

To obtain a preliminary injunction, plaintiffs must show they are: "(1) … likely to succeed

on the merits of the claim; (2) … likely to suffer irreparable harm in the absence of an injunction;

(3) the balance of hardships weighs in the[ir] favor; and (4) the injunction serves the public

interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021).

In addition, the APA authorizes a reviewing court to stay "agency action" pending judicial

review "to prevent irreparable injury." 5 U.S.C. § 705. The standard for granting a § 705 stay is

the same as for obtaining a preliminary injunction. *See Casa de Md., Inc. v. Wolf*, 486 F.Supp.3d

928, 949–50 (D. Md. 2020).

II.   **Plaintiffs Have Standing to Sue Over the Agency Directives and Challenged Agency Actions.**

"To have standing, a plaintiff must present an injury that is concrete, particularized, and

actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be

redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (cleaned

up). Each individual plaintiff and GLMA satisfies this standard.

A.    **Each Individual Plaintiff Has Standing.**

As a direct result of Defendants' conduct, Individual Plaintiffs have lost millions of dollars

in terminated grants and grant applications whose review has been withheld, which establishes

Article III standing. *Dep't of Com.*, 588 U.S. at 767 ("[L]os[ing] out on federal funds" is "a

sufficiently concrete and imminent injury to satisfy Article III."); *see also Md. Shall Issue, Inc. v.

Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) ("[F]inancial harm is a classic and paradigmatic form

of injury in fact.") (cleaned up). Plaintiffs have also been harmed by the infringement of their

constitutional rights. *FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Defendants

7

have deprived them of funding because they research, study, and care for LGBTQI+ people, government action that classifies based on sex, sexual orientation, and/or transgender status. *See*, *e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 433-34 (1984) (custody determination based on mother's spouse's race constituted racial classification).

Healthcare Provider Plaintiffs also have third-party standing on behalf of their LGBTQI+ patients who are deprived of federally funded research involving their health needs. It is well established that healthcare providers can assert the equal protection rights of their patients. *See*, *e.g.*, *Washington v. Trump*, 2025 WL 659057, at *8 (W.D. Wash. Feb. 28, 2025); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 34–36 (D.D.C. 2020); *City & Cnty. of S.F. v. Azar*, 411 F.Supp.3d 1001, 1011 (N.D. Cal. 2019).

### B.    GLMA Has Associational Standing.

GLMA has associational standing because: (1) "[their] members would otherwise have standing to sue in their own right"; (2) "the interests [they] seek[] to protect are germane to the organization[s'] purpose[s]"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199–201 (2023).[6]

*First*, GLMA has members who would otherwise have standing to sue because they have suffered and will continue to suffer concrete, particularized, and actual injuries directly traceable to the government's unlawful grant terminations. *See Dep't of Com.*, 588 U.S. at 766; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). GLMA's

---

[6] GLMA also has derivative standing to assert claims on behalf of the LGBTQI+ patients of its healthcare provider members, like Drs. Streed, Spinelli, and Garofalo. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 293 (3d Cir. 2002) ("If on remand the Pennsylvania Psychiatric Society warrants associational standing to represent its members, we conclude it also may have derivative authority to raise the claims of its members' patients.").

membership includes researchers whose grants have been terminated or withheld based on the Agency Directives. Sheldon Decl. ¶ 9. Defendants' actions have injured GLMA's members in the same way as the individual plaintiffs, several of whom are themselves GLMA members.[7]

*Second*, GLMA is seeking to protect interests germane to its purpose because the terminated grants are inherently tied to its mission of ensuring health equity for LGBTQI+ people, and equality for LGBTQI+ health professionals. Sheldon Decl. ¶ 6. This mission includes addressing the full range of health issues facing LGBTQI+ people, including ensuring that sound science and research inform health policy impacting those communities.  Sheldon Decl. ¶ 8.

*Third*, GLMA's claims do not require the participation of each individual member. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members[.]") (cleaned up). Because Plaintiffs' claims turn solely on the unlawfulness of Defendants' conduct and not on the terms of individual grant agreements, any remedy would inure to the benefit of all of GLMA's members. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975).

### C.    Plaintiffs' Claims Are Ripe.

Plaintiffs' claims are fit for judicial decision because they are "purely legal." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see also Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992). They present a "facial challenge" to the Agency Directives and Challenged Agency Actions prohibiting funding for research related to gender identity, LGBTQI+ health, or DEI. *See PFLAG, Inc. v. Trump*, 2025 WL 685124, at *7 (D. Md.

---

[7] *See, e.g.*, Arayasirikul Decl. ¶ 5; Brewer Decl. ¶ 5 ; Holmes Decl. ¶ 4; Murchison Decl. ¶ 5; Peitzmeier Decl. ¶ 4; Phillips Decl. ¶ 6; Ribisl Decl. ¶ 4; Soe Decl. ¶ 4; Streed Decl. ¶ 5; *see also*, *e.g.*, Beccia Decl. ¶ 3; Garofalo Decl. ¶ 3; Moe Decl. ¶ 4; Spinelli Decl. ¶ 3.

Mar. 4, 2025). Moreover, the success or failure of any Plaintiff's pending appeal of their grant termination does not undermine ripeness. First, as several of the termination notices acknowledged, any appeal is almost certainly futile. *See Miller*, 462 F.3d at 319. Second, Plaintiffs seek to enjoin *future* terminations and withholding of grants based on alleged connections to "gender identity" or "DEI." The success or failure of any appeal would not preclude the Court from adjudicating the lawfulness of terminating or withholding approval of funding on those bases.

## III.    This Court—Not the Court of Federal Claims—Has Jurisdiction Over This Case.

Plaintiffs seek only declaratory and injunctive relief. Their claims are not founded upon any express or implied contract with the United States, nor do they seek money damages for breach of contract. What is more, in addition to their APA claims, Plaintiffs' other claims are constitutional or statutory, not contractual, in nature. ***Nothing in the Tucker Act divests this Court of jurisdiction to remedy constitutional or statutory harms.*** These facts are fatal to any argument that jurisdiction lies exclusively in the Court of Federal Claims ("CFC").

The government has argued that the appropriate forum for similar APA claims is not District Court, but the CFC, because such claims sound in contract and would result in monetary relief. Not so. "[T]he mere fact that a court may have to rule on a contract issue does not … automatically transform an action … into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The APA provides that any "person suffering legal wrong because of agency action … is entitled to judicial review thereof," where they are "seeking relief other than money damages" and "there is no other adequate remedy" for such action in another court. 5 U.S.C. §§ 702, 704; *see also Megapulse*, 672 F.2d at 968 ("The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).") (citation omitted).

Here, Plaintiffs' Complaint expressly states that they "***do not seek money damages***." Compl. ¶18 (emphasis added). Instead, Plaintiffs "seek an order declaring as unlawful Defendants' sweeping termination of grants, or the withholding of review of applications therefor, because they related to LGBTQI+ health, in violation of Plaintiffs' constitutional, statutory, and regulatory rights, and enjoining Defendants from rescinding, terminating, denying, refusing to consider, or withholding from review grants on such prohibited bases."  *Id*.; *see also id*. at 40 (Prayer for Relief). In short, Plaintiffs seek equitable relief, much of it forward-looking, unavailable in the CFC. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) ("[W]e have stated categorically that 'the Court of [Federal] Claims has no power to grant equitable relief.'") (citation omitted); *see also Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023) (CFC "lacks power to grant equitable relief."); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1353 (Fed. Cir. 2021) (when "a plaintiff is seeking equitable relief, … the case is not properly before the Court of Federal Claims.").

Because the Tucker Act has no bearing on Plaintiffs' constitutional and non-APA statutory claims, and because there is no "adequate remedy" at the Court of Federal Claims with regards to Plaintiffs' APA claims, this Court has jurisdiction.

### A.    Under *Bowen*, the Availability of Payment under the Tucker Act is Not An "Adequate Remedy" Where Plaintiffs Seek Primarily Equitable Relief.

The government has argued in other grant termination challenges that because the restoration of terminated grants would necessarily result in money flowing to plaintiffs, they are in actuality seeking money damages properly adjudicated under the CFC's Tucker Act jurisdiction. But the Supreme Court rejected that argument in *Bowen*, explaining "***[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages***.'" *Bowen*, 487 U.S. at 893 (emphasis added); *see also Kidwell v.*

*Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("[A] claim is not for money merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff.") (cleaned up).

*Bowen* considered Massachusetts's challenge to HHS's determination that certain state-provided services were ineligible for Medicaid reimbursement, resulting in payment disallowances of upwards of $10 million. *Bowen*, 487 U.S. at 885-87. Massachusetts filed an APA suit in district court, seeking as injunctive relief that the court "set aside" HHS' disallowance determinations. *Id.* at 887. On appeal, HHS argued that the district court lacked jurisdiction over the APA claims, because the state was not "seeking relief other than money damages," and thus those claims belonged in the CFC under the Tucker Act. The *Bowen* Court rejected that argument:

> Our cases have long recognized the distinction between an action at law for damages . . . and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for "the recovery of specific property or *monies*[.]"

*Id.* at 893 (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 688 (1949)).

The *Bowen* Court further explained that Massachusetts's effort to enforce the Medicaid Act's language directing that HHS "shall pay" for the services at issue was "not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, ***it [was] a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money***." *Bowen*, 487 U.S. at 900 (emphasis added).

Finally, the *Bowen* Court rejected HHS's "unprecedented" read of the APA to divest the district court of jurisdiction where "the availability of any review of a disallowance decision in the Claims Court [was] doubtful" because that court "does not have the general equitable powers of a district court to grant prospective relief." *Id.* at 904-905. Absent the possibility of equitable relief, the Tucker Act did not provide an "adequate remedy" for the state's claims. *Id.* at 913.

Heeding *Bowen*, the Fourth Circuit has instructed that the salient question in considering the appropriate forum for a claim against the United States implicating a payment of monies is "whether [a plaintiff] has an available remedy under the Tucker Act." *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996). Applying that test, the *Randall* court affirmed a district court's jurisdiction over a service member's APA challenge to his denial of a promotion, which included a request for a retroactive promotion with back pay. *Id.* at 342, 347. The *Randall* court agreed that plaintiff's claims "were primarily for equitable relief" and that the "claim for money damages in the form of back pay ***was merely subordinate to [plaintiff's] equitable claims***." *Id.* at 347 (emphasis added). The *Randall* court further explained that any monetary relief the CFC might award was not an "adequate remedy" because "[t]he injunctive relief requested by Plaintiff would not be available under the Tucker Act[.]" *Id.*; *see also Coleman*, 74 F.4th at 615 (APA jurisdiction appropriate where "plaintiff seeks primarily injunctive relief[,]" even if relief may result in monetary payment by United States). The same is true here.

### B. The Supreme Court's *Per Curiam* Order in *Department of Education v. California* Did Not Overrule *Bowen*.

In *Department of Education v. California*, the Supreme Court stayed a district court's temporary restraining order enjoining numerous Department of Education grant terminations on the grounds that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," and that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" 145 S. Ct. 966, 968 (2025) (citation omitted). The government has seized upon the order in *California* to argue against district court APA jurisdiction over claims arising out of grant terminations. But as multiple courts have recognized, the decision in *California* was issued from the Court's "emergency docket, without full briefing or hearing, … and its precedential value

is thus limited." *Maine v. U.S. Dept. of Agric.*, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (citations omitted). Most importantly, *California* did not—and could not—overrule *Bowen*. *See Colorado v. HHS*, 2025 WL 1426226, at *9 (D.R.I. May 16, 2025).

Unsurprisingly, courts considering challenges to grant terminations after *California* have almost unanimously held that the order ***does not*** alter the legal landscape for claims for equitable relief arising out of agency grant terminations, and that *Bowen* continues to guide the analysis. For example, in *Southern Education Foundation v. Department of Education* ("*SEF*"), the district court explained that "the Supreme Court's stay order in [*California*] does not displace governing law that guides this Court's assessment of whether [plaintiff's] claims are essentially contract claims such that jurisdiction properly lies with the Court of Federal Claims." 2025 WL 1453047, at *8–9 (D.D.C. May 21, 2025), *appeal filed*, No. 25-5144 (D.C. Cir. Apr. 24, 2025); *see also Widakuswara v. Lake*, 2025 WL 1166400, at *9 (D.D.C. Apr. 22, 2025) ("*California* does not change the governing law," which holds that "whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" (cleaned up)).[8]  In sum, "[t]he case that 'directly controls,' and the one that the Court must follow, is *Bowen*."[9] *Colorado*, 2025 WL 1426226, at *9 (citation omitted).

### C.    Whereas *California* Considered Only APA-based Claims, Plaintiffs Bring Claims Based upon Numerous Constitutional and Statutory Violations.

In any case, the claims at issue in *California* are distinguishable from those Plaintiffs bring here. In *California*, the plaintiffs sought to recover money awarded in since-terminated grants; the

---

[8]The district court's preliminary injunction in *Widasuka* remains in effect. *See Middle E. Broad. Networks, Inc. v. United States*, 2025 WL 1378735 (D.C. Cir. May 7, 2025) (*en banc*).

[9] *See also AIDS Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 1380421, at *2-3 (D.D.C. May 13, 2025); *Massachusetts v. Kennedy*,2025 WL 1371785, at *4-9 (D. Mass. May 12, 2025).

*only* injunctive relief they requested was to set aside the previously-awarded grant terminations, and the only violations they identified were of the APA itself. *See* Compl., *California v. Dep't of Educ.*, 2025 WL 725103 (D. Mass. Mar. 6, 2025) ("California Complaint"). Plaintiffs here "do not seek money damages or an order mandating specific performance of any particular contract." Compl. ¶18. Rather, they "seek an order declaring as unlawful" Defendants' terminations as well as *future* withholding of grants "because they relate to LGBTQI+ health, … and enjoining Defendants from rescinding, terminating, denying, refusing to consider, or withholding from review grants on such prohibited bases." *Id.*; *see Rhode Island v. Trump*, 2025 WL 1303868, at *6 (D.R.I. May 6, 2025), *appeal filed*, No. 25-1477 (1st Cir. May 20, 2025) (distinguishing *California* in a grant termination challenge seeking "equitable relief to enjoin the Defendants' actions implementing the [challenged action]—not specific performance of any grant agreements."). That Plaintiffs' requested relief may result in some monetary payment does not turn Plaintiffs' claims into claims for money damages, where any such monetary disbursement would be subordinate or collateral to the injunctive relief Plaintiffs primarily seek. *See Bowen*, 487 U.S. at 893; *Kidwell*, 56 F.3d at 284.

Second, Plaintiffs' claims are grounded primarily in constitutional and statutory law and make no argument that Defendants have violated any specific term or condition of their grant agreements—the core of the *California* plaintiffs' argument. *See* California Complaint, 2025 WL 725103, ¶¶ 14, 86-100, 129-131, 177-186; *see also S.F. Unified Sch. Dist. v. AmeriCorps*, 2025 WL 1180729, at *9 (N.D. Cal. Apr. 23, 2025) (distinguishing *California* on this basis). Plaintiffs allege that the Agency Directives themselves as well as the stated reasons for the grant terminations—their connections to "gender identity" or "DEI"—violate constitutional and federal law. "Nowhere are the parties quibbling over whether the [plaintiffs] subject to those grant

15

terminations breached the terms or conditions of the underlying agreements as to transform this action into one sounding in contract." *Rhode Island*, 2025 WL 1303868, at \*6. As the Ninth Circuit recently recognized, *California* "**has no application where, as here, the claims sound in statute, rather than contract**." *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 2025 WL 1393876, at \*3 (9th Cir. May 14, 2025) (emphasis added). *California* simply does not apply to Plaintiffs' constitutional and statutory claims. *See also SEF*, 2025 WL 1453047, at \*8; *Am. Bar Ass'n v. Dep't of Just.*, 2025 WL 1388891, at \*6 (D.D.C. May. 14, 2025).

### D. This Court's Decision in *Hometown Connections* Does Not Compel a Different Result.

This Court's decision in *Solutions in Hometown Connections v. Noem*, 2025 WL 1103253 (D. Md. Apr. 14, 2025), properly applied the lessons of *Bowen* and *Megapulse*, and is simply distinguishable on its facts. Recognizing that "the fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages[,]'" *Id.* at \*7 (quoting *Bowen*, 487 U.S. at 893) (cleaned up), and that courts must consider "the source of the right upon which the plaintiff bases its claims," and "the type of relief sought (or appropriate)[,]" *id.* (quoting *Megapulse*, 672 F.2d at 968) (cleaned up), the Court found that "the source of" the plaintiffs' claims was their grant agreements. *Id.* at \*9. Because the plaintiffs there primarily alleged that the challenged grant terminations were "contrary to the relevant regulations governing the process for payment and reimbursement," the Court found the agreements were "the source of the rights upon which the [plaintiffs] base[d] their APA claims. *Id.*

In contrast, here, the grant agreements themselves are **incidental** to Plaintiffs' primary claims—that the Agency Directives and Challenged Agency Actions discriminated against them and LGBTQI+ people, in violation of the Constitution and federal law. The grant agreements are merely the vehicles through which Defendants violated Plaintiffs' constitutional and statutory

rights because their work aimed to better health outcomes for LGBTQI+ Americans. Indeed, the Court need not even review the terms of the grant agreements to adjudicate these claims. *See AIDS Vaccine Advoc. Coal.*, 2025 WL 1380421, at *2 ("[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach.") (cleaned up).

Moreover, in *Hometown Connections*, the relief sought was "primarily monetary in nature and backward-looking." 2025 WL 1103253, at *10; *see also id.* at *11 (explaining plaintiffs sought restoration of funding and "reimbursement for expenses already incurred in reliance upon the terms of their Grants"). By contrast, Plaintiffs seek not just retrospective relief, but primarily *prospective relief*—namely, "preliminary and permanent injunctive relief enjoining Defendants" from, *in the future* "(i) implementing, enforcing, or effectuating the Agency Directives or any agency guidance setting forth 'agency priorities' prohibiting federal funding, or (ii) taking any of the Challenged Agency Actions, because the research relates to the Banned Topics." Compl. at 40. They also seek injunctive relief ordering Defendants "to review all properly submitted applications as required by law." *Id.* This forward-looking relief is not, as in *Hometown Connections*, merely incidental to a claim for monetary damages; rather, it is distinct and critical relief that Plaintiffs seek. Because the Court of Federal Claims is unable to order such relief, jurisdiction properly rests in this Court.

### E.    Grants Are Not Contracts, and Are Not Subject to the Court of Federal Claims' Tucker Act Jurisdiction Except in Rare Circumstances.

Efforts to push all grants-related litigation to the CFC ignore that grants are not contracts that fall within the CFC's Tucker Act jurisdiction, nor have they traditionally been treated as such.

The Tucker Act directs that "[t]he United States shall have jurisdiction upon any claim against the United States founded … upon any express or implied contract." 28 U.S.C. §

1491(a)(1). The Federal Acquisition Regulation ("FAR"), in turn, defines a "contract" as "a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them," and includes all types of commitments that obligate the Government to an expenditure of appropriated funds" but "***do[es] not include grants*** and cooperative agreements covered by 31 U.S.C. § 6301, *et seq*." FAR § 2.101 (emphasis added). Finally, Title 31 defines "grant agreements" by their purpose, directing executive agencies to use them when "the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose" and where "substantial involvement is not expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." 31 U.S.C. § 6304.

The NIH grants at issue here represent funding expressly "to carry out a public purpose" as contemplated by 31 U.S.C. § 6304, removing them from the FAR's definition of "contract." For that additional reason, they are not subject to the CFC's Tucker Act jurisdiction and are appropriately adjudicated in this Court.

## IV.    Plaintiffs Have Established a Likelihood of Success on the Merits.

### A.    The Agency Directives and Challenged Agency Actions Violate the Equal Protection Component of the Fifth Amendment [Count I].

#### 1.    The Challenged Actions Discriminate Based on Sex, Transgender Status, and Sexual Orientation and Thus Warrant Heightened Scrutiny.

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2

(1975); *see also Strickland v. United States*, 32 F.4th 311, 357-358 (4th Cir. 2022).

Under the Court's equal protection jurisprudence, the government may not treat groups of people "unequally for reasons 'wholly unrelated' to permissible government objectives." *Kadel v. Folwell*, 100 F.4th 122, 141 (4th. Cir. 2024) (quoting *Reed v. Reed*, 404 U.S. 71, 75-76 (1971)). If the government "draws distinctions based on a protected classification, however, a more searching review is required." *Id.* at 142. Here, the Agency Directives and Challenged Agency Actions flagrantly violate this equal protection guarantee because they discriminate based on sex, gender identity, and sexual orientation, and because they are motivated by animus towards an unpopular minority.

First, "all gender-based classifications . . . warrant heightened scrutiny." *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 555 (1996) (cleaned up); *Kadel*, 100 F.4th at 142. Binding Supreme Court and Fourth Circuit precedent establish that discrimination based on transgender status or sexual orientation constitutes discrimination based on sex. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 669 (2020); *Kadel*, 100 F.4th at 153-54; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-10, 616 (4th Cir.), as amended (Aug. 28, 2020); *see also Hecox v. Little*, 104 F.4th 1061, 1079-80 (9th Cir.), as amended (June 14, 2024); *Fowler v. Stitt*, 104 F.4th 770, 788 (10th Cir. 2024).

Second, "[b]ecause transgender people constitute a quasi-suspect class, … discrimination on the basis of gender identity is subject to heightened scrutiny." *Kadel*, 100 F.4th at 143; *Grimm*, 972 F.3d at 610; *see also Hecox*, 104 F.4th at 1079; *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017).

Third, discrimination based on sexual orientation is likewise independently subject to heightened scrutiny. This is so because sexual minorities (*e.g.*, gays, lesbians, and bisexual people)

constitute a quasi-suspect class. *See SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 480-481 (9th Cir. 2014); *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013); *Whitewood v. Wolf*, 992 F. Supp. 2d 410, 430 (M.D. Pa. 2014).[10]

Here, by prohibiting research funding related to "transgender issues" and "gender identity," the Agency Directives and Challenged Agency Actions indubitably facially classify based on sex and transgender status and are therefore subject to heightened scrutiny.

In addition, the Agency Directives and Challenged Agency Actions purposefully discriminate against LGBTQI+ people based on sex, gender identity, and sexual orientation, which subjects them to heightened scrutiny. In their efforts to attack LGBTQI+ people and deny them equal protection and recognition by their government, Defendants have searched grant awards for terms that specifically target LGBTQI+ health research for termination. Among these terms are "transgender," "transsexual," "nonbinary," "LGBT," "LGBTQ," "MSM," "sexual preference," and "sexuality," for example. **Exs. 17 and 25**. Analyses have thus shown how under the guise of "transgender issues," "gender identity," "DEI," and "equity," Defendants have dismantled LGBTQI+ health research in our country. Of all the grants that NIH has canceled "in whole or in part as of early May," "nearly half of them [] related to L.G.B.T.Q. health." **Ex. 6**.

For example, Dr. Roe's funding was terminated because it sought to address disordered

---

[10]  Three decades ago, the Fourth Circuit held that "service members who engage in or have a propensity to engage in homosexual acts" are not a "classification comprised of persons who engage in acts that the military can legitimately proscribe is not suspect." 80 F.3d at 928. However, since then, the Supreme Court has explained that its "decisions have declined to distinguish between status and conduct in this context." *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010); *see also Lawrence*, 539 U.S. at 575 ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination[.]" (emphasis added)); *id*. at 583 (O'Connor, J., concurring in judgment).

eating behaviors in transgender youth. Roe Decl. ¶ 14. If her research aimed to address these same issues in young people who identify as their birth-assigned sex (*i.e.*, cisgender youth), Defendants would not have terminated the funding based on its supposed relation to gender identity. Similarly, Dr. Umberson's funding was terminated because her study, which focused on how married partners affect one another's health, included married same-sex couples. Umberson Decl. ¶¶ 7-10. If the research had focused only on different-sex (i.e., heterosexual) couples, Defendants would not have terminated the funding based its alleged association with "DEI."

Defendants' conduct demonstrates that they have discriminated in the funding of health research "because of," not "in spite of," its effect on LGBTQI+ people. A discriminatory purpose is shown when "the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Such purposeful discrimination is subject to heightened scrutiny under Fourth Circuit precedent.

The Constitution forbids policies stemming from such "negative attitudes" and "irrational prejudice." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). And, here, Defendants' actions targeting LGBTQI+ health research for defunding reflect a "bare … desire to harm" LGBTQI+ people. *Romer v. Evans*, 517 U.S. 620, 634 (1996).[11] Plaintiffs'

---

[11] Even if heightened scrutiny were not applied, because animus towards LGBTQI+ people motivates Defendants' actions, the Agency Directives and Challenged Agency Actions are subject to more searching scrutiny than mere rational basis. The Supreme Court has on numerous occasions "struck down" laws when "the protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 10 (1st Cir. 2012) (citing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *City of Cleburne*, 473 U.S. at 446–47; and *Romer*, 517 U.S. at 640). Such "equal protection decisions have both intensified scrutiny of purported justifications where minorities are subject to discrepant treatment and have limited the permissible justifications." *Mass.*, 682 F.3d at 10; *see also Windsor*, 699 F.3d at 180. "[I]t is of no moment what label is affixed to the distinctive equal-protection mode of analysis that is performed in the animus cases," what is important is that "the hallmark of animus jurisprudence is its focus on actual legislative *motive*." *Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2014) (Holmes, J., concurring).

termination letters laid this stark,[12] stating that "research based on gender identity … do[es] nothing to enhance the health of many Americans" and "ignore[s] biological realities."[13] One "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG*, 2025 WL 685124, at *23.

## 2. The Agency Directives and Challenged Agency Actions Fail Heightened Scrutiny.

Under heightened scrutiny, the government must "produce an 'exceedingly persuasive justification' for treating individuals differently based on quasi-suspect characteristics." *Kadel*, 100 F.4th at 142 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). "At a minimum, the government must show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 156 (cleaned up). Moreover, the government's articulated reasons "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* (quoting *VMI*, 518 U.S. at 533). Moreover, it is well-established that "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534. Nor may the government "protect the public fisc by drawing an invidious distinction between classes of its citizens." *Kadel*, 100 F.4th at 156 (citation and quotation omitted).

Defendants have not offered any justification for their grant terminations that is not itself rooted in conjecture and animus. The only reasons provided for their terminations of Plaintiffs' grants is identical or largely similar language to templates set forth in the directives. *See supra*

---

[12] *See, e.g.*, Arayasirikul Decl. ¶¶ 16, 18, 20; Garofalo Decl. ¶ 29; Littleton Decl. ¶ 12; Poe Decl. ¶ 15.

[13] Defendants' actions are direct byproduct of the administration's Gender EO, which instructs agencies to prohibit funding that promotes "gender ideology," which it defines as the "false claim that males can identify as and thus become women and vice versa." Gender EO § 2(f).

Facts Section II.C. These baseless assertions are woefully insufficient under heightened scrutiny.

Defendants have not even explained what they mean by "diversity, equity, and inclusion studies," much less described how such studies "fail to enhance health, lengthen life, [] reduce illness," or "support unlawful discrimination." Nor have they offered guidance on what research programs are "based on gender identity," or substantiated their claims that such studies "have little identifiable return on investment," fail to "enhance the health of many Americans," or "ignore . . . biological realities." On the contrary, Plaintiffs' research had *already* gone through NIH's rigorous two-level review and had scored among the highest applicants with respect to scientific and technical merit. *See* Compl. ¶ 68 (approximately only 21% of applications ultimately receive funding annually). Defendants have cited no studies, scientific reviews, or even financial analyses to support their generalized claims about research relating to "gender identity" or "DEI." Put simply, these unsubstantiated statements disparaging broad swaths of research as "artificial" and "unscientific," do not suffice under heightened scrutiny. *See Kadel*, 100 F.4th at 156-157.

### 3. The Agency Directives and Challenged Agency Actions Fail Even Rational Basis Scrutiny.

In any event, Defendants' conduct here is so untethered to Defendants' own (unsupported) justifications that it violates the Fifth Amendment's equal protection guarantee under even the deferential rational basis standard. Under rational basis scrutiny, courts will sustain a government action "if it rationally relates to a legitimate government objective." *Kadel*, 100 F.4th at 142. But the scrutiny required under rational basis review "is not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). Indeed, not every government purpose is legitimate.

As noted above, the sole purpose of the Agency Directives and Challenged Agency Actions is to harm LGBTQI+ people. But "neither unfounded antipathy nor outright hostility may serve as the basis for a law." *Just Puppies, Inc. v. Frosh*, 565 F.Supp.3d 665, 730 (D. Md. 2021), *aff'd sub*

*nom. Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024). "[A] general announcement" of animosity toward LGBTQI+ people "inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for [them]." *Romer*, 517 U.S. at 635; *see also Dekker v. Weida*, 679 F.Supp.3d 1271, 1292-93 (N.D. Fla. 2023) ("[D]isapproving [of] transgender status" and "[d]issuading a person from conforming to the person's gender identity rather than to the person's natal sex" are "plainly illegitimate purposes[.]"), appeal argued, No. 23-12155 (11th Cir. Nov. 22, 2024). Moreover, they follow a barrage of executive actions targeting transgender people's ability to participate in nearly every aspect of civic life and undermining efforts to address and remedy discrimination against LGBTQI+ people more broadly.[14] That context reinforces that the very intent of the challenged actions is to adversely impact LGBTQI+ people and that such adverse effects are not merely their incidental byproduct. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

Even if Defendants' stated reasons for terminating or refusing to fund grants promoting gender ideology or DEI were legitimate (which they are not), the terminations of *these Plaintiffs' grants* do not even serve the government's asserted purposes. Even under rational basis scrutiny, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446. Many of Plaintiffs' terminated research projects do not in any way fit the reasons they were given for termination. For example, neither Dr. Streed's project studying cardiovascular health and dementia in transgender individuals nor Dr. Littleton's research into ways to reduce teen dating

---

[14] *See* Compl. at 17-20; *see, e.g.*, EO No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025); EO No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025); EO No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); EO No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025); EO No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

violence and alcohol use among LGBTQI+ youth can reasonably be said to "ignore" any "biological realities." Similarly, the UNC researcher Plaintiffs' study into the impact of regulations and communication campaigns on tobacco use does not somehow become "artificial and non-scientific" simply because it includes sexual minorities as a community affected by tobacco use disparities. Defendants' mass terminations do not, as they claim, target research that is "based on amorphous equity objectives" or "ignore[s] biological realities."

What Defendants' actions *actually* target is research aimed at improving LGBTQI+ people's health. They send the unmistakable message to SGM communities that their government disdains their health, wellbeing, and lives. Such blatant discrimination is as un-American as it is unlawful. The "sheer breadth" of Defendants' withdrawal of funding for LGBTQI+ health "is so discontinuous with the reasons offered for" it that their actions are "inexplicable by anything but animus toward the class [they] affect[]." *Romer*, 517 U.S. at 632. Defendants' terminations of grant funding for studies on the health of LGBTQI+ people were undertaken "not to further a proper legislative end but to make them unequal to everyone else." *Id.*, 517 U.S. at 635. Just as "[a] State cannot [] deem a class of persons a stranger to its laws," *id.*, the federal government cannot carve LGBTQI+ people as a class out of government-funded health studies.

## V.    The Agency Directives and Challenged Agency Actions Violate Section 1557 of the Affordable Care Act [Count II].

Section 1557 of the ACA prohibits discrimination in health programs or activities, any part of which receives federal funding, based on race, color, national origin, sex, age, or disability. *See* 42 U.S.C. § 18116(a). Here, the Agency Directives and Challenged Agency Actions violate this Congressional command by prohibiting funding for research that relates to LGBTQI+ health.

To succeed on a Section 1557 claim, a plaintiff must demonstrate that (1) the defendant is a health program or activity, any part of which receives federal funding; (2) the plaintiff was

excluded from participation in, denied the benefits of, or subjected to discrimination under the health program or activity; and (3) the latter occurred on a prohibited basis. *See Fain v. Crouch*, 618 F. Supp. 3d 313, 330-31 (S.D.W. Va. 2022), *aff'd sub nom. Kadel*, 100 F.4th 122; *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F.Supp.3d 791, 796 (W.D. Wash. 2021). These elements are met.

*First*, NIH and HHS are covered entities within the scope of Section 1557. *See* 45 C.F.R. § 92.4 (defining "covered entity" to include "The Department," and defining "Department" to mean "U.S. Department of Health and Human Services"). Additionally, health research is a health program or activity. *See* 45 C.F.R. § 92.4 (defining "health program or activity" to mean, *inter alia*, "[e]ngage in health or clinical research"); *see also Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522, 37,540 (May 6, 2024). "By extending nondiscrimination protections to individuals under 'any health program or activity,' Congress clearly intended to prohibit discrimination by any entity acting within the 'health' system." *Fain v. Crouch*, 545 F. Supp. 3d 338, 342 (S.D.W. Va. 2021); *see also C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *5 (W.D. Wash. Dec. 19, 2022) ("The phrase 'any health program or activity,' is not defined in the ACA but it is clearly broader in scope than only the provision of healthcare."); *Kadel v. Folwell*, 2022 WL 17415050, at *2-3 (M.D.N.C. Dec. 5, 2022), *aff'd*, 100 F.4th 122. This includes all operations of the health program or activity. *See T.S. by & through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 742-43 (7th Cir. 2022).

*Second*, Section 1557 provides that "an individual shall not," on the basis race, color, national origin, sex, age, or disability, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity." 42 U.S.C. § 18116(a). Here, Individual Plaintiffs and health researcher members of GLMA are *being excluded from*

*participating in* federally funded health research because the research relates to LGBTQI+ health, gender identity, or looks at health disparities by measuring intersectional aspects of people's identities like sexual orientation, race, or ethnicity. Similarly, the LGBTQI+ patients of Healthcare Provider Plaintiffs are *being denied the benefits of* federally funded health research that relates to their health. In sum, they are being subjected to discrimination because the research they conduct or benefit from relates to LGBTQI+ health, gender identity, or looks at health disparities by measuring intersectional aspects of people's identities like sexual orientation, race, or ethnicity.

*Third*, Section 1557 bars discrimination based on sex and disability. Binding Supreme Court and Fourth Circuit precedent establish that discrimination based on sex encompasses discrimination based on sexual orientation and gender identity. *See Bostock*, 590 U.S. at 660; *Kadel*, 100 F.4th at 164; *see also Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023); *PFLAG*, 2025 WL 685124, at *22; *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 589-90 (D. Md. 2021), *appeal filed*, No. 23-1394 (4th Cir. 2023). Similarly, discrimination based on gender dysphoria is a form of disability discrimination. *See Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022). Here, the Agency Directives and Challenged Agency Actions are based on sex, gender identity, sexual orientation, or disability.

In addition, by prohibiting research that investigates the intersectional aspects of people's identities under the guise of "equity" or "DEI," Defendants are expressly prohibiting funding for research that looks at health disparities that necessarily must consider and measure these intersectional aspects of LGBTQI+ people's identities. Section 1557 prohibits such intersectional discrimination. *See* 45 C.F.R. § 92.101(a); 89 Fed. Reg. at 37,572.

Finally, Defendants discriminate against Plaintiffs based on their association to LGBTQI+ people—associational discrimination Section 1557 prohibits. 45 C.F.R. § 92.209; *see also Zarda*

*v. Altitude Express, Inc.*, 883 F.3d 100, 124–26 (2d Cir. 2018) (*en banc*), *aff'd sub nom. Bostock*, 590 U.S. 644; *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 347 (7th Cir. 2017) (*en banc*); *Falls v. Prince George's Hosp. Ctr.*, 1999 WL 33485550, at *11 (D. Md. Mar. 16, 1999).

By prohibiting funding for research relating to "gender identity" or "transgender issues," Defendants are discriminating based on sex and disability when it comes to who can have access to federal funding for research or who can benefit from federally funded research. Similarly, by prohibiting research relating to "equity," or "DEI," Defendants are discriminating based on sex and disability, as well as LGBTQI+ people's intersectional identities.

## VI.    The Agency Directives and Challenged Agency Actions Violate the Constitutional Separation of Powers [Count X].

The Appropriations Clause, *see* U.S. Const. art. I, § 9, cl. 7, "gives Congress exclusive power over federal spending." *PFLAG*, 2025 WL 685124, at *19 (citation omitted); *accord U.S. Dept. of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Indeed, the very purpose of the Appropriations Clause is to serve "as a restriction upon the disbursing authority of the Executive." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). Congress has "reinforce[d] [its] control over appropriated funds" by statute. *U.S. Dep't of Navy*, 665 F.3d at 1347; *see*, *e.g.*, 31 U.S.C. § 1301(a). Put simply, only Congress may *condition* how public funds are spent. *See generally South Dakota v. Dole*, 483 U.S. 203 (1987); *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595 (2013). When Congress intends to place conditions on federal funds, "it has proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17-18 (1981).  The EOs on which Agency Directives and Challenged Agency Actions are based encroach upon this exclusively congressional authority. Specifically, they instruct agencies to terminate all "'equity-related' grants or contracts"—*i.e.*, withhold congressionally appropriated funds—and to carry out

the administration's policy "'to end the Federal funding of gender ideology.'" **Exs. 1, 2, and 3**. But critically, Congress has not conditioned NIH grants on the research not relating to the Banned Topics. Nor has it empowered the Executive Branch to do so. In fact, the opposite is true: Congress expressly commanded that NIH funds be used specifically "to improve research related to the health of sexual and gender minority populations," 42 U.S.C. § 283p, and address health disparities, 42 U.S.C. §§ 282(b)(8)(d)(ii), (m)(2)(b)(iii). Moreover, Congress has expressly conditioned such funds on *not discriminating* based on, *inter alia*, sex, including gender identity and sexual orientation. *See supra* Section IV.

Under our Constitution, the Executive Branch *must* "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3. This means the Executive Branch has an "affirmative" duty to execute duly enacted law. *PFLAG*, 2025 WL 685124, at *14. And it must do so regardless of what "policy reasons (as distinct from constitutional reasons[])" the current administration might have "for wanting to spend less than the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

While federal statutes vest NIH with *some* discretion regarding the administration of grants, that discretion must be exercised to "carry[] out the purposes of" the *statute*, not the President's own purposes. *See* 42 U.S.C. §§ 282(b), 284(b)(1). NIH's discretion is further circumscribed by provisions mandating the considerations that must inform NIH's decisions. *See, e.g.*, 42 U.S.C. §§ 241, 282(b), 284(b), 289a. Nothing in Article II grants the President "unilateral authority" to use NIH's "limited discretion" regarding grant priorities as a basis "to condition the *entirety* of their federal funding" on research not relating to the Banned Topics or a grantee's compliance with the administration's views on LGBTQI+ health. *PFLAG*, 2025 WL 685124, at *16. Nor does any provision in the Public Health Services Act or any other federal grant statute authorize them to do

so. Indeed, "the Supreme Court has struck down agencies' attempts to extrapolate broad authority under narrow delegations of power." *PFLAG*, 2025 WL 685124, at *16. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (delegated authority to modify loan requirements did not include authority for loan forgiveness); *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (delegated authority to adopt workplace safety conditions did not include authority to mandate COVID vaccination). By exceeding their Article II authority—and, in turn, interfering with Congress's exclusive authority over federal spending under Article I—Defendants necessarily violate the separation of powers.

## VII.    The Agency Directives and Challenged Agency Actions Violate the Administrative Procedure Act.

### A.    The Agency Directives and Terminations Constitute Final Agency Action.

The APA authorizes judicial review of "final agency action," 5 U.S.C. § 704, meaning actions that "mark the consummation of the agency's decisionmaking process" and determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Judicial review is available if those actions have "an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

The Agency Directives are final agency actions for APA purposes. They articulate the settled position of the Defendant agencies that they will not fund any research that, they believe, relates to "DEI" or "gender identity," and direct such existing grants be terminated.[15] "That is not merely a guidance. It is a directive that immediately produced legal consequences across the entire federal funding system." *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 53–54 (D.D.C. 2025); *see also New York v. Trump*, 133 F.4th 51, 67-68 (1st Cir. 2025)

---

[15] **Ex. 5** at 1. (instructing NIH personnel to ensure grants "do not fund or support low-value and off-mission research activities or projects—including DEI and gender identity"); *see also* **Ex. 4** at 1 ("Agency personnel shall briefly pause all payments made to . . . grantees related to DEI. . . .[I]f after review the Department has determined that a contract is inconsistent with Department priorities . . . such contracts may be terminated.").

(holding that implementation of "categorical funding freezes" constitutes "discrete final agency action"). The Agency Directives also instruct how to terminate such grants, including providing boilerplate language to be included in termination notices. **Ex. 6** at 5. They are thus reviewable under the APA. *See Mass.*, 2025 WL 1371785, at *10.

Likewise, the Challenged Agency Actions constitute final agency actions for APA purposes. Each termination letter stated that it "represent[ed] the final decision of the NIH." *See, e.g.*, **Ex. 6** at 5; *see also Mass.*, 2025 WL 1371785, at *10 ("[T]he terminations themselves are final agency action."). And each termination had immediate legal consequences, including the loss of access to pre-approved and future funding. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 2025 WL 833917, at *12 (D. Md. Mar. 17, 2025) ("The Department's Termination Letters immediately produced legal consequences for the Grant Recipients; the Grant Recipients could no longer access the funds allotted to them by the Grant Awards.").

### B.    Defendants' Directives and Terminations Are Arbitrary and Capricious [Count V].

Defendants have acted arbitrarily and capriciously, because their actions were unreasonable, not reasonably explained, based on factors Congress did not intend the agencies to consider (*i.e.*, not agency priorities), and otherwise not in accordance with law. *See Sierra Club v. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018). For at least six reasons, Plaintiffs are likely to succeed in proving Defendants' conduct was arbitrary and capricious.

*First*, Plaintiffs will easily be able to prove that Defendants failed to provide a "reasonable explanation" of their actions as the APA requires. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). To be reasonable, the explanation must "includ[e] a rational connection between the facts found and the choice made." *Dep't of Com.*, 588 U.S. at 773 (cleaned up). The Agency Directives and Challenged Agency Actions here fail that test, as they include no "facts found"

whatsoever. The Agency Directives and Challenged Agency Actions failed to explain almost anything about how or why any specific project failed to meet agency priorities, or even how the project in question related to "DEI" or "gender identity," was "unscientific," had "little identifiable return on investment," or ignored "biological realities." "Here, the agency decision is not accompanied by any explanation, let alone a satisfactory one." *Sierra Club*, 899 F.3d at 293; *see also Am. Ass'n of Colls.*, 2025 WL 833917, at *21.

*Second*, a "reasonable explanation considers relevant data," but the Defendants' explanation did not reflect consideration of *any* data whatsoever. *Am. Ass'n of Colls.*, 2025 WL 833917, at *21 (granting PI in those circumstances). Rather, Defendants' "use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the Department did not consider individual, or any, data or information." *Id.* To excuse such conduct "would be to accept an agency's blanket conclusions at face-value and to abdicate this Court's role to ensure that the agency has considered 'important aspect[s] of the problem' and rendered a decision that is at least rational." *Sierra Club*, 899 F.3d at 294 (citation omitted).

*Third*, Plaintiffs will be able to prove that Defendants' proffered boilerplate rationale for the termination—that these grants "no longer effectuate[] agency priorities"—is wrong as a matter of law. It is incontrovertible that the current "agency priorities" are those reflected in the NIH's Strategic Plans, in Defendants' policy and grant termination guidelines, in Defendants' regulatory pronouncements, and in congressional mandates to NIH and HHS.[16] The Defendant agencies' *actual* priorities strongly support Plaintiffs' research (Compl., ¶¶55-59), as NIH itself previously found when it awarded Plaintiffs the grants it later unreasonably terminated (*id.* ¶¶66-67). Defendants can point to no legitimate agency (or legislative) action that in any way amended or

---

[16] *See* 42 U.S.C. § 283p; 42 U.S.C. § 282(b)(8)(d)(ii); 42 U.S.C. § 282(m)(2)(b)(iii).

modified those actual priorities, much less that any such change complied with the procedural requirements to make that change.[17]

*Fourth*, the Agency Directives and Challenged Agency Actions failed to consider the consequences of those actions, including how they negatively impact researchers (including Plaintiffs), their institutions, their study participants, their fields of academic study, the body of research to which their grant-funded projects contributed, the communities or populations that would benefit from any of that research, or the reliance interests of each of these stakeholders. Failure to consider these factors renders these decisions arbitrary and capricious. *Sierra Club*, 899 F.3d at 293 (finding arbitrary an action that "neither mentions this detrimental effect nor the efficacy of any mitigating steps"); *see also Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("serious reliance interests that must be taken into account") (cleaned up).

*Fifth*, Defendants failed to follow their own policies in adopting the Agency Directives and taking the Challenged Agency Actions. *See infra* Section VI.C; *Deese v. Esper*, 483 F.Supp.3d 290, 310 (D. Md. 2020) (finding "agency's actions are arbitrary and capricious because they violate their own regulations"). *Sixth*, Defendants' actions violate the U.S. Constitution, which renders them arbitrary and capricious as a matter of law. *See supra* Sections III, V; *Darden v. Peters*, 488 F.3d 277, 283 (4th Cir. 2007).

### C.    The Agency Directive and Challenged Agency Actions Are Contrary to Both Federal Law and Regulation [Counts VI and VII].

The Agency Directives and Challenged Agency Actions are "not in accordance with law" and are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Defendants' actions blatantly contravene congressionally prescribed

---

[17] *See, e.g.*, 42 U.S.C. § 282(m)(1) (requiring submission to congressional committees and posting on NIH's website); 42 U.S.C. § 282(m)(4) (requiring consultation with, *inter alia*, IC directors, researchers, and patient advocacy groups).

procedures and priorities for NIH-funded medical research. Plaintiffs thus are likely to succeed on Counts VI and VII because Defendants "exercise[d] [their] authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (cleaned up).

The Agency Directives and Challenged Agency Actions run afoul of duly enacted federal law. For starters, the Public Health Service Act (PHSA) expressly directs NIH to "encourage efforts to improve research related to the health of sexual and gender minority populations." 42 U.S.C. § 283p; *see also id.* § 282(b)(8)(D)(ii) (requiring NIH to "encourage" ICs to "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities"). By summarily squelching federally funded research related to gender identity and LGBTQI+ health, Defendants have improperly "substitute[d] their policy judgments for those of Congress." *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000).

Defendants' actions also flout the PHSA's express requirement that NIH "shall develop and submit" to Congress a "Strategic Plan" specifying the agency's "strategic research priorities and objectives across biomedical research." 42 U.S.C. § 282(m)(1), (2)(A). In developing that plan, the NIH "shall . . . consider," among other things, "biological, social, and other determinants of health that contribute to health disparities." *Id.* § 282(m)(2)(B)(iii). Defendants undisputedly did not prepare or submit a new "Strategic Plan," as required by § 282(m), before adopting the Agency Directives and taking the Challenged Agency Actions. Meanwhile, the operative NIH Strategic Plan continues to commit research investments to addressing the "distinct health needs" and "disparities in health outcomes" experienced by LGBTQI+ people. Compl. ¶¶58-59. By ignoring these requirements, Defendants unlawfully have subordinated the codified will Congress

to the whim of the executive.

Defendants' actions also make a mockery of Plaintiffs' rights to object to a termination decision, to be heard on those objections, and, if those objections are overruled, to appeal that decision. HHS regulations required Defendants to give each Plaintiff "an opportunity to object and provide information and documentation challenging the suspension or termination action," as well as to allow Plaintiffs a meaningful opportunity both to have their objections be heard and to appeal that termination decision to the Departmental Appeals Board. 45 C.F.R. § 75.374(a); 45 C.F.R. pt. 16. Rather than respect the right to effectively appeal, Defendants explicitly discouraged resistance to their termination decisions as futile by telling several Plaintiffs that "no corrective action is possible" because the awarded grants are inherently "incompatible with agency priorities,"[18] a reason "so broad and vague as to be limitless; devoid of import, even." *Am. Ass'n of Colls.*, 2025 WL 833917, at *21. This combination of forecasted futility and empty explanations "effectively and practically renders meaningless" any right to object or appeal. *Id.*

### D. Defendants Violate the APA by Unlawfully Withholding Applications from Review and Unreasonably Delaying NOAs [Count VIII].

Plaintiffs are likely to succeed on their claim that Defendants have violated their rights by withholding decisions, removing submitted applications from study sections, and withholding NOAs on previously approved submissions. Such actions violate the APA, which mandates that an agency "proceed to conclude a matter presented to it," 5 U.S.C. § 555(b), and requires courts to "compel agency action" that is "unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). To prevail, Plaintiffs need only show that (1) the action in question is "a *discrete* agency action that it is *required to take*," and (2) the agency failed to take, or unreasonably delayed in taking, that action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

---

[18] *See*, *e.g.*, Poe Decl.¶ 15; Phillips Decl.¶ 25; Roe Decl.¶ 15.

Here, Defendants are subject to a statutory and regulatory scheme governing grant applications review. *See, e.g.*, 42 U.S.C. § 289a; 42 U.S.C. § 284a(a), (e); 42 C.F.R. § 52h.7; 42 C.F.R. § 52.5. Yet, Defendants have withheld routine and even already approved NOAs from being issued, contrary to these established processes and timelines and ordinary practice.[19] In addition, they have removed applications from the established study section review process,[20] and have failed to even re-schedule some of the applications.[21]

To decide if an agency has unreasonably delayed a discrete and required action, courts look to the "TRAC factors," which consider applicable statutes, the delay's effect on human health and welfare, competing agency priorities, prejudice to party experiencing delay, and a "rule of reason." *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021) (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*")). Here, those factors support a finding of unreasonable delay. For one, NIH has put forth a grant review timeline,[22] which is itself a rubric for the Court to use to decide if its delay is unreasonable. *See Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 470-71 (D.D.C. 2020) (evaluating "rule of reason" based on internal policy guidance); *see also Begum v. U.S. Dep't of State*, 2022 WL 16575703 at *7 (D. Md. Oct. 31, 2022). For another, Defendants' delay is particularly unreasonable because "human health and welfare are at stake." *TRAC*, 750 F.2d at 80. The research conducted and healthcare provided by Plaintiffs and countless others pursuant to the subject NIH grants have a direct and critical impact on human health.[23] Defendants' refusal to process grant applications also prejudices applicants like Plaintiffs whose

---

[19] *See*, *e.g.* Peitzmeier Decl.¶¶ 17-18, 27; Garofalo Decl. ¶ 30; Arayasirikul Decl. ¶ 26; Littleton Decl. ¶¶ 22-23.

[20] *See*, *e.g.* Poe Decl. ¶¶ 10, 22; Peitzmeier Decl. ¶¶ 19-20; Murchison Decl. ¶ 14 n.2.

[21] *See*, *e.g.* Peitzmeier Decl. ¶¶ 19-20; Murchison Decl. ¶ 14 n.2.

[22] NIH "*Standard Due Dates*," https://grants.nih.gov/grants-process/submit/submission-policies/standard-due-dates (last visited May 28, 2025); *see also* 42 U.S.C. § 284a(e).

[23] *See* Compl. ¶¶20-37; *see also* Poe Decl. ¶13; Littleton Decl. ¶21; Noar Decl. ¶17; Brewer Decl. ¶18; Umberson Decl. ¶16.

research has been interrupted midstream.[24]

E.    **Defendants' Directives and Terminations Are Contrary to Constitutional Rights or Powers [Count IX].**

For the reasons explained above in Sections III and V, the Agency Directives and Challenged Agency Actions are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Defendants' actions violate, at minimum, the Fifth Amendment's Equal Protection Component and the separation of powers principles enshrined in the U.S. Constitution. Therefore, those actions also violate the APA.

## VIII.  Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction.

Plaintiffs are "likely to suffer irreparable harm in the absence of an injunction[.]" *HIAS, Inc.*, 985 F.3d at 318.  Defendants' actions have caused and will continue to cause irreparable harm to Plaintiffs, as well as the LGBTQI+ patients of Healthcare Provider Plaintiffs, unless enjoined. To establish irreparable harm, plaintiffs must show they are likely to suffer harm that is "actual and imminent" and that the harm "cannot be fully rectified by the final judgment." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted). Further, "a deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (cleaned up). Because of NIH's actions, researchers are facing a range of actual and imminent irreparable harms, including deprivation of constitutional rights, which cannot be fully rectified without immediate injunctive relief, as well as harms to their careers, reputations, and income, psychological distress, and harms to their patients, research participants, staff, and team colleagues.

NIH grant terminations have harmed the trajectory of Plaintiffs' careers at all stages. For early-career researchers, the loss of a grant often means the collapse of preliminary independent

---

[24] *See* Peitzmeier Decl.¶ 27; Poe Decl. ¶13.

research projects, critical for building a publication record, establishing professional credibility, and securing tenure-track positions.[25] For those going through the tenure process, having their grants reinstated now could rectify the harm. Beyond the immediate human toll, the broader scientific enterprise suffers as vital training pathways are severed, and specialized knowledge remains underdeveloped. As one plaintiff warns, "without ongoing funding to support LGBTQI+ health research, we will lose an entire generation of researchers and health specialists." Streed Decl. ¶ 27.

For more established researchers, Defendants' actions have resulted in the dismantling of their life's work, the demolition of the infrastructure of their research, and their inability to continue the lifesaving research to which they have dedicated their careers.[26] These harms are not speculative, as many researchers have been left panicking over the long-term consequences of reducing or terminating the roles of key research staff, including assistants, graduate students, and postdoctoral fellows, who are rearranging their lives to pursue other career paths.[27] Beyond the destruction of the research infrastructure they have spent decades building, these researchers face other consequential career harms, like having to take on additional responsibilities to make ends meet, taking away critical time from their research, and the dismantling of trust with community organizations they relied on in their research.[28] In all cases, the loss of funding leads to reputational harm and professional instability.

Defendants' prohibition on funding for LGBTQI+ health research also harms research participants and patients in clinical studies, many of whom have committed their time and trust to

---

[25] *See*, *e.g.*, Roe Decl. ¶ 9; Moe Decl. ¶ 24; Sheldon Decl. ¶ 21; Beccia Decl. ¶ 24.

[26] *See*, *e.g.*, Soe Decl. ¶ 27; Sheldon Decl.¶ 20; Peitzmeier Decl.¶ 16; Arayasirikul Decl.¶ 27.

[27] *See*, *e.g.*, Ribisl Decl. ¶ 21; Brewer Decl. ¶ 20.

[28] *See*, *e.g.*, Phillips Decl. ¶ 26; Umberson Decl. ¶ 18.

Plaintiffs' research with the expectation of continuity, leaving critical health interventions incomplete.[29] Moreover, "[e]xcluding research specifically with transgender and gender-diverse people is inherently creating bias amongst research literature," which makes it harder for healthcare providers to care for their LGBTQI+ patients. Roe Decl. ¶ 17.

Finally, Plaintiffs—all of whom are deeply invested in their work and the populations they serve—have experienced profound mental and emotional distress.[30]

Further, even "the prospect of an unconstitutional enforcement supplies the necessary irreparable injury." *PFLAG*, 2025 WL 685124, at *28 (cleaned up). Thus, by showing they are likely to succeed on their constitutional claims, "the irreparable harm factor is satisfied." *Id.*

## IX.    The Balance of Equities and the Public Interest Favor a Preliminary Injunction.

The balance of equities and public interest strongly favor a preliminary injunction. *See id.* at *29; *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022); *see also Nken*, 556 U.S. at 435.

Granting plaintiffs' motion for preliminary injunction would undoubtedly serve the public interest because "public interest favors protecting constitutional rights." *Leaders of Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021); *see also Giovani Carandola, Ltd. v. Bason*, 33 F.3d 507, 521 (4th Cir. 2002). In that regard, there is a "substantial public interest in having governmental agencies abide by federal laws[.]" *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020). Plaintiffs have demonstrated that the government's termination of plaintiffs' research grants violate the Constitution, Section 1557 of the ACA, the APA, and other federal laws and regulations, and there is a strong public interest in restraining such unlawful action.

---

[29] *See, e.g.*, Spinelli Decl. ¶¶ 10, 14; Streed Decl. ¶ 10, 22, 26; Littleton Decl. ¶ 14; Moe Decl. ¶ 23.

[30] *See, e.g.*, Roe Decl. ¶ 17; Poe Decl. ¶ 28; Brewer Decl. ¶ 20; Arayasirikul Decl. ¶ 27.

What is more, public health and therefore the public interest are harmed by the termination of Plaintiffs' grants. These projects were designed to fund crucial research to enhance public health, lengthen life, and reduce illness. Through their actions, Defendants have halted important work on pressing public health issues, such as cardiovascular health, dementia, depression, suicidal ideation, HIV prevention, intimate partner and sexual violence, substance use, tobacco-related disease, and disordered eating behaviors.[31] This research is critical not just LGBTQI+ people but for the public more broadly. *See Whitman-Walker Clinic*, 485 F.Supp.3d at 60–61.

Further, the government faces no harm from an injunction that "merely ends an unlawful action[.]" *Leaders*, 2 F.4th at 346. The government's purpose in terminating plaintiffs' research grants is to thwart research that does not align with its political goals while simultaneously violating the Constitution, Section 1557 of the ACA, the APA, and other federal laws and regulations. That is no legitimate interest. *See Am. Fed. of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 2025 WL 868953, at *54 (D. Md. Mar. 20, 2025) ("there is generally no public interest in the perpetuation of unlawful agency action") (cleaned up).

Finally, the Court should either waive the bond requirement or impose a nominal bond of zero dollars. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (collecting cases waiving bond when bond would frustrate Plaintiffs' ability to vindicate constitutional rights).

## CONCLUSION

For the reasons expressed above, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and enter the attached proposed order.

---

[31] *See, e.g.*, Streed Decl. ¶¶ 12, 25 (cardiovascular health and dementia); Moe Decl. ¶ 16 (depression and suicidal ideation); Garofalo Decl. ¶ 10 (HIV prevention); Arayasirikul Decl. ¶ 15 (HIV prevention); Birkett Decl. ¶ 9 (HIV and substance use); Peitzmeier Decl. ¶ 11 (intimate partner and sexual violence); Littleton Decl. ¶ 9 (substance use); Ribisl Decl. ¶ 12 (tobacco-related disease); Roe Decl. ¶ 11 (disordered eating behaviors).

Dated: May 28, 2025

Respectfully submitted,

*/s/ Elizabeth P. Hecker*

Justin D. Kingsolver*
**Bryan Cave Leighton Paisner LLP**
1155 F St. NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
justin.kingsolver@bclplaw.com

Elizabeth P. Hecker*
Anuj Vohra*
Ruben F. Reyna (D. Md. Bar 14949)
Heather Sanborn*
Tai Williams*
**Crowell & Moring LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
ehecker@crowell.com
avohra@crowell.com
rreyna@crowell.com
hsanborn@crowell.com
taiwilliams@crowell.com

Alexis Ward*
**Crowell & Moring LLP**
515 South Flower Street, 41st Floor
Los Angeles, CA 90071
Telephone: (213) 622-4750
Facsimile: (213) 622-2690
award@crowell.com

Michael Vine*
**Crowell & Moring LLP**
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 263-8400
Facsimile: (949) 263-8414
mvine@crowell.com

Alexander Rosen*

Omar Gonzalez-Pagan**
**Lambda Legal Defense
  and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense
  and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nathan Maxwell*
**Lambda Legal Defense
  and Education Fund, Inc.**
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Telephone: (312) 663-4413
Facsimile: (855) 535-2236
nmaxwell@lambdalegal.org

Pelecanos*†
**Lambda Legal Defense
  and Education Fund, Inc.**
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017
Telephone: (213) 351-6051
Facsimile: (855) 535-2236
pelecanos@lambdalegal.org

K. Lee Marshall*
Carlie Tenenbaum*
**Bryan Cave Leighton Paisner LLP**
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111

Jacob Zucker*
**Crowell & Moring LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
Facsimile: (212) 223-4134
arosen@crowell.com
jzucker@crowell.com

\* Admitted *pro hac vice*.

\*\* Application for admission to D. Md. Bar
approved; swearing in pending.

† Mailing Address Only

Telephone: (415) 675-3400
Facsimile: (415) 675-3434
lee.marshall@bclplaw.com
carlie.tenenbaum@bclplaw.com

Matthew Stanford*
**Bryan Cave Leighton Paisner LLP**
Two North Central Avenue, Suite 2100
Phoenix, AZ 85004-4406
Telephone: (602) 364-7068
Facsimile: (602) 364-7070
matt.stanford@bclplaw.com