**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| GLMA; *et al*., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 8:25-cv-01620-LKG |
| NATIONAL INSTITUTES OF HEALTH; *et al*., | |
| *Defendants.* | |

**<u>DECLARATION OF DR. PHOEBE POE, PHD</u>**

I, Dr. Phoebe Poe, hereby state as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.      I am a plaintiff in this action. I am offering this declaration in my individual capacity and not on behalf of my employer.

4.      Phoebe Poe is a pseudonym.  I am submitting this declaration under a pseudonym to protect my privacy and to protect my family and me from harassment, violence, and retaliation.

5.      I hold a Doctorate of Philosophy in Sociology and work as a researcher and associate professor at a higher education institution in Tennessee.  I also serve as the director of an LGBTQI+ research center associated with the institution.  My research focuses on the health and aging of LGBTQI+ populations.  I am a nationally recognized expert in my field and have dedicated my career to researching health disparities within LGBTQI+ populations that are often overlooked.  My research includes one of the only longitudinal panel studies regarding older LGBTQI+ adults in the United States.  My research has also focused on sexual identity formation

among young gay men in the United States, provider relationships with HIV/AIDS patients, and relationship dynamics among bisexual men living with HIV.  My research has been published in leading journals in social science, medicine, and public health.

6.    I came to sociology through an unexpected but deeply formative path. As an undergraduate at a liberal arts college, I was drawn to questions of gender, sexuality, and health, and I pursued these interests through coursework and research in psychology. Working in a psychology lab helped me build a foundation in research methods and sparked my early interest in mental health, particularly in the context of LGBTQI+ communities. After college, I worked in HIV/AIDS research, where I began to see the limits of individual-level approaches to understanding health. With the mentorship of thoughtful colleagues, I came to recognize that the questions I was asking about inequality, discrimination, and the role of policy were fundamentally sociological. Although I had never taken a sociology course as an undergraduate, I pursued graduate training in the field because it offered the tools to explore how social structures and policy shape health outcomes. In the HIV/AIDS community research space, I gained substantial experience as a team member in applying for and executing federally funded grants, including multiple NIH awards.

7.    After completing my graduate training in 2013 and a postdoctoral appointment in 2015, I became an assistant professor of Medicine, Health, and Society at a leading research institution.  As of the date of this document, I have published fifty-one (51) peer-reviewed journal articles.

8.    I was awarded my first internal research grant as Graduate Investigator in 2009. I first served as Principal Investigator on a federally funded award from the National Institutes of Health (NIH) in 2019. As of the date of this Declaration, I have twenty-one (21) completed grants,

six (6) active grants, two (2) pending grants, and one (1) grant currently in preparation.

9.      I can say definitively that NIH grant applications are rigorously reviewed for their scientific merit and their impact on public health and human lives.  As a standing member of the social sciences study section, I have seen firsthand how rigorously applications are reviewed and scrutinized by my colleagues and peers across the social sciences, medicine, and public health. Scientists regularly disagree and discuss points of merit across multiple applications in a fair and impartial way that respects the science and cares about the appropriate and ethical use of resources. These meetings are managed by highly trained and effective NIH staff to ensure that scientific review proceeds fairly and in accordance with the rules and policies set forth by NIH.

10.      Since January 2025, I have had four grants terminated, one grant renewal award that cannot administratively advance due to the original award being terminated, one grant scheduled for review in February 2025 that was pulled from review and was directed to an *ad hoc* study section in April 2025 where it was not discussed, and one application not submitted because the Program Announcement closed prior to the submission due date. I have also abandoned two federal applications in progress because I was concerned they would not be fairly evaluated in light of the terminations.

11.      I have received 10 grants as Principal Investigator (PI) or Co-Investigator (Co-I) from NIH over the course of my career.

12.      In September 2019, the NIH awarded funding for my research regarding the impact of social networks and policy contexts on the health of older sexual and gender minorities (SGM). The primary aims of this work were to generate a longitudinal panel dataset that could be used to assess how social relationships may buffer or exacerbate stress experienced by SGM individuals as a result of discrimination, harassment, and violence.  This work has direct implications for

public health intervention development. Outcome measures included mental health, physical health, cognitive health, and other markers of biological systems functioning.  The study successfully recruited 1,256 SGM adults aged 50 to 76 (born 1941-1971) in four states in the US South at Wave 1 (2020-2021).  Wave 2 was completed at 90% retention in 2022.  Wave 3 was completed in 2023.  Data from this study have contributed valuable insights into the determinants of aging and health outcomes among older LGBTQI+ adults, including the importance of access to LGBTQI+ affirming healthcare providers for uptake of preventive care. Team members published twenty-seven (27) peer-reviewed papers and have an additional twenty-three (23) papers under review and in progress. With NIH pilot (P30 and P2C) and supplement funds (-04S1, -05S2), we also leveraged study infrastructure to collect, for the first time, biomarkers of aging and cognitive functioning among self-identified LGBTQI+ adults. All data are being made publicly available. Over the course of the project, roughly 25 individuals were employed by the project. At the time of termination, February 28, 2025, this project had been awarded $2.6 million under the grant.

13.     This study is one of only two NIH-funded longitudinal cohort studies of older LGBTQI+ adults in the United States. Older LGBTQI+ people are a high-need disparity population that is rarely included in aging research. Growing research indicates disparities in cardiovascular, metabolic, and mental health by sexual orientation and gender identity.  As LGBTQI+ populations age, these disparities increase the risk of earlier and more severe cognitive decline.  Despite these risks, few studies and health services focus on older LGBTQI+ adults. Just 7.6% of NIH-funded LGBTQI+-related projects examine aging-related conditions despite 23% of LGBTQI+ people being age 50 or older. Additionally, nearly all studies of LGBTQI+ health and aging are cross-sectional. These critical gaps inhibit the development of rigorous research and

evidence-based interventions to improve LGBTQI+ aging outcomes. My research addressed these gaps by expanding high-quality, publicly accessible LGBTQI+-inclusive aging data resources in a prospective cohort, that is, in a group of people who aren't already diagnosed with a specific illness or age-related condition. Longitudinal studies are essential in aging research because they allow researchers to observe change over time, rigorously and directly test causal mechanisms, and identify health trajectories, opportunities for intervention, and the long-term effects of early life experiences. Terminating longitudinal studies can cause acute harm to underserved populations by cutting off critical sources of health data and support.  Longitudinal studies like this one often provide health information and screenings that participants may not otherwise access. Ending them also breaks the trust that researchers work hard to build with marginalized communities, potentially discouraging future participation in research. Without these data, policymakers and health service providers lose valuable insights into the unique challenges these populations face, leading to poorly informed health interventions and widened disparities. Ultimately, halting such studies deepens existing inequities and silences the needs of those already underrepresented in health research.

14.    A true and correct redacted copy of the notice of award ("NOA") is attached as **Exhibit A**.

15.    On February 28, 2025, I received a letter from NIH terminating my funding.  It stated that the award "no longer effectuate[d] agency priorities."  The letter did not state that I had failed to comply with any terms of my award. The termination letter claimed that "[r]esearch programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans."  The letter did not explain how the NIH concluded that my years-long research regarding the health of older sexual and

gender minorities was "unscientific."  The termination letter I received stated I was eligible to appeal the decision within 30 days of receiving the termination notice, but also stated that "no corrective action is possible here" and "no modification of the project could align the project with agency priorities."  A true and correct redacted copy of the termination notice is attached as **Exhibit B**.

16.    When I received notice that my largest research grant would not be renewed, it felt like the floor dropped out from under me. It wasn't just about the funding. I was stunned to hear from a government official that my work was unscientific, despite having just gone through another round of rigorous scientific review for the five-year renewal process of this award. That renewal project was reviewed highly favorably by my peers across social sciences and public health. Additionally, at the end of 2024, I had just received a Mid-Career Investigator award from NIH, a national recognition of my contributions to public Health Science. And earlier in 2024, NIH also recognized the lab that I direct through their inaugural prize for enhancing diversity in biomedical and public health research. The termination letter's commentary that my work had no value or benefit to the American people or their health is particularly ironic, given that I had just received these prestigious honorary awards for service to public health. This made me very angry and sad in its erasure of the almost 10% of Americans who identify as LGBTQI+.

17.    The termination of this grant has significantly impacted my life, both professionally and personally.  Professionally, the termination has caused my team to lose valuable research time. The participant cohort that I recruited will be lost due to a lack of follow-up.  The impact on my research is compounded by the fact that the terminated project was a longitudinal study that will be impossible to replicate.  The early termination also ended any possibility of an additional renewal of the grant.  Further, without the ability to complete this years-long study, I have lost

years of progression in my career.  As a researcher, my success is largely defined by my research grants and publications.  I now will never have the chance to publish the research I spent years of my life conducting.

18.     Financially, I lost approximately one-quarter of my salary in the 2024-2025 fiscal year with the termination of this grant, and this impact will continue annually for the next five years due to the lost renewal. I will experience additional changes in job quality as I have to move more into a teaching role to cover the lost research effort.  This not only changes how I spend my work time in the short term but has implications for my long-term productivity and promotion, as time spent teaching is not as valued towards promotion as time spent researching. Additionally, I now must cover expenses that the grant had supported, including conference travel, statistical software, data sharing, and even basic supplies, to disseminate results from the terminated work and ensure that even more is not lost.  These expenses were covered in the award budget and are part of the process of scientific research. I have spent considerable time negotiating with and preparing internal applications for bridge funding support following the termination of my project, but as of the date of this application, I have not received any assistance from my institution to cover any lost funding.

19.     Others on my team have experienced harms as well. Co-Investigators who received financial support from this grant and planned to receive financial support on the renewal award are in positions where they need to raise 75% or more of their salary. A supervisor told one of these individuals to begin looking for another job because this funding will not arrive. I also regularly work with a small business that provides research support and sample management for my study. I have discussed this termination at length with the president of that company, who has informed me that they will have to adjust staffing due to the termination of this award and the loss of the

renewal opportunity for which they were budgeted approximately $750,000 over the next five years. Research participants have told me how disheartened they are to hear the study was terminated, and how important it was for them to participate in research that was affirming and valued their experiences. The project regularly employed undergraduate research assistants who will have no future opportunities on this project.

20.     I have participated in several other awards that have been impacted by terminations. I am the PI of an active supplement to an R01 that was terminated along with the parent award on February 28, 2025. I am Co-I on another R01, which was terminated on March 20, 2025, a true and correct redacted copy of which is attached as **Exhibit C**. I am the Primary Mentor on a grant, which was terminated on March 21, 2025, a true and correct redacted copy of which is attached as **Exhibit D**.

21.     I have also had one grant that was not awarded. Although this might seem insignificant, NIH regularly conducts new scientific reviews based on expanded or novel aims for previously awarded 5-year R01 research grants. The renewal of my terminated R01 award received an 8th percentile score in October 2024.  This score was within the published fundable range at the National Institute on Aging for the 2025 fiscal year and is considered a very high score. As a result, NIH had requested the final administrative documentation for this application before it supplies the Notice of Award, which my institution provided. This project was scheduled to start on April 1, 2025, but I never received the Notice of Award that is necessary to start drawing down funds.

22.     In addition, I have had multiple pending applications disrupted. One R01 application that was under review focused on examining epigenetic aging. This application was removed from part of the later review process, which the grant process calls a Study Section, on February 9, 2025. The research team was made aware of this via an automated email through the

NIH grant portal. A member of the research team called the Center for Scientific Review, and they had no information and suggested that the Scientific Review Officer might know more. The Scientific Review Officer confirmed by phone that NIH had removed the grant from review but provided no other information.  Later, this application was assigned to a new ad-hoc study section, which did not exist or have any standing members at the time of assignment, a concerning and bizarre change. A second application, a K99/R00 training application on which I serve as Primary Mentor, was submitted in early February 2025. This application was immediately assigned to an ad-hoc study section with no published standing members at the time of assignment.

23.    I have also had multiple applications in progress disrupted. In January 2025, I was preparing three different submissions: a T32 training program application as Principal Investigator, an R21 research grant as Principal Investigator, and an R01 as Co-Investigator. The T32 training programs constitute an immense achievement for the center or department, institution, and leadership receiving the award. These awards typically fund multiple postdoctoral and/or graduate training slots for multiple years and contribute additional resources and recognition to the recipient center/department. The T32 training program application is over 50 pages of information on current research, training and research plans, mentorship plans, and other institutional support information. This application was being prepared for the May 2025 deadline, and we had already accrued more than 100 hours of time on the application. We made the hard decision to abandon this application. The R21 research grants are smaller 3-year awards that are intended to be exploratory or higher-risk research. The risk is outweighed by the potential yield of major insights or opportunities in public health and medicine. I contributed approximately 80 hours to developing the project, ensuring data access, planning budgets, and working with Co-Is to write the application. We have also abandoned this application and project work due to concerns about fair

review and the potential of not receiving the Notice of Award even if we are funded.  These projects have no opportunities for funding from other sources.

24.     The final disrupted R01 application was fully prepared, focusing on improving care and outcomes for cancer survivors from SGM populations. On Feb 10, 2025, the program officer assured us that we should still submit to the funding stream that called for exactly this submission, which had a due date of March 5. Two weeks after the call with the program officer, on February 24, the team was reviewing our revised attachments and budget when we logged into the application portal to make sure the funding opportunity was still there. It was not there. From the archived synopsis at grants.gov, a team member noticed that this webpage had been updated earlier that day, on February 24. The update changed the grant application closing date to February 24, effectively archiving the funding opportunity. This project has no clear path forward absent federal support. No other funding agency whose priority area is cancer survivorship has the resources to fund this project, which was budgeted for $2.7 million over 5 years, distributed across investigators at four universities, a community partner organization, and two cancer registries.  Because this project is no longer viable, the team at the submitting institution had to lay off staff and eliminate research experiences for students.

25.     Prior to February 2025, NIH had never terminated a grant that supported my research.

26.     My institution chose not to appeal the terminations, despite my requests to appeal the terminations. Each of the termination letters stated that "no corrective action is possible here" and "no modification of the project could align the project with agency priorities."

27.     The personal toll of the project terminations and disruptions has been immense. I have spent years building a research program I deeply believed in, one that supported not only my

work but also the livelihoods and futures of junior collaborators, research staff, and students. Overnight, I went from leading a vibrant, productive team to making impossible decisions about who I could afford to keep employed and which projects would have to be abandoned. I did not just do this once, but over and over. Weekly, for months, there has been a new crisis.

28.     The uncertainty of my work life has bled into my home life. I started calculating how long I could stretch my own salary if my remaining two grants were terminated. I have delayed large expenses like home repairs. And I have felt like I failed, not just myself, but my team and the communities that I serve through my work. My sleep has been disrupted, and I regularly wake up at 3 or 4 in the morning feeling anxious about work, finances, and the possibility of government retaliation. I dread opening my email, worried that each message might bring more bad news, and have struggled to stay productive and up-to-date with work. I know that I am not alone in these feelings. I saw my experience echo across the country as more and more scholars, all working with LGBTQI+ populations, found themselves scrambling after their projects were terminated.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 25, 2025

*Phoebe Poe*
_____
Dr. Phoebe Poe

# Exhibit A



**Department of Health and Human Services**
NATIONAL INSTITUTE ON AGING

**Notice of Award**

FAIN #

**Federal Award Date**
/2025

---

| **Recipient Information** | **Federal Award Information** |
|---|---|

**Recipient Information**

**1. Recipient Name**

**2. Congressional District of Recipient**

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier**

**7. Project Director or Principal Investigator**



**8. Authorized Official**

**Federal Agency Information**

**9. Awarding Agency Contact Information**
Ryan Blakeney

NATIONAL INSTITUTE ON AGING
blakeneyr@mail.nih.gov
301-451-9802

**10. Program Official Contact Information**
FRANK  Bandiera

NATIONAL INSTITUTE ON AGING
frank.bandiera@nih.gov
301-496-3131

**Federal Award Information**

**11. Award Number**

**12. Unique Federal Award Identification Number (FAIN)**

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Effects of Social Networks and Policy Context on Health among Older Sexual and Gender Minorities in the US South

**15. Assistance Listing Number**
93.866

**16. Assistance Listing Program Title**
Aging Research

**17. Award Action Type**
Supplement (REVISED)

**18. Is the Award R&D?**
Yes

| **Summary Federal Award Financial Information** | |
|---|---:|
| **19. Budget Period Start Date** 07/01/2023 **– End Date** 02/28/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $99,998 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $99,998 |
| **26. Project Period Start Date** /2019 **– End Date** 02/28/2025 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $2,628,998 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Jeni  Smits

---

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Notice of Award



*RESEARCH*
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE ON AGING



**SECTION I – AWARD DATA –** ███████████ **REVISED**

**Principal Investigator(s):**
████████████

**Award e-mailed to:** ███████████████

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to ███████████ in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Aging of the National Institutes of Health under Award Number ████████. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,


Jeni  Smits
Grants Management Officer
NATIONAL INSTITUTE ON AGING

Additional information follows

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Consultant Services**                                                                            $52,916
**Subawards/Consortium/Contractual Costs**                                       $10,174

Version: 35 - 3/15/2024 9:51 AM | Generated on: 3/13/2025 12:07 AM

| | |
|---|---|
| **Federal Direct Costs** | $63,090 |
| **Federal F&A Costs** | $36,908 |
| **Approved Budget** | $99,998 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $99,998 |
| **TOTAL FEDERAL AWARD AMOUNT** | $99,998 |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTAL FEDERAL AWARD AMOUNT YEAR ( 5 ) (for this Document Number) | |
|---|---|
| **AWARD NUMBER** | **TOTAL FEDERAL AWARD AMOUNT** |
| ██████████████ | $99,998 |
| █ | $362,818 |
| **TOTAL** | **$462,816** |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 5 | $99,998 | $462,816 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | ████████████ |
| **Document Number:** | |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2023 |

| IC | CAN | 2023 |
|---|---|---|
| AG | ████████ | $99,998 |

**NIH Administrative Data:**
PCC: ████████ / OC: ████████ / **Released**: 03/12/2025
**Award Processed:** 03/13/2025 12:07:31 AM

**SECTION II – PAYMENT/HOTLINE INFORMATION –** ████████████ **REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS –** ██████████ **REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

    a.  The grant program legislation and program regulation cited in this Notice of Award.
    b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
    c.  45 CFR Part 75.
    d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
    e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
    f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to

report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AG063771. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience*.

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE: If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required. However, a final expenditure FFR is required and must be submitted electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

**SECTION IV – AG SPECIFIC AWARD CONDITIONS –** ▊▊▊▊▊▊▊                **REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

It is the policy of NIH not to prioritize research activities that focuses on Transgender issues. Your program no longer effectuates agency priorities. Therefore, this project is terminated. Vanderbilt University may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

**Supersedes Notice of Award issued 03/03/2025. Previous terms and conditions apply:**

This project is suspended and therefore, no research activities may be carried out under this award and no funds may be obligated nor charged any reason under this project.  NIH is carrying out the suspension under NIH's independent authority under the Public Health Service Act to determine research priorities and ensure program integrity and is not being carried out under any of the Executive Orders.

**Supersedes Notice of Award issued 06/26/2023. Previous terms and conditions apply:**

Funding for this award has been provided by Alzheimer's Disease Initiative funds.

This award provides supplemental support under the program NOT-OD-22-032: Notice of Special Interest (NOSI): Administrative Supplements for Research on Sexual and Gender Minority (SGM) Populations (Admin Supp Clinical Trial Optional) (nih.gov).

These funds, $99,998 Total Costs ($63,090 Direct Costs and $36,908 Facilities and Administrative Costs) are to be used as requested in the recipient's proposal submitted 01/30/2023.

This award includes funds awarded for consortium activity with The University of Texas at Austin. Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at: http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15_consortium_agreements.htm

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** ███████████████ REVISED

**INSTITUTION:** ███████████

| Budget | Year 5 |
|---|---|
| Consultant Services | $52,916 |
| Subawards/Consortium/Contractual Costs | $10,174 |
| TOTAL FEDERAL DC | $63,090 |
| TOTAL FEDERAL F&A | $36,908 |
| TOTAL COST | $99,998 |

| Facilities and Administrative Costs | Year 5 |
|---|---|
| F&A Cost Rate 1 | 58.5% |
| F&A Cost Base 1 | $63,090 |
| F&A Costs 1 | $36,908 |

# Exhibit B

PRIVILEGED, CONFIDENTIAL, PRE-DECISIONAL



Dear ██████████ :

Funding for Project Numbers ████████████████████████ are hereby terminated pursuant to the 2022 National Institutes of Health ("NIH") Grants Policy Statement,[13] and 2 C.F.R. § 200.340(a)(2) (2023).  This letter constitutes a notice of termination.[14]

The 2022 Policy Statement applies to your project because NIH approved your grants on ████ /2023 and, ████ /2023, respectively, and "obligations generally should be determined by reference to the law in effect when the grants were made."[15]

The 2022 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[16]  According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[17]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities.  NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.].

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[18] no corrective action is possible here.  The premise of Project Numbers

---

[13] https://grants.nih.gov/grants/policy/nihgps/nihgps_2022.pdf.
[14] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[15] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[16] 2022 Policy Statement at IIA-1.
[17] *Id.* at IIA-153.
[18] 2022 Policy Statement at IIA-154.

PRIVILEGED, CONFIDENTIAL, PRE-DECISIONAL

███/2023 and, ███/2023 are incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[19] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390.  NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[20]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[21] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[22]

You must submit a request for such review to NIH Acting Director, Matthew J. Memoli, M.D., M.S., no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, NIH Acting Director, Matthew J. Memoli, M.D., M.S.,  may grant an extension of time.[23]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position.  In addition to the required written statement, you shall provide copies of any documents supporting your claim.[24]


Sincerely

*Jeni A. Militano*

---

[19] *See* 2 C.F.R. § 200.343 (2023).
[20] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[21] *See* 45 C.F.R. § 75.374.
[22] See 42 C.F.R. Part 50, Subpart D.
[23] *Id.* § 50.406(a).
[24] *Id.* § 50.406(b).

# Exhibit C



March 20, 2025



Dear ▮▮▮▮▮▮▮:

Effective with the date of this letter, funding for Project Number ▮▮▮▮▮▮▮ is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on ▮▮▮▮▮▮▮ 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S     Digitally signed by Michelle G.
                         Bulls -S
                         Date: 2025.03.20 17:06:28 -04'00'

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, National Institute of Mental Health
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

# Exhibit D



Grant Termination Notification    ⬇ Download                              ⊞ Show email  ⧉  ✕

## Grant Termination Notification

BG  Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>                        ···

                                                                    Fri 3/21/2025 11:28 AM

You don't often get email from michelle.bulls@nih.gov. Learn why this is important

**NIH** National Institutes of Health
Office of Extramural Research

3/21/2025

Dear

Effective with the date of this letter, funding for Project Number _____ is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on ____ 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4]

According to the Policy Statement, "NIH may ... terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding entity or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

**Michelle**      Digitally signed
**G. Bulls -S**   by Michelle G.
                  Bulls -S

Michelle G. Bulls, on behalf of Jeni Militano (Acting), Chief Grants Management Officer, NIA
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] Bennett v. New Jersey, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] Id. at IIA-156.
[6] NIH Grants Policy Statement at IIA-156.
[7] See 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(C)
[9] See 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 Id. § 50.406(a)
[12] 12 Id. § 50.406(D)