**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

AMERICAN ASSOCIATION OF
PHYSICIANS FOR HUMAN RIGHTS, INC.
d/b/a GLMA: HEALTH PROFESSIONALS
ADVANCING LGBTQ+ EQUALITY; *et al.*,

        *Plaintiffs,*

        v.

NATIONAL INSTITUTES OF HEALTH;
*et al.*,

        *Defendants.*

Civil Action No. 8:25-cv-01620-LKG

---

**DECLARATION OF DR. RACHEL ROE, MD**

I, Dr. Rachel Roe, hereby declare and state as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.      I am a plaintiff in this action. I am asserting claims on behalf of myself and on behalf of my LGBTQI+ patients.

4.      I am offering this declaration in my individual capacity and not on behalf of my employer.

5.      I am also a member of GLMA: Health Professionals Advancing LGBTQ+ Equality.

6.      Rachel Roe is a pseudonym.  I am submitting this declaration under a pseudonym to protect my privacy and to protect my family and me from harassment, violence, and retaliation.

7.      I am a physician and a researcher at a hospital and higher education institution in Virginia.  I am profoundly dedicated to improving the lives of gender minority youth, a

1

marginalized and under-researched population of youth who are transgender and gender diverse, through health research and evidence-based medical practice.  My research empowers the voices of transgender and gender-diverse youth through qualitative and youth-engaged research methods and covers topics including mental health, healthcare transition, and disordered eating.

8.      Over the course of a decade, I completed medical school, pediatric residency, an Adolescent Medicine fellowship, and also earned a master's degree in public health.  During my Adolescent Medicine fellowship training, I quickly found that a majority of my transgender and gender-diverse patients were struggling with disordered eating behaviors for reasons that were unique to their gender identity and stigma of being transgender.  As a physician-scholar, my desire to utilize best clinical practices to address disordered eating in transgender and gender-diverse youth was and continues to be limited by a lack of research on this topic.  To advocate for my patients through inclusive research, I have contributed to disordered eating research with transgender and gender-diverse youth over the past 8 years.

9.      In 2024, I was awarded a K23 Career Development Award through the National Institutes of Health ("NIH").  K23 grants offer clinical investigators the opportunity to develop into independent clinical researchers through mentorship, "protected time" and funding.  As an untenured professor, conducting research is essential to furthering my career goal of becoming a leading independent researcher on youth-engaged disordered eating research with transgender and gender-diverse youth. A strong and consistent research record and transition from early career investigator to independent researcher, the purpose of K23 grants, increases my opportunities to become a tenured professor.

10.      This K23 grant is the first NIH grant I have applied for and received over the course of my career.

11.    My K23 grant was awarded through the National Institute of Mental Health ("NIMH") and began on April 1, 2024.  NIH's grant review process has a high level of rigor to fund research with scientific merit.  In the Fiscal Year of 2024, the success rate of K23 grant applications submitted to NIMH was 33.1%.  NIH grants are scored with a final impact score that can range from 10 to 90, where 10 is the best score.  My K23 grant application received an impact score of 15.  In my K23 application's summary statement, one reviewer wrote, "[this proposal] focuses on disordered eating behaviors, for which transgender and gender diverse youth face extreme disparities. There is very limited expertise in this area, despite the need.  The candidate is excellent and has proposed a cohesive set of training experiences that will enable her to conduct culturally informed research with this population."   Another reviewer wrote, "[o]verall, the weaknesses are viewed as minor and this proposal is viewed as likely to have a strong impact, launching the career of a talented physician-scientist dedicated to addressing a significant public health issue."

12.    My research funding began on April 1, 2024. As a cisgender researcher with no lived experience of being transgender, I aspire to create a research environment that empowers the voices of transgender and gender-diverse people. Research is most successful when those affected participate in its design and implementation. I conduct my K23 research with the help of 1) a transgender research coordinator, 2) a transgender community consultant who has expertise in mental health treatment and community advocacy for transgender people with disordered eating, and 3) a youth advisory board of 6 transgender and gender-diverse youth who guide our research team to optimize the cultural sensitivity and impact of our research. So far, this K23 grant has recruited 20 transgender and gender-diverse youth to participate in qualitative interviews for Aim 1 of the grant.

13.     On March 18, 2025, I received a letter from NIH stating that it had terminated my funding.  (A true and correct copy of the redacted termination letter is attached hereto as **Exhibit A**.)

14.     The letter did not state that I had failed to comply with any terms of my award. Rather, it stated that "[i]t is the policy of NIH not to prioritize research activities based on gender identity as it no longer effectuates agency priorities."  The funding, originally $205,000 for one year, was awarded to support my research titled "Using youth-engaged methods to develop and evaluate a measure for disordered eating behaviors in transgender and gender-diverse youth."  The letter from NIH asserted that "[r]esearch programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans—" effectively concluding this group of youth involved in my research is not important, while also undermining my credibility as a clinical researcher.  The letter did not explain how my research into disordered eating behaviors among transgender and gender-diverse youth was unscientific or failed to advance health.

15.     The termination letter I received stated I was eligible to appeal the decision within 30 days of receiving the termination notice but stated that "no corrective action is possible here."

16.     My institution decided not to appeal the termination, believing that an administrative appeal is unlikely to be successful.

17.     The statements in my K23 termination letter were both devastating and frustrating as an investigator with actual experience conducting research with transgender and gender-diverse participants. The termination notes that "research programs based on gender identity are often unscientific." Research with transgender and gender-diverse people has been in existence for over a century, and spans disciplines including public health, medicine, psychology, and sociology.

NIH grants and peer-reviewed manuscripts on research topics related to transgender and gender-diverse people undergo the same level of scrutiny and rigor as other research topics. Excluding research specifically with transgender and gender-diverse people is inherently creating bias amongst research literature.

18.    The termination letter also notes "research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans." Research specifically with transgender and gender-diverse people has real world impact. The results of research have directly challenged, informed, and changed clinical practice, education, and policy. Improved clinical practice contributes to more affirming care, improved mental health disparities, and fewer hospitalizations and emergency department visits for transgender and gender-diverse people. Improved education for healthcare providers, educators, and any other individual who interacts with transgender and gender-diverse people decreases harm and increases protective factors for the health and well-being of transgender and gender-diverse people.

19.    My institution has agreed to fund my research with the expectation I will find additional sources of funding. The stress I am experiencing from losing my grant funding has affected me both emotionally and physically. K23 grant funding includes the necessary salary coverage of protected research time that allows me, as an early career researcher, to develop the necessary skills to conduct research and become an independent investigator. More importantly, my research has the potential to improve the lives of a marginalized and high-risk population, including the patients I care for on a day-to-day basis. Rates of both suicidal ideation and suicide attempts are higher in transgender and gender-diverse individuals with eating disorders compared with transgender and gender-diverse individuals without eating disorders. Despite these risks, there

are no evidence-based screening measures or treatment for transgender and gender-diverse youth with disordered eating behaviors.

20.    The results of my K23 grant would result in the first tailored, evidence-based measure of disordered eating specifically for transgender and gender-diverse youth. This will have the potential to transform clinical care for our transgender and gender-diverse youth patients. By screening and identifying disordered eating behaviors in transgender and gender-diverse youth, medical and mental health providers can intervene earlier and prevent the development of eating disorders, psychiatric diagnoses with one of the highest mortality rates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May 24, 2025

Dr. Rachel Roe

# Exhibit A

 

## National Institutes of Health
### Office of Extramural Research

March 18, 2025



Dear ▮▮▮▮▮▮▮

Effective with the date of this letter, funding for Project Number ▮▮▮▮▮▮▮▮▮▮ is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on ▮▮▮▮▮ 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

1

agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S
Digitally signed by Michelle G. Bulls -S
Date: 2025.03.18 11:07:20 -04'00'

Michelle G. Bulls, on behalf Theresa Jarosik, Chief Grants Management Officer, National Institute of Mental Health
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)