**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

AMERICAN ASSOCIATION OF
PHYSICIANS FOR HUMAN RIGHTS, INC.
d/b/a GLMA: HEALTH PROFESSIONALS
ADVANCING LGBTQ+ EQUALITY, *et al.*,

      Plaintiffs,

      v.

NATIONAL INSTITUTES OF HEALTH, *et al.*,

      Defendants.

Civ. A. No. 25-cv-1620-LKG

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
**AND PLAINTIFFS' REQUEST FOR A STAY PURSUANT TO 5 U.S.C. § 705**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ................................................... 6

  A.  The Plaintiffs' Complaint and Motion for Injunctive Relief ............................. 6

  B.  NIH's Mission and Discretionary Authority to Administer Grants.................... 7

  C.  The Plaintiffs' NIH Grants and the Termination Decisions ............................. 9

ARGUMENT ............................................................................................................ 11

  I.  The Legal Standard .......................................................................................... 11

  II.  The Court of Federal Claims, Not This Court, Has Exclusive Jurisdiction Over Plaintiffs' Claims. ............................................................................................................. 12

  III.  Plaintiffs Lack Standing to Seek Prospective Relief. ...................................... 18

  IV.  Defendants' Grant Cancellations Do Not Violate the Equal Protection Clause of the Fifth Amendment.................................................................................................. 20

  V.  The Agency Directives and Challenged Actions Do Not Violate Section 1557 of the Affordable Care Act....................................................................................... 25

  VI.  Defendants Have Not Violated Constitutional Separation of Powers .............. 26

  VII.  Neither the Agency Directives nor the Grant Terminations Violate the APA ......... 28

    A.  The Challenged Agency Directives Are Not Reviewable Final Agency Actions. .........28

    B.  Funding Decisions Are Committed to Agency Discretion and Are Not Reviewable.....29

    C.  NIH's Directives and Grant Terminations Were Reasoned...........................................31

    D.  NIH Directives and Actions Comported with Both Federal Law and Regulation. ........33

    E.  The Claims of Unreasonable Delay of Notices of Awards and Grant Application Review Are Not Justiciable Under the APA. ......................................................................35

    F.  The Agency Directives and Challenged Actions Are Not Violative of the Constitution. 35

VIII.  Plaintiffs Do Not Face Irreparable Harm........................................................................ 35

IX.  The Balance of Equities and Public Interest Favor the Defendants................................... 36

X.  The Court Should Require a Bond if the Motion Is Granted............................................. 37

CONCLUSION........................................................................................................................ 37

# TABLE OF AUTHORITIES

*AACTE, App. No. 25-1281,*
  2025 WL 1232337 (4th Cir. Apr. 10, 2025) ........................................................ 13

*Aetna Life Ins. Co. of Hartford, Conn., v. Haworth,*
  300 U.S. 227 (1937) ............................................................................................ 18

*Am. Ass'n of Colls. for Teacher Educ. v. McMahon,*
  Civ. No. 25-cv-702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025) ................. 13

*Am. Tel. and Tel. Co. v. United States,*
  124 F.3d 1471 (Fed. Cir. 1997) .......................................................................... 27

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................ 28

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ...................................................................................... 13, 14

*Brendsel v. Off. of Fed. Hous. Enter. Oversight,*
  339 F. Supp. 2d 52 (D.D.C. 2004) ...................................................................... 27

*Carlson v. United States,*
  837 F.3d 753 (7th Cir. 2016) .............................................................................. 34

*Child Trends, Inc. v. U.S. Dep't of Educ.,*
  Civ. No. 25-1154-BAH, 2025 WL 1651148 (D. Md. June 11, 2025) ........ 3-4, 15, 16

*City of Cleburne,*
  473 U.S. ............................................................................................................... 25

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989) .............................................................................................. 24

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................ 19

*Clark v. Jeter,*
  486 U.S. 456 (1988) ...................................................................................... 20, 21

*Coleman v. Kendall,*
  74 F.4th 610 (4th Cir. 2023) ............................................................................... 12

*Craig v. Boren,*
  429 U.S. 190 (1976) ............................................................................................ 22

*Department of Education v. California,*
  145 S. Ct. 966 (2025) ................................................................... 3, 12, 13, 37

*Dewhurst v. Cnty. Aluminum Co.*,
    649 F.3d 287 (4th Cir. 2011) ................................................. 1

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ................................................. 36

*FCC v. Beach Commc'ns*,
    Inc., 508 U.S. 307, 313– 14 (1993) ................................... 23, 24

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367381 (2024) ....................................................... 18

*Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ......................................................... 32, 33

*Frazier v. Prince George's Cnty.*,
    86 F.4th 537 (4th Cir. 2023) ................................................. 11

*FTC v. Standard Oil Co. of California*,
    449 U.S. 232 (1980) ......................................................... 28, 29

*Gore v. Lee*,
    107 F.4th 548 (6th Cir. 2024) ........................................... 23, 25

*Granny Goose Foods*, Inc. *v. Brotherhood of Teamsters*,
    415 U.S. 423 (1974) ............................................................... 1

*Grimm* v. *Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ....................................... 22, 23, 25

*Harper v. Warfel*,
    118 F.4th 100 (1st Cir. 2024) ............................................... 28

*Heller v. Doe*,
    509 U.S. 312 (1993) ............................................................. 24

*Holbrook v. Tenn. Valley Auth.*,
    48 F.4th 282 (4th Cir. 2022) ................................................. 31

*Just Puppies, Inc. v. Frosh*,
    565 F. Supp. 3d 665 (D. Md. 2021) ..................................... 24

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ........................................... 22, 25

*Kenny v. Wilson*,
    885 F.3d 280 (4th Cir. 2018) ............................................... 18

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ......................................................... 30, 31

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 18

*Lyng v. Castillo*,
    477 U.S. 635 (1986) ......................................................................... 23

*Maine Community Health Options v. United States*,
    590 U.S. 296 (2020) ......................................................................... 12

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976) ......................................................................... 22

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ......................................................... 12

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ................................................... 30, 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................... 32, 33

*Nat'l Treas. Emplys. Union v. Trump*,
    No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ................. 37

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................... 11

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) ............................................................................. 20

*North Carolina State Conference of NAACP v. North Carolina State Bd. of Elections*,
    283 F.Supp.3d 393 (M.D.N.C., 2017) .............................................. 19

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................... 35

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ......................................................................... 22

*Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ................................................ 30-31

*RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*,
    614 F. Supp. 2d 39 (D.D.C. 2009) .................................................... 36

*Ren v. U.S. Citizenship and Immigration Servs.*,
    60 F.4th 89 (4th Cir. 2023) ........................................................ 32, 33

*Solutions in Hometown Connections v. Noem*,
    No. 25-cv-00885-LKG, 2025 WL 1530318 (D.Md. May 29, 2025) ........... 3, 14, 15

*Sustainability Inst. v. Trump,*
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ............................................ 3, 13, 37

*Telecomms. Rsch & Action Ctr. v. FCC,*
750 F.2d 70 (D.C.Cir. 1984) ............................................................................................. 35

*Vance v. Bradley,*
440 U.S. 93 (1979) ............................................................................................................ 24

*Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.,*
98 F.4th 483 (4th Cir. 2024) ............................................................................................. 32

*Vill. of Bald Head Island v. U.S. Army Corp. of Eng'rs,*
714 F.3d 186 (4th Cir. 2013) ............................................................................................ 29

*Washington v. Davis,*
426 U.S. 229 (1976) .......................................................................................................... 20

*Wilcox v. Lyons,*
970 F.3d 452 (4th Cir. 2020) ............................................................................................ 21

*Williams v. Kincaid,*
45 F.4th 759 (4th Cir. 2022) ............................................................................................. 26

*Williams v. Skrmetti,*
83 F.4th 460 (6th Cir. 2023) ................................................................................. 21, 22, 23

*Winter v. Natural Res. Def. Council,*
555 U.S. 7 (2008) ........................................................................................................ 11, 36

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
576 U.S. 1 (2015) .............................................................................................................. 26

*Zzyym v. Pompeo,*
958 F.3d 1014 (10th Cir. 2020) ........................................................................................ 24

Article III, Section 2 of the United States Constitution ............................................................. 4

5 U.S.C. § 701 ......................................................................................................................... 30

5 U.S.C. § 705 ........................................................................................... 12, 7, 10, 19, 36, 1

5 U.S.C. § 1009 ....................................................................................................................... 10

28 U.S.C. § 1346 ..................................................................................................................... 12

28 U.S.C. § 1491 ................................................................................................................. 2, 12

42 U.S.C. § 241 ................................................................................................. 7, 9, 10, 25, 27

42 U.S.C. § 282 ............................................................................................................. 7, 9, 27

42 U.S.C. § 284 ....................................................................................................................... 31

42 U.S.C. § 18116 ................................................................................................................... 25

Federal Rule of Civil Procedure 65 ......................................................................................... 37

42 C.F.R. § 52.5 ................................................................................................... 35

42 C.F.R. § 52.6 ............................................................................................ 7-8, 8, 9

2 C.F.R. § 200 ........................................................................................... passim

Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d ed.) ........................................ 36

In accordance with Rule 65 of the Federal Rules of Civil Procedure and Local Rule 105.2, the Defendants, the National Institutes of Health (hereinafter "NIH"), Jay Bhattacharya, Director of NIH, the United States Department of Health and Human Services, and Robert F. Kennedy, Jr., Secretary of the United States Department of Health and Human Services, by and through their attorneys, Kelly O. Hayes, United States Attorney for the District of Maryland, and undersigned counsel, submit the following memorandum in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and Stay (ECF No. 64, the "Motion").

## INTRODUCTION[1]

The grant of a preliminary injunction is an extraordinary remedy never awarded as of right. *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). Accordingly, relief may be awarded only upon a clear showing that the plaintiff is entitled to the remedy. *Id.* The plaintiff bears the burden of proving the requirements for such relief by clear and convincing evidence. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441 (1974). In this matter, the plaintiffs, a national nonprofit membership organization comprised of physicians, researchers and academics, health-profession students, and health professionals, and sixteen individuals whose research grants were terminated by NIH, have moved for a stay and a preliminary injunction[2] seeking to enjoin the defendants from implementing or enforcing certain internal NIH directives

---

[1] Citations to the docketed pleadings and exhibits filed in this case by the plaintiffs, which exhibits are incorporated herein by reference, shall refer to the CM/ECF numbers assigned to the pleading and exhibit. Citations herein to "Mem." are to the May 28, 2025 Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction and Stay, ECF No. 64-1.

[2] The plaintiffs have filed a ten-count complaint corresponding to their motion for injunctive relief. *See* ECF No. 1. The Complaint alleges violations of the: Equal Protection Clause of the Fifth Amendment (Count I); Section 1557 of the Affordable Care Act (Count II); Fifth Amendment's Due Process Clause (procedural due process) (Count III); Fifth Amendment's Due Process Clause (Void for Vagueness) (Count IV); Administrative Procedure Act (Counts V to IX); and Separation of Powers (Count X). *Id.* at ¶¶ 119-185.

and guidance that plaintiffs characterize as the "Agency Directives"[3] relating to "agency priorities prohibiting federal funding."  Mem. at 4-5.  The plaintiffs further seek to have this Court enjoin what they refer to as "Challenged Agency Actions." Mem. at 5-6.  Specifically, the plaintiffs contest the grant terminations (and seek their restoration) of the sixteen individual plaintiffs and the alleged suspension of application processes for grants, namely, "withholding" of approved grants or related funding and delaying or "refusing" to review grant applications or the renewal of same pertaining to LBGTQI+ health.  *Id*.  As explained below, and more fulsomely in the Argument section of this Opposition, the plaintiffs have not carried their burden for the relief sought because they have not made a clear showing of a substantial likelihood of success on the merits of their ten-fold claims.  Although the failure to satisfy the substantial-likelihood-of-success element of the test for issuance of a preliminary injunction relieves a court of the need to consider other factors informing the injunctive relief test, the plaintiffs in this case have failed to establish another element of the test; they have not shown that they will be harmed irreparably without injunctive relief and so their bid for relief must be denied.

As a threshold matter, binding Fourth Circuit precedent mandates that this Court lacks subject matter jurisdiction to grant injunctive relief on the plaintiff's claims.  This case, at bottom, belongs, pursuant to the Tucker Act, 28 U.S.C.  § 1491, in the Court of Federal Claims because the crux of the plaintiffs' claims is tethered to an express contract with the United States.  Put

---

[3]    The "Agency Directives" at issue are found at ECF Nos. 65-4 (Feb. 10, 2025 Secretarial Directive on DEI-Related Funding); 65-5 (Feb. 21, 2025 Directive on NIH Priorities); 65-6 (March 2025 Staff Guidance—Award Assessments for Alignment with Agency Priorities); 65-8 (Mar. 25, 2025 NIH Grants Management Staff Guidance—Award Assessments for Alignment with Agency Priorities); 65-19 (Mar. 6, 2025 Article in *Nature*, "NIH to Terminate Hundreds of Active Research Grants"); 65-20 (Mar. 5, 2025 Washington Post Article, "NIH Reels with Fear, Uncertainty About Future of Scientific Research); 65-22 (Feb. 24, 2025 Mother Jones Article, "NIH is Again Throttling Research Funding in Defiance of a Federal Court Order"); and 65-24 (Feb. 13, 2025 NIH Supplemental Guidance to Memo Entitled – NIH Review of Agency Priorities Based on New Administration's Goals).

simply, this case is, at its essence, about contract claims as a fair reading of the plaintiffs' complaint, prayer for relief, and Motion make plain. The remedy the plaintiffs seek principally – reinstatement of their terminated grants and resultant funding – is a contractual remedy. An order that prohibits NIH from terminating grant agreements is a directive that NIH specifically perform those agreements by paying the grants – something beyond this Court's power to order. Although the plaintiffs maintain that their grant awards are not contracts and their claims turn on the "unlawfulness" of the Agency's Directives and Challenged Agency Actions and are thus rooted in alleged constitutional and statutory violations, including the Administrative Procedure Act ("APA"), Mem. at 9-18, no amount of wish-casting and artful use of descriptors can hide that it is the operative grant agreements from which the federal funds flow and that such agreements satisfy the essential elements of a contract. To be sure, there are courts that have exercised jurisdiction in the surfeit of suits arising from the cancellation of grants since January 20, 2025. Other courts, including this Court in *Solutions in Hometown Connections v. Noem*, No. 25-cv-00885-LKG, 2025 WL 1530318 (D.Md. May 29, 2025) (*Solutions* II), have rejected detouring around the Tucker Act where, as here, the source of the rights for the plaintiffs' claims is the grant agreements – a more reasoned view consonant with *Department of Education v. California*, 145 S. Ct. 966 (2025) and the Fourth Circuit Court of Appeals' recent decision in *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025). Indeed, the only district court in the Fourth Circuit that has ruled on the question of jurisdiction in a grant termination with the benefit of the Fourth Circuit's recent opinion in *Sustainability* interpreted that decision to mean "that the Tucker Act precludes Article III courts from exercising jurisdiction over *any* claims pertaining to individual grant agreements, even if those claims are brought as constitutional or *ultra vires* actions." *Child Trends, Inc. v. U.S. Dep't of Educ.*, Civ. No. 25-1154-BAH, 2025 WL

1651148, at *8 (D. Md. June 11, 2025) (emphasis in original).

Even if the Court had jurisdiction in this case, to the extent that certain of the plaintiffs have appealed administratively their grant terminations while proposing that this Court enjoin "future" grant terminations and the withholding of grants, applications or renewal applications for awards and "related funding" *see* Mem. at 6, 10, this aspect of their claims is not ripe for judicial adjudication. For purposes of determining standing, and as Supreme Court precedent teaches, the focus is properly on the status of the party pursuing the complaint and not the merits of the case. Here, the plaintiffs have not alleged sufficiently that they have suffered an injury that is direct, distinct and palpable, as opposed to simply conjectural as pertains to their concerns about *future* grant terminations, grant awards and consequent funding. Mere interest in an issue will not suffice to satisfy the injury-in-fact requirement commanded by Article III, Section 2 of the United States Constitution and for this reason alone, the Court should deny injunctive relief as to claims related to apprehension of *future* grant terminations and awards and so avoid taking premature action based solely on an abstraction.

Regarding their constitutional claims, the plaintiffs fare no better in establishing a substantial likelihood of success on the merits of such claims. The Agency's Directives and Actions do not violate either the Fifth Amendment's guaranty of equal protection or the anti-discrimination provision of Section 1557 of the Affordable Care Act, the latter of which does not protect against selectivity in the subject of research and does not mandate that covered entities affirmatively fund or seek to benefit any particular group, even if that group was subject to discrimination historically. Likewise, neither the Challenged Agency Directives nor the Challenged Agency Actions are based on a constitutionally protected class and animus toward such. They are predicated upon the important governmental interest of protecting the public fisc

by not funding research deemed as having minimal scientific value.  Therefore, the challenged actions pass constitutional and statutory muster.  This Court should not ascribe to NIH motivations that do not exist and depend instead on speculation.

Neither are the plaintiffs substantially likely to succeed in pressing their claim that the EOs [Executive Orders] on which the Agency Directives and Challenged Agency Actions are allegedly based constitute a usurpation of Congress' authority under the Appropriations Clause of the Constitution and thus violate the separation of powers doctrine.  Mem. at 28-30.  The caselaw is clear that the authority of the President of the United States to control and supervise executive policymaking is grounded in the Constitution.  Moreover, the Executive Branch may set the terms of federal funding.  Specifically, NIH is vested, by statute, with the authority to fund research and as an incident of such authority delegated by Congress, to exercise its discretion to determine research priorities and allocate funding, accordingly.

As for the plaintiffs' Administrative Procedure Act ("APA")-based claims, here too such claims founder.  As regards the Challenged Agency Directives, there is nothing for the Court to enjoin as certain of the Challenged Directives are no longer in effect or they are not final agency actions subject to APA review.  As to the Challenged Agency Actions, the grant terminations are unreviewable because they are committed to agency discretion by law.  Even if judicial review is permitted under the APA's highly deferential standard, the Court cannot do what the plaintiffs invite it to do, that is, substitute its judgment for that of NIH.  NIH's termination of the grants was the result of reasoned decision-making and conformed with the applicable statutes and regulations.  Though the plaintiffs complain that they were deprived of a meaningful opportunity to object to or appeal the grant terminations because the language in the notices of termination "discouraged resistance," making it futile to challenge the termination decisions, Mem. at 35, the notices

explicitly provided for the right of appeal and several of the plaintiffs exercised that right. Until those appeals are decided any claim of futility is premature. The claim of unreasonable delay with respect to reviewing grant applications and withholding notices of award on previously approved submissions fails because these actions are discretionary and not mandatory.

The plaintiffs also fall short in establishing that they will be harmed irreparably by the absence of injunctive relief. Though plaintiffs insist that their ability to conduct their research has been severely compromised, NIH has not prohibited or interfered with the continuation of the research; funding may be secured from alternative sources, a point that Plaintiffs do not refute. Moreover, the "harms" claimed by the plaintiffs are borne of speculation and not fact. Finally, because this case properly belongs in the Court of Federal Claims, Plaintiffs cannot establish irreparable harm when they have an adequate remedy at law, *i.e.*, money damages for (alleged) breaches of contract.

Furthermore, the balance of equities and public interest weigh against granting a preliminary injunction because the government's interest in protecting taxpayer dollars is weighty and NIH is unlikely to recover funds after the grantees spend such funds. The loss of likely unrecoverable funds suffices to deny injunctive relief. For the reasons enumerated above, Defendants request that the Motion be denied. Should the Court disagree and grant injunctive relief, such relief should be narrowly tailored to that necessary to provide the plaintiffs fair redress and relief should be accompanied by more than a nominal bond.

## **BACKGROUND AND PROCEDURAL HISTORY**

### A.    **The Plaintiffs' Complaint and Motion for Injunctive Relief**

On May 20, 2025, the plaintiffs commenced this action by filing a Complaint for Declaratory and Injunctive Relief. ECF No. 1 (the "Complaint" or "Compl".) In the Complaint,

the plaintiffs challenge certain NIH directives and guidance and the termination decisions as violative of the Fifth Amendment's Equal Protection Clause (Count I), Section 1557 of the Affordable Care Act (Count II), the Fifth Amendment's Due Process Clause (Count III), the Fifth Amendment's Due Process Clause -- Void for Vagueness (Count IV), the Administrative Procedure Act (Counts V-IX), and the Separation of Powers doctrine (Count X). *Id*. at ¶¶ 120-185. Thereafter, on May 28, 2025, the plaintiffs filed a motion in support of their bid for a sweeping preliminary injunction. ECF No. 64-1.

  **B.**  <u>**NIH's Mission and Discretionary Authority to Administer Grants**</u>

   NIH's mission is to "seek fundamental knowledge about the nature and behavior of living systems" to better enhance health, lengthen life, and reduce illness and disability.[4] NIH spent more than $35 billion in Fiscal Year 2023 on nearly 50,000 competitive grants awarded to more than 300,000 researchers at over 2,500 universities, medical schools, and other research institutions across the United States. *See* Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates, NOT-OD-25-068 (Feb. 7, 2025). Congress has vested NIH with broad discretion in awarding grants. 42 U.S.C. § 241(a)(3); 42 U.S.C. § 282(b)(3), (12). By the authority of regulations[5] promulgated to implement the power Congressionally conferred, the Secretary of the United States Department of Health and Human Services ("HHS") has authorization to award grants "to those applicants whose approved projects will *in the Secretary's judgment* best promote the purposes of the statute authorizing the grant and the regulations of this

---

[4] NIH, Mission and Goals, available at https://www.nih.gov/about-nih/what-we-do/mission-goals (last visited June 11, 2025)
[5] The United States Department of Health and Human Services promulgates regulations that apply to the agencies within it, including NIH. *See* G.E.1 at 1, ¶¶ 1, 5, June 12, 2025 Declaration of Jon Lorsch, Ph.D., Acting Deputy Director for Extramural Research. All references to the Defendants' exhibits will be denoted as "G.E.," followed by the page number of the exhibit and where applicable the pertinent paragraph number.

part." 42 C.F.R. § 52.6(a).  In addition to the award of grants, NIH, correspondingly, has wide discretion in the administration of grants.  *See, e.g.*, 42 C.F.R. § 52.6(f).

When NIH exercises its discretion to award a grant, it enters into an agreement with the grantee through the issuance of a Notice of Award ("NOA"); the terms of the NOA govern the contractual relationship between the parties to the agreement – NIH and the grant recipient.  *See, e.g.*, ECF No. 64-4, NOA at 3, § III(d).  Under the grant agreements, if allowable costs are incurred, the grantee may draw down the allocated grant funds from the HHS Payment Management System to support such costs.  *Id*. at 1-2.  Notably, although a grant agreement permits the grantee to draw funds, it does not "commit[] or obligate[] the United States in any way to make additional, supplemental, continuation, or other award with respect to any approved application or portion of an application.  42 C.F.R. § 52.6(c)(3).

On August 13, 2020, the Office of Management and Budget ("OMB") revised its Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("UAR") at 2 C.F.R. § 200 to permit termination *"if an award no longer effectuates the program goals or agency priorities."* 2 C.F.R. § 200.340(a)(4) (emphasis added); 85 Fed. Reg. 49,506.  OMB's revision was effective August 13, 2020.  85 Fed. Reg. 49,506.  The OMB directed agencies to "implement the language [of the revised guidance] in codified regulations . . ." 2 C.F.R. § 200.106.  HHS did not immediately adopt OMB's revised UAR.  85 Fed. Reg. 72,899, 72,911, 72,903 (Nov. 16, 2020).  *See also* G.E.1 at 2, ¶ 6, June 12, 2025 Declaration of Jon Lorsch, Ph.D., Acting Deputy Director for Extramural Research.  In 2021, NIH, at the urging of professional university associations interested in a uniform approach to the terms and conditions of federal grants, and through NIH's Grant Policy Statement, incorporated 2 C.F.R. § 200 into its grant agreements, making it an express term and condition of all NIH grants.  *Id*. at 3, ¶¶ 7-8.  In addition

to incorporating 2 C.F.R. § 200 directly into the NIH Grants Policy Statement, NIH announced its adoption of the 2020 updates to the UAR to the grant recipient community in 2021 (NOT-OD-21-029, available at https://grants.nih.gov/grants/guide/notice-files/NOT-OD-21-029.html). *Id.* at 3, ¶ 9.

In 2024, NIH again advised the grant recipient community that it had adopted, without change, the OMB's update to the UAR, which retained the termination provision found at 2 C.F.R. § 200.340(a)(4). G.E.1 at 4, ¶ 9. The 27 grants that comprise the instant litigation incorporate by reference to the NIH Policy Statement 2 C.F.R. § 200.340(a)(4). ECF Nos. 64-4 to 64-23. Regarding the termination of grant awards, the agency, as NIH did here, must provide written notice to the recipient with the reasons for the termination, effective date, and the portion of the award to be terminated (if applicable). 2 C.F.R. § 200.341(a). Notably, although a grant agreement permits the grantee to draw funds, it does not "commit[] or obligate[] the United States in any way to make an additional, supplemental, continuation, or other award with respect to any approved application or portion of an application." 42 C.F.R. § 52.6(c)(3).

### C.    The Plaintiffs' NIH Grants and the Termination Decisions

Shortly after the Presidential inauguration on January 20, 2025, and in accordance with the NIH Director's independent priority-setting powers, *see, e.g.,* 42 U.S.C. § 282(b)(4)-(6), various HHS and NIH officials began issuing new policy guidance to NIH personnel. Consistent with its past practice when NIH comes under new management, on January 21, 2025, the new Administration issued a temporary freeze on the publication of any documents until such was reviewed by a presidential appointee. G.E.1 at 4, ¶ 11. On January 21, 2025, the Acting Secretary of HHS, Dorothy A. Fink, issued a memorandum to that effect to the Heads of HHS' Operating Divisions. *Id.* at ¶ 17. This pause went into effect to provide the Administration with time to

9

"consider[] its plan for managing the federal policy and public communications processes."  *Id.*

The memorandum also required HHS employees to "[r]efrain from participating in any public

speaking engagement until the event and material have been reviewed and approved by a

Presidential appointee."  *Id.*  Pursuant to Section 1009 of the Federal Advisory Committee Act

("FACA"), 5 U.S.C. § 1009(a)(2), NIH must post a notice to the Federal Register each time it

schedules peer review group and advisory council meetings.  *Id.*  at 6, ¶ 18.  The January 21

memorandum, which prohibited NIH from sending any documents to the Federal Register absent

approval from a Presidential appointee, constrained NIH from scheduling any meetings for the

duration of the temporary pause.  *Id.*  at 6, ¶¶ 20.  In late March 2025 and before April 2, 2025,

NIH resumed holding advisory council and peer review group meetings.  *Id.* at 6-7, ¶¶ 21-22.  It

also restarted all reviews, meetings, and other procedural steps necessary to approve grant

applications and reinstituted approving grant applications.[6]  *Id.* at 7-8, ¶¶ 23-26.

        In the interim, NIH began exercising its grant-making and administering authority to align

with its priorities, including by terminating grants or portions of grants not deemed to effectuate

NIH's priorities.  On February 10, 2025, the Acting Secretary of Health and Human Services

directed agency personnel to "briefly pause all payments made to contractors, vendors, and

grantees related to DEI and similar programs" to allow time for an internal review, including "to

determine whether those contracts or grants are in the best interest of the government and

consistent with current policy priorities." ECF No. 65-4, Fink Feb. 10, 2025 Directive.  NIH then

began the process of reviewing its grants for consistency with NIH's priorities.  ECF No. 65-5,

Memoli Feb. 21, 2025 Directive at 1-2.

---

[6]  *See, e.g.*, 90 Fed. Reg. 11175-01 (Mar. 4, 2025); 90 Fed. Reg. 11324-01 (Mar. 5, 2025); 90 Fed. Reg. 11323-02 (Mar. 5, 2025); 90 Fed. Reg. 11422-01 (Mar. 6, 2025); 90 Fed. Reg. 12333 (Mar. 17, 2025); 90 Fed. Reg. 12325 (Mar. 17, 2025); 90 Fed. Reg. 13187 (Mar. 20, 2025); 90 Fed. Reg. 13182 (Mar. 20, 2025).

The plaintiffs' grants were among those that NIH determined, after review, did not effectuate agency priorities.  ECF Nos. 64-4 to 64-23.  Each plaintiff was sent a written letter explaining the reason underlying the termination decision, based on one of the six deprioritized issue areas -- COVID-19, vaccine hesitancy, China, gender issues, DEI, and climate change.  *Id.* Each letter also referenced NIH's authority pursuant to 2 C.F.R. § 200.340 to terminate the grants based upon a change in agency priorities.  *Id.*; G.E.1 at 4-5, ¶¶ 12-13.  The termination letters further contained advisements of the right of appeal.  *Id.*  Each appeal is reviewed by NIH's Deputy Director of the Office of Extramural Research to determine if the termination was done in error, or if the terminated grant does not align with agency priorities.  *Id.* at 4, ¶ 12.  As of June 9, 2025, NIH has received 614 appeals of grant terminations through NIH's appeals process, and appeals remain pending.  G.E.1 at 5, ¶ 13.  The grant terminations at issue here represent only 0.04% of active NIH grants.  *Id.* at 4, ¶ 12.  NIH has at present 64,174 active grants, including competitive and non-competitive.  *Id.* at 5, ¶ 14.

## ARGUMENT

### I.    The Legal Standard

In order to obtain the extraordinary relief sought, the plaintiffs must satisfy four elements: first, they must show that they are likely to succeed on the merits; second, that they will likely experience irreparable harm unless the court grants relief; third, that the balance of equities weighs in their favor; and fourth that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023).  The last two factors – balance of equities and the public interest – "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

II.    **The Court of Federal Claims, Not This Court, Has Exclusive Jurisdiction Over Plaintiffs' Claims.**

The "United States is immune from suit unless it unequivocally consents." *Maine Community Health Options v. United States*, 590 U.S. 296, 322 (2020).  The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *California*, 145 S. Ct. at 968 (quoting 5 U.S.C. § 702).  Nor does the waiver apply to claims seeking "money damages." *Id*.  The APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money." *Id*.  Instead, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  *See also* 28 U.S.C. § 1346(a)(2) ("the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States").

In this regard, courts have held that the Tucker Act applies if the issue in a case is "at its essence" a contract claim.  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).  To determine the essence of a claim, the Court considers: (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *Id*. at 968.  The Fourth Circuit has also held that a plaintiff primarily seeks injunctive relief when the relief requested is "not . . . an incident of, or collateral to, a monetary award." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023) (citing *Randall v. United States*, 95 F.3d 339, 347 (4th Cir. 1996)).  When a plaintiff's claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, that is a Tucker Act claim, not an APA claim. *Id*. at 967–71.  The Court thus looks to the complaint, with "an eye toward 'the true nature of the action,'" to determine whether

the exercise of jurisdiction is appropriate under the APA or the Tucker Act.  *Am. Ass'n of Colls. for Teacher Educ. v. McMahon*, Civ. No. 25-cv-702-JRR, 2025 WL 863319, at *3 (D. Md. Mar. 19, 2025) (quoting *Williams v. Roth*, No. 21-cv-02135, 2022 WL 4134316, at *4 (D. Md. Sept. 12, 2022)).

Over the past several months, there has been a flood of lawsuits challenging agency decisions to freeze and/or terminate federal grants across a range of industries and agencies.  On April 4, 2025, the Supreme Court addressed the question in a challenge to the Government's decision to freeze the funding for certain grants to teachers awarded through programs authorized by a federal statute. *California*, 145 S. Ct. at 968.  In that case, the Supreme Court stayed the district court's temporary restraining order pending appeal, because, among other things, the Supreme Court found that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id*.

Plaintiffs correctly note that several district courts have minimized the precedential value of *California*, for a variety of reasons. Mem. at 14.  But the holdings in those cases have been overtaken by events and are undercut—if not entirely foreclosed—by the Fourth Circuit's recent decision in *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025). *See also AACTE*, App. No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025) (relying upon *California* and staying a preliminary injunction entered by this Court in another grant termination case involving similar Tucker Act issues and alleged harms).  In *Sustainability*, plaintiffs argued that the government's termination or suspension of 38 grants administered by multiple government agencies violated, *inter alia*, the APA and the Constitution. 2025 WL 1587100, at *1. Like Plaintiffs here and the plaintiffs in *California*, the *Sustainability* plaintiffs argued that based on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Tucker Act did not apply

to their grant termination claims because "their 'dispute d[id] not hinge on the terms of a contract between the parties.'" *Id.* at *2 (quoting *California v. U.S. Dep't of Educ.*, Civ. A. No. 25-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. March 10, 2025)).  The United States District Court for the District of South Carolina agreed that it had jurisdiction, *i.e.*, that the Tucker Act did <u>not</u> apply, and entered injunctions—a permanent one on the APA claims and a preliminary one on the Constitutional claims—requiring "the Government 'to restore Plaintiffs' access to grant funds immediately' and prohibit[ing] the Government from 'freezing, termination or otherwise interfering with the funding of [those] Grants . . . without written authorization from the Court." *Id.* at *1 (quoting *Sustainability Inst. v. Trump*, No. 2:25-cv-2152-RMG, 2025 WL 1486979, at *4, *10 (D.S.C. May 20, 2025)).

The Government appealed the decision to the Fourth Circuit and sought a stay of the injunctions pending appeal, arguing that the Tucker Act applied and therefore divested the district court of jurisdiction. *Id.* *1.  The Fourth Circuit agreed, holding that the Government was likely to succeed "in showing that the district court lacked subject matter jurisdiction" because it was "the operative grant agreements which entitle[d] any particular Plaintiff to receive federal funds" and thus the Tucker Act applied to the grant termination claims. *Id.* at *1–2.  In reaching its decision, the Fourth Circuit relied on the Supreme Court's holding in *California*, noting that the Court in that case had "distinguished *Bowen*" therein, "highlighting the meaningful difference between the relief in that case and an order 'to enforce a contractual obligation to pay money' along the lines of what the district court entered here." *Id.* at *2. Moreover, the Fourth Circuit held that the Constitutional claims were "unlikely" to "provide a detour around the Tucker Act." *Id.*

The appellate cases discussed above are also in line with this Court's recent holding in *Solutions in Hometown Connections v. Noem*, Civ. A. No. 25-cv-885-LKG, 2025 WL 1530318

(D. Md. May 29, 2025). There, plaintiffs challenged the termination of grants by the United States Citizenship and Immigration Services ("USCIS") that had funded programs and services to "assist lawful permanent residents with learning English, studying for the citizenship test and applying to be naturalized citizens." *Id.* at *1. Noting the difficult tension between the APA and the Tucker Act and applying *Megapulse*, this Court concluded that the source of the plaintiffs' APA, separation of powers and *ultra vires* claims were the grants themselves and therefore were "at bottom, contract claims over which the United States Court of Federal Claims has exclusive jurisdiction." *Id.* at *9–10. The "essence" of the plaintiffs' "APA claims [was] a breach of contract claim that s[ought] to recover monetary damages from the Government." *Id.* at *11. This conclusion was bolstered by this Court's complementary determinations that: (1) the alleged irreparable harm plaintiffs faced was "the loss of the funds provided under their Grants" (*id.*) and (2) any equitable claim "to obtain Grant funds for future work" was "at bottom, a request for specific performance of their Grant Agreements." *Id.* at 13 n.3. Accordingly, this Court rejected plaintiffs' argument—similar, if not identical, to the one advanced in this case—"that the source of the rights for [plaintiffs'] APA, separation of powers and ultra vires claims [was] statutory and/or constitutional in nature." *Solutions*, 2025 WL 1530318, at *12.

Another session of this Court reached the exact same conclusion in another grant termination case. *Child Trends, Inc. v. U.S. Dep't of Educ.*, Civ. No. 25-1154-BAH, 2025 WL 1651148, at *8 (D. Md. June 11, 2025). Relevant here, *Child Trends* is the first district court decision in the Fourth Circuit in a grant termination case following the Fourth Circuit's decision in *Sustainability.* Though noting that *Sustainability* was "not a decision on the merits," the Court held that because "a panel opinion of the Fourth Circuit has held that the government is likely to succeed in showing that the Tucker Act precludes Article III courts from exercising jurisdiction

over *any* claims pertaining to individual grant agreements, even if those claims are brought as constitutional or *ultra vires* actions," the Court was "unable to conclude that it has jurisdiction over" the plaintiffs' termination claims and therefore could not "determine that Plaintiffs are likely to succeed on the merits . . . for the purposes of preliminary injunctive relief." *Child Trends*, 2025 WL 1651148, at *8 (emphasis in original).

Defendants respectfully request and urge this Court to follow the Supreme Court's, the Fourth Circuit's, and this Court's interpretation of *California* as binding precedent in this case. The essence of Plaintiffs' claims is that NIH materially breached terms and conditions of its agreement to fund their research programs. Indeed, Plaintiffs would have no claim at all without having alleged a breach of the contractual agreements by the government. And regardless of the suggestion that Plaintiffs do not seek money damages, that is of course exactly what they seek, *i.e.*, the restoration of funding and specific performance of the terms and conditions of their grant agreements. Their proposed order should the Court grant injunctive relief illustrates as much. *See* Proposed Order to Plaintiffs Motion at 3-4. In short, Plaintiffs' claims are quintessential contract claims.

Though creative, Plaintiffs' efforts to paint this case as anything but a breach of contract case fail. Courts have consistently rejected attempts to cast a contract dispute in different terms to establish (improper) jurisdiction in federal district courts. In *International Engineering Company v. Richardson,* a contractor entered into an agreement with the United States Air Force to construct a model of a long-range missile system it had developed. 512 F.2d 573, 574 (D.C. Cir. 1975). Included in the contract was a surrender to the government of rights in the technical data. *Id.* at 575. When a dispute later arose as to the extent of the rights, the contractor similarly brought it to the district court, characterizing it as "arbitrary and capricious" agency action and not a breach of

contract.  *Id.* at 576.  Reversing an order of the district court which enjoined the Air Force from eliminating restricted access to the data, the United States Court of Appeals for the District of Columbia concluded that because the claim that the Air Force had acted arbitrarily could not be resolved without reference to the contract, exclusive jurisdiction lay in the Court of Claims.  *Id.* at 578.

Similarly, in *Alabama Rural Fire Insurance Company v. Naylor*, the Secretary of the Farmers Home Administration (FmHA) entered a contract with plaintiff whereby plaintiff would provide "backup insurance" to applicants for FmHA loans that otherwise would have been unable to obtain the required coverage.  530 F.2d 1221, 1223 (5th Cir. 1976).  When FmHA cancelled the contract on the grounds that the plaintiff did not have the authority to enter into it, plaintiff sued in the district court for injunctive and declaratory relief to prevent rescission of the contract, solicitation of other bids by FmHA, and disclosure of plaintiff's insurance plan, all on the grounds that the agency action had been 'ultra vires' of its authority.  *Id.* at 1224–25.  Even though the plaintiff had not requested money damages, jurisdiction was held to lie in the Court of Claims. *Id*. at 1225–26 ("Irrespective of the terminology employed . . . the object of the instant suit is clearly to compel appellants [the agency] in their official capacities to specifically perform a contract.").  The facts in this case are functionally indistinguishable from these authorities and jurisdiction therefore lies exclusively in the Court of Federal Claims.

Plaintiffs seek to avoid the Tucker Act by arguing that a payment of damages after judgment by the Court of Federal Claims will not adequately protect their interests, correctly pointing out that the Court of Federal Claims is without authority to grant the injunctive or declaratory relief sought here.  Mem. at 11.  However, that the Court of Federal Claims cannot provide the precise relief requested here is not a basis to deny its jurisdiction over the claim.  As

the court noted in *Alabama Rural*, the remedy for breach of a contractual obligation is damages, which the Court of Claims is fully capable of assessing. 530 F.2d at 1230. In any event, as discussed *infra*, Plaintiffs' lack standing to assert claims for prospective injunctive relief in this Court, and therefore the Court of Federal Claims' inability to grant prospective injunctive relief is a distinction without meaning.

For these reasons, this Court lacks jurisdiction to hear this case.

### III.    <u>Plaintiffs Lack Standing to Seek Prospective Relief.</u>

"The Constitution limits the exercise of judicial power to 'cases' and 'controversies.'" *Aetna Life Ins. Co. of Hartford, Conn., v. Haworth*, 300 U.S. 227, 239 (1937) (citing U.S. Const. art. III, § 2).  For a "case or controversy" to exist, a litigant must have standing to bring the claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish Article III standing, a plaintiff must demonstrate that it (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See id.* at 560–61.  "The injury-in-fact requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'"  *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "Injury in fact is 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).

Moreover, "when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367381 (2024).  Specifically, "[w]hen a plaintiff seeks redress for a prospective harm, the plaintiff can demonstrate that an alleged injury is sufficiently imminent for standing purposes by showing that the harm is 'certainly impending' or that the plaintiff faces a 'substantial risk' of

its occurrence." *North Carolina State Conference of NAACP v. North Carolina State Bd. of Elections*, 283 F.Supp.3d 393, 399 (M.D.N.C., 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504, U.S. at 564 n.2).

Here, Plaintiffs have failed to establish standing to assert claims for prospective relief regarding future funding opportunities and future grant applications.[7]  Plaintiffs allege that they are entitled to an injunction that "ensures that Plaintiffs' future or pending grant applications are not subjected to similar unlawful discrimination." ECF No. 1 ¶ 137.  Plaintiffs specifically identify several grant applications that are currently pending NIH review, have been removed from study sessions, or have had NOAs withheld despite the submission being previously approved.  *See id*. ¶¶ 32, 113–14; Mem. at 6.  But of course, Plaintiffs cannot identify future grant application opportunities that do not yet exist, and they can therefore only speculate as to the future harm that might befall them or others absent injunctive relief.  Accordingly, Plaintiffs' "theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Clapper*, 568 U.S. at 401 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990)).

Further, even with respect to grant applications or funding renewals that are pending NIH review, Plaintiffs offer only generalized allegations of future injury.  For example, Dr. Carl Streed, Jr. states that he "fear[s] that NIH will reject and is unduly delaying" review of his pending grant

---

[7] Though they insist that the relief they seek in this lawsuit is strictly equitable and declaratory in nature, the individual Plaintiffs assert they have standing in this case, *inter alia*, because they "have lost millions of dollars in terminated grants and grant applications whose review has been withheld." Mem. at 7.  As discussed *infra* at § 3, this case, at its core, is a breach of contract case.

applications, but he offers nothing concrete about the future risk of his applications being denied. ECF No. 64-5 ¶ 25; *see also* ECF No. 64-6 (Dr. Debra Umberson expressing "worry" that funding will be terminated). Dr. Sean Arayasirikul states that he has not received funding for the second year of one of his grants because "NIH has delayed issuing [a] grant renewal and is now unresponsive," but he too offers nothing to support the proposition that his pending grant will be denied funding. ECF No. 64-16 ¶ 26; accord ECF No. 64-21 ¶ 18 (Dr. Sarah Peitzmeier expressing similar concerns about delays and unresponsiveness). Dr. Heather Littleton similarly complains that her pending grant application is "pending administrative review," but also offers no assertion that her grant is going to be terminated or rescinded. ECF No. 64-18 ¶ 23. These generalized allegations that NIH has delayed review of certain Plaintiffs' grant applications does not establish with the requisite certainty that a future injury is imminent.

## IV.    Defendants' Grant Cancellations Do Not Violate the Equal Protection Clause of the Fifth Amendment

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). This guarantee "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To analyze governmental action under the equal protection guarantee, courts "apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Typically, governmental classifications must be merely "rationally related to a legitimate governmental purpose." *Id.* "Classifications based on race or national origin," on the other hand, are suspect and receive "the most exacting scrutiny." *Id.* "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate

scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*

As a threshold matter, Plaintiffs do not plead an equal protection claim regarding the cancellation of grants relating to DEI. *See generally* ECF No. 1 ¶¶ 119–28. Rather, the crux of Plaintiffs' equal protection claim is that the NIH's cancellation of their research grants "discriminate based on sex, gender identity, and sexual orientation" and were "motivated by animus towards an unpopular minority." Mem. at 19; *accord* ECF No. 1 ¶ 121 (similar). However, Plaintiffs do not claim that they were *personally* discriminated against based on their membership in a protected class, but rather assert that the subject of their research was disfavored for this reason. Fourth Circuit precedent makes clear that the Equal Protection Clause's protection from sex-based discrimination does not cover conduct or speech related to sex. *See Wilcox v. Lyons*, 970 F.3d 452, 460 (4th Cir. 2020). In *Wilcox*, the court declined to recognize a claim of sex discrimination under the Equal Protection Clause where the plaintiff's "allegations [did] not implicate an impermissible classification or discrimination on the basis of [her] membership in a class defined by an immutable characteristic," but instead was based on "adverse consequences because of her speech and conduct: reporting alleged harassment and discrimination." *Id.* Similarly, here, the plaintiffs do not claim they were discriminated against based on their sex or gender identity; they claim discrimination based on the subject matter of their research. They have therefore failed to state an Equal Protection claim.

More to the point, there is no reasonable reading of the Complaint that suggests Defendants have discriminated based on sex, and Plaintiffs have not alleged such other than in conclusory fashion. Namely, Plaintiffs have not alleged how the termination of their grants treated men and women differently. *Cf. L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 483 (6th Cir.

2023) ("[L]aws on their face [that] treat both sexes equally" are subject to rational basis.)  Nor do Plaintiffs allege how any of the grant terminations discriminate based on sexual orientation (even assuming this was a recognized protected class, which it is not).

Instead, as stated, the crux of Plaintiffs' arguments is that the grant terminations discriminated because the research grants in question related to gender identity and sexual orientation.  And, while the Fourth Circuit has found that individuals who assert a gender identity inconsistent with their sex "constitute a quasi-suspect class," *see Kadel v. Folwell*, 100 F.4th 122, 143 (4th Cir. 2024)[8] and *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020)), *as amended* (Aug. 28, 2020), the Supreme Court has never so held.  *See Skrmetti*, 83 F.4th at 486 (noting that the "Supreme Court" has not "recognized transgender status as a suspect class. Until that changes, rational basis review applies").  Nor has the Supreme Court recognized any new constitutionally protected class, *see, e.g., Craig v. Boren,* 429 U.S. 190 (1976) (recognizing sex as a quasi-suspect class)190 (1976) (recognizing sex as a quasi-suspect class), and instead has repeatedly declined to do so.  *See*, *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age) *of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *San Antonio Indep.*, *Sch. Dissee also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay people are a quasi-suspect class) address whether gay people are a quasi-suspect class).

Moreover, contrary to the Fourth Circuit's analysis in *Grimm*, 972 F.3d at 610, Plaintiffs—not all of whom identify as transgender—cannot show that they are a "discrete group[,]" defined

---

[8] The Government respectfully submits that *Kadel* and *Grimm*, upon which Plaintiffs also rely, Mem. at 19, were wrongly decided.  Petitions for certiorari in *Kadel* are currently pending before the Supreme Court.  The Supreme Court's disposition of those petitions may be affected by its forthcoming decision in *United States v. Skrmetti*, No. 23-477 (U.S.), concerning whether other state laws regarding similar interventions violate the Equal Protection Clause.  The Supreme Court's decision in *Skrmetti* is expected by the end of this month.  Given that Supreme Court guidance is imminent on these constitutional issues, this Court should not rule on the Motion until the Supreme Court issues *Skrmetti*.

by "immutable" characteristics; who are "politically powerless[;]" and have suffered a history of discriminatory treatment.  *See, e.g., Lyng v. Castillo,* 477 U.S. 635, 638 (1986).  "It is difficult to see" how Plaintiffs "fit[] this description."  *Skrmetti*, 83 F.4th at 487.  "Unlike existing suspect classes[,]" Plaintiffs' "gender identity" inconsistent with their the sex is not "definitively ascertainable at the moment of birth."  *Id.*  Nor is the purported class characterized by a specific defining feature; rather, it includes "a huge variety" of gender identities and expressions, is incapable of accurate description, and can sweep in anyone who is not cabined by their sex stereotype.  *Gore v Lee*, 107 F.4th 548, 558 (6th Cir. 2024).  Plaintiffs' supposed group is simply not ascertainable and hence is not an immutable characteristic.

Plaintiffs are also not "political[ly] powerless[]."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28; *but see Grimm*, 972 F.3d at 613 ("transgender people constitute a minority lacking political power").  As *Skrmetti* explains, "a national anti-discrimination law, Title VII, protects transgender individuals in the employment setting," and many "States have passed laws specifically allowing some of the treatments sought here." 83 F.4th at 487.  "These are not the hallmarks of a skewed or unfair political process -- and they offer no explanation for inviting a greater political dysfunction problem: the difficulty of amending the Constitution if the federal courts err in choosing to occupy the field."  *Id.*

Defendants submit that because the Supreme Court has not identified transgender people as a quasi-suspect class, rational basis review is appropriate.  Rational basis review "is a paradigm of judicial restraint."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313– 14 (1993).   It is "the most relaxed and tolerant form of judicial scrutiny" under the Equal Protection Clause.  *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989).  Under rational basis review, the challenged law enjoys "a strong presumption of validity," even if the classification is "both underinclusive and

overinclusive." *Beach*, 508 U.S. at 314–15; *Heller v. Doe*, 509 U.S. 312, 321 (1993) (rational basis "compel[s]" Courts to "accept a legislature's generalizations even when there is an imperfect fit between means and ends"). "[P]erfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979). "Given this low bar, invalidating a statute subject to rational basis review is a tall order: the plaintiff must negate every conceivable basis which might support the legislation." *Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 727 (D. Md. 2021), *aff'd sub nom. Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024). Rational basis does not permit the Court to consider the strength of the plaintiffs' interest or the extent to which the challenged law intrudes on that interest. *Id*. ("it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"). The focus is entirely on the rationality of the Government's reason for enacting the law. *Id*. at 727–28 (so long as the classification "rationally advances a reasonable and identifiable governmental objective, [judges] must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred").

Under these unquestionably deferential standards, NIH has not violated any equal protection guarantees. Instead, the grant terminations are a legitimate choice by NIH. The cancellation of the grants is rationally related to NIH's directive of reprioritizing research grants to ensure that federal funds are being directed towards research that is consistent with science and that benefits the population at large. *See, e.g., Zzyym v. Pompeo*, 958 F.3d 1014, 1023 (10th Cir. 2020) (the Government "could reasonably conclude that use of a third sex designation would impede at least some other systems that classify everyone as either male or female" where most agencies' systems "accommodate only two sexes" and allowing "a third sex designation could complicate searches"); *Gore*, 107 F.4th at 561 (the Government "has an interest in maintaining a

consistent, historical, and biologically based definition of sex"). Thus, the cancellation of the grants at issue was rationally related to furthering the Government's legitimate interest. For the same reason, even if it were applicable, NIH's cancellation of the grants at issue passes intermediate review because it "substantially further[s] an important government interest." *City of Cleburne*, 473 U.S. at 435; *Kadel*, 100 F.4th at 143; *Grimm*, 972 F.3d at 607.

## V.    **The Agency Directives and Challenged Actions Do Not Violate Section 1557 of the Affordable Care Act.**

Plaintiffs' contention that the Agency Directives and Actions at issue here violate Section 1557 of the Affordable Care Act, Mem. at 25-28, need not detain the Court long as this claim that NIH violated Section 1557 by prohibiting funding for research that relates to LBGTQI+ health is unlikely to succeed on the merits. Section 1557 precludes discrimination in health programs or activities, any part of which receives federal funding, based on race, color, national origin, sex, age, or disability. 42 U.S.C. § 18116(a). Even if NIH is a covered entity, to succeed on their claim plaintiffs must show differential or less favorable treatment based on membership in any class protected under Section 1557. *Id.* Plaintiffs have not done so.

Section 1557 does not protect against being selective in the subject of research and it does not mandate that covered entities affirmatively fund or seek to benefit any particular group regardless of that group's minority status or disability even if that group was subject to discrimination historically. The text of the statute does not suggest otherwise. Whether the claimed basis of discrimination is sex (including what Plaintiffs refer to as LGBTQI+), disability[9],

---

[9]  Plaintiffs rely on *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022), Mem. at 27, to argue that gender dysphoria is protected as a basis of disability discrimination. *Williams* held that the plaintiff stated a plausible claim that the particular plaintiff's gender dysphoria could be a disability under the Americans with Disabilities Act, despite the statutory exclusion of non-physical "gender identity disorders" from coverage. *Id.* However, LGBTQI+ statuses generally, including

or "intersectional aspects of LGBTQI+ people's identities," Mem. at 27-28, Plaintiffs have not shown that they were treated worse than other researchers on any ground prohibited by Section 1557, even assuming that discrimination on the basis of sex includes LGBTQI+ statuses. They have not shown that if they, the very same researchers, applied for meritorious research grants, the subject of which aligned with administration priorities, those applications would not be granted.

Plaintiffs, though claiming that the Agency Directives and grant terminations were rooted in discriminatory animus offer nothing remotely probative of their claim. Instead, the plaintiffs want this Court to rely on supposition, which this Court cannot do. Injunctive relief must be denied.

## VI.    **Defendants Have Not Violated Constitutional Separation of Powers**

Plaintiffs' argument that NIH's conduct violates the Constitution's separation of powers clause is unfounded. Initially, Congress explicitly authorized NIH to take the challenged actions. "[W]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). Congress specifically charges the Secretary of HHS, through the Director of NIH, with responsibility "for the overall direction of the National Institutes of Health and for the establishment and implementation of general polices respecting the management and operation of programs and activities within the National Institutes of Health." 42 U.S.C. § 282(b)(1). The Director of NIH also "shall, in consultation with the heads of the national research institutes and national centers, be responsible for program coordination across the national research institutes and national centers, including conducting priority-setting reviews, to ensure that the research portfolio of the National

_____

transgender status, do not constitute disabilities, and plaintiffs do not claim that their grants were cancelled because they provided for treatment of potentially covered forms of gender dysphoria.

Institutes of Health is balanced." 42 U.S.C. § 282(b)(3). Taken together these two provisions explicitly authorize the Director of NIH to wield significant discretion in setting NIH's priorities, scheduling meetings, and terminating grants.

The Executive also has implicit authority to terminate grants because Congress authorized NIH to make grant awards and left the design, implementation, and administration of those grants to NIH's discretion. *See* 42 U.S.C. § 241(a)(3). Indeed, the appropriation for each institute of NIH is breathtakingly capacious. *See, e.g.*, H.R. 2882, 118th Cong. (2024) (appropriating funds to the National Cancer Institute "[f]or carrying out section 301 and title IV of the PHS Act."). Congress knows how to write laws that constrain Executive Branch discretion, including laws that mandate inclusion of terms in agency contracts. *Am. Tel. and Tel. Co. v. United States*, 124 F.3d 1471, 1478 (Fed. Cir. 1997), *aff'd*, 307 F.3d 1374 (Fed. Cir. 2002). Congress did not do so here. *See Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) (Congress' "silence is controlling"). Because Congress empowered the NIH to administer grants and did not cabin its discretion to terminate grants, no separation of powers concern exists.

Plaintiffs' separation-of-powers arguments also fails for other reasons. As discussed, *supra*, the grant terminations did not violate the Appropriations Acts. Because Plaintiffs' separation of powers argument presumes that the terminations contravened congressional appropriations (Mem. at 28–29), these arguments fail for those same reasons. Furthermore, the grants themselves specifically contemplate that the agency can terminate the grants (*see supra*), as do the Uniform Guidance regulations incorporated therein. *See* 2 C.F.R. § 200.340(a) (Ex. M, J.R. 630) ("The Federal award may be terminated . . . (2) By the Federal awarding agency . . . to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."). Thus, the notion that the agency cannot terminate the grants that it administers is

contrary to the governing contracts and regulations.

**VII.    Neither the Agency Directives nor the Grant Terminations Violate the APA**

        A.    *The Challenged Agency Directives Are Not Reviewable Final Agency Actions.*

By its terms, the APA only permits judicial review of "final agency action."  5 U.S.C. § 704.  To qualify as such, the agency action must "mark the consummation of the agency's decision-making process" and determine "rights or obligations" or be action from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  Investigatory measures do not constitute the consummation of the agency's decision-making process; such measures are instead "tentative or interlocutory in nature."  *Harper v. Warfel,* 118 F.4th 100, 116 (1st Cir. 2024) (collecting cases).  Instituting a review or investigation is merely gesturing to the possibility of a final action; it is not, of itself, final action.  *Id*.

Neither can the types of interlocutory steps referenced above be considered alone as constituting action giving rise to legal consequences when the status of the grants then remained subject to review.  Instructive is *FTC v. Standard Oil Co. of California,* 449 U.S. 232 (1980). There, the Supreme Court held that preparing a complaint and initiating enforcement proceedings did not have "definitive" legal consequences for the respondent in that the proceedings were final agency action.  *Id*. at 449 U.S. at 241.  No different result should be reached here.

A careful and fair reading of the Challenged Agency Directives at issue here, ECF Nos. 65-4, 65-5, 65-8, 65-19, 65-20, 65-22, and 65-24, is in accord with the above principles and reveals that the Directives, including the other successive guidance complained of by the plaintiffs, constituted only prefatory steps informing the Agency's internal investigation of grants corresponding to NIH's priorities.  *Id*.  The February 10, 2025 Directive issued by the then Acting HHS Secretary, ECF No. 65-4, speaks to this truth as is illustrated by the language in the Directive

which called for "a review of the overall contracts and grants to determine whether those contracts

or grants are . . . consistent with current policy priorities."  ECF No. 65-4 at 1-2.  ECF No. 65-24,

the February 13, 2025 Memorandum entitled "Supplemental Guidance to memo Entitled – NIH

Review of Agency Priorities Based on the new Administration's Goals" and written by then

Deputy Director for Extramural Research, Michael Lauer, is not a Directive and it was later

rescinded.  ECF No. 65-5.

       With respect to ECF No. 65-5, the February 21, 2025 "Directive on NIH Priorities"

authored by the NIH Director, there too the Directive initiated a review of, *inter alia*, "cooperative

agreements," "existing awards," "notices of funding opportunities," and applications pending

certain types of awards for the purpose of determining whether such was "inconsistent with NIH's

mission."  The Directive made clear that such a review was compatible with "NIH's own obligation

to pursue effective, fiscally prudent research," an obligation of longstanding.  ECF 65-5 at 1-2.

The internal guidance offered on the termination of grants, including suggested language to use *if*

a grant was terminated based on a searching review mindful of NIH priorities, ECF Nos. 65-6 and

65-8, is likewise not final agency action.  It is instead useful operational direction for handling the

process if a determination to terminate a grant deemed inconsistent with NIH's priorities occurred

subsequently.  *See Vill. of Bald Head Island v. U.S. Army Corp. of Eng'rs*, 714 F.3d 186, 193 (4th

Cir. 2013).  In sum, it is the termination of the grants that is the consummation of the decision-

making process, not the Plaintiffs' characterized Agency Directives and guidance which are

interlocutory processes and are not therefore reviewable.  To hold otherwise, is introducing a new

legal rule counter to the extant caselaw and such should be rejected by this Court.

       B.    *Funding Decisions Are Committed to Agency Discretion and Are Not Reviewable.*

       Plaintiffs are also unlikely to succeed on their APA claims because they seek to challenge

funding decisions by the NIH that are committed to the agency's discretion by law.  5 U.S.C. § 701(a)(2).  Although the APA presumes that agency action can be judicially reviewed, "under § 701(a)(2), agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'"  *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993).

In *Lincoln*, the Supreme Court held that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," and thus such a decision is not reviewable under the APA.  *Id.* at 192.  The Court noted, however, that "an agency is not free simply to disregard statutory responsibilities:  Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ."  *Id.* at 193.  If the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review.  *Id.*

Although *Lincoln* involved lump-sum appropriations, in *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), the D.C. Circuit extended its logic to more specific appropriations, holding that where Congress "left to the Secretary the decision about how the moneys" appropriated for a particular program "could best be distributed consistent with" the governing statute, such decisions were not subject to judicial review under the APA.  *Id.* at 751-52.  *See also Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.) ("*Milk Train* thus makes quite clear that even funding decisions related to a specific appropriation for a specific program can be properly deemed committed to agency discretion.").  Here, NIH's decisions about whether to offer a grant and on what terms and conditions are simply unreviewable.  The plaintiffs have not overcome that presumption derived from the discretion conferred by Congress.

To be sure, "Congress may overcome the presumption against review by providing 'guidelines for the agency to follow in exercising its enforcement powers,' by 'setting substantive priorities, or by otherwise circumscribing an agency's power.'" *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 293 (4th Cir. 2022) (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 (1985)).  In determining such, statutory interpretation is paramount.  *Id.* (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988) ("[Section] 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based")).  This type of examination is no different where express conferrals of discretion are in issue.  *See Milk Train, Inc.*, 310 F.3d at 751-52 (holding plain language of statute conferred discretion on Secretary where statute directed distribution of funds "as soon as practicable").

Unquestionably, NIH has broad discretion when awarding grants.  42 U.S.C. § 284(b)(2) ("Support for an activity or program under this subsection *may* be provided through grants, contracts, and cooperative agreements.") (emphasis added); § 284(b)(2)(A)–(B) (providing that the agency "*may* enter into a contract for research" and "*may* make grants and cooperative agreements") (emphasis added).  The permissive language of the statute makes clear that NIH is not mandated to enter into grant agreements at all.  Like *Lincoln*, Congress here gave the NIH "the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  508 U.S. at 192.  NIH's decisions about whether to offer a grant are thus unreviewable.

C.    <em>NIH's Directives and Grant Terminations Were Reasoned.</em>

The plaintiffs are unlikely to succeed on their claim that NIH acted arbitrarily and capriciously with respect to the Agency Directives and grant terminations.  Mem. at 31-33.  Even if the Directives and grant terminations are reviewable under the APA (and they are not) both the

31

Directives and the grant terminations were reasoned, and the record shows a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court's review under the APA "is narrow and highly deferential, meaning that we look only to see if there has been a clear error of judgment." *Ren v. U.S. Citizenship and Immigration Servs.*, 60 F.4th 89, 93 (4th Cir. 2023) (internation quotations and citations omitted). Contrary to what the plaintiffs would have this Court believe, there is no "heightened standard" or "more searching review" applicable to changes in agency policy. *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). In *FCC v. Fox*, the Supreme Court upheld an agency action that represented a complete policy shift, even though the agency lacked objective evidence in support of its shift but instead relied on its own discretion, determination, and experience. *Id.* at 517–20. Moreover, where Congress shows intent to give an agency discretion to define applicable terms, the agency does not run afoul of the APA when it produces a definition that differs from previous proposals. *Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, 98 F.4th 483, 494, 498 (4th Cir. 2024). The Fourth Circuit has held that an agency action satisfies the APA where the agency acknowledges a change in position and bases the change only on experience and statutory language. *Id.* at 498.

Here, in issuing the Agency Directives and terminating the grants, NIH provided the reasons for its actions – changes in priorities. The plaintiffs make clear their disdain for NIH's reason, Mem. at 32, but that does not convert NIH's actions into those that are arbitrary and capricious. The plaintiffs, like this Court, may not substitute their judgment for that of the agency's. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Although the plaintiffs assert that NIH engaged in no discernible fact-finding to support its actions and it did not consider any relevant data, Mem. at 32, or the consequences of its actions, the Directives and grant termination notices

establish that NIH undertook a systematic review of the grant awards and the agency's priorities –
the relevant data – to determine whether the grants comported with NIH priorities to support
effective and fiscally prudent research and terminated the grants incompatible with these priorities.
In terminating the individual grants at issue here, NIH provided the reason for its terminations and
the fact that the same reason could be logically applied to more than one grant does not render the
agency's actions arbitrary and capricious.  The APA does not require exhaustive explanation for
every action.  *Cf. Fox*, 556 U.S. at 514 (no heightened standard), *Ren*, 60 F.4th at 93 (deferential
review).  A court must "uphold a decision of less than ideal clarity if the agency's path may
reasonably be discerned."  *FCC v. Fox*, 556 U.S. at 513-14.  The record shows reasoned
consideration prior to termination, in accordance with the applicable law, which satisfies the APA.

> D.    *NIH Directives and Actions Comported with Both Federal Law and
> Regulation.*

Although the plaintiffs maintain that the Directives and grant terminations were not in
accordance with the law, Mem. at 33-35, not so.  NIH followed its procedures when it terminated
the grant agreements by providing notice to grantees about the terminations and of their right to
appeal.  *See* ECF Nos. 64-3 to 64-23.  Importantly, and as the Notices of Award show, the terms
of the awards give NIH the right to terminate a grant if the agency concluded that the grant no
longer effectuated agency priorities.  *Id*.  Each of the plaintiffs agreed to these terms and the
regulations nowhere bars NIH from including a change in agency priorities from inclusion in its
contracts or from unilaterally exercising this discretionary authority.  *See* NAT'L INSTS. OF
HEALTH, NIH Grants POLICY Statement at II-A-155 (2024) (incorporating 2 C.F.R. § 200.340);
2 C.F.R. § 200.340(a)(4).  To the extent that plaintiffs contend that grant terminations must be
predicated on certain grounds only, the pertinent regulations are not so constraining.  Specifically,
although 45 C.F.R. § 75.372(a) lists four grounds upon which a grant may be terminated, the use

of the word "may" implies that the list is not exhaustive or exclusive. *See Carlson v. United States*, 837 F.3d 753, 765 (7th Cir. 2016) (holding enumerated list of exceptions in the rules was not exclusive because the rule "uses the word 'may,' which 'usually implies some degree of discretion.'") (quoting *United States v. Rodgers*, 461 U.S. 677, 706 (1983)).

As for the contention that the agency's actions contravened the Public Health Service Act ("PHSA") first by "squelching federally funded research" related to the health of sexual and gender minority populations and secondly by not submitting to Congress a Strategic Plan outlining NIH's research priorities across biomedical research before taking the Challenged Actions and issuing the Directives, Mem. at 34, Plaintiffs are wrong. Myopically, the plaintiffs seemingly suggest that their terminated grants constitute the sole constellation of research on the topics. Consonant with the statutes directing HHS and NIH to support research into certain minority-related topics, 42 U.S.C. §§ 282(h), 283p, 285a-6, 285b-7a(c)(1), 285t(a), NIH continues to support research related to "minority health conditions" and "populations with health disparities." The agency exercised its discretion in terminating grants it determined did not support agency priorities while preserving grants studying health disparities. The statutes permit the exercise of discretion to decide which grants pertinent to health disparities should be awarded or renewed.

Furthermore, the notion advanced that NIH did not comply with the statutory directive to develop a Strategic Plan outlining its objectives as pertains to research, Mem. at 34-35, is untrue. NIH put forth a Strategic Plan in 2021 in compliance with Section 282(m)(1) of Title 42 of the United States Code. That statute provides that such a plan is to be developed every six years; NIH has two more years before it must submit a new Strategic Plan. In any event, such plans do not serve to keep NIH wedded to a single course unable to change its priorities. Plaintiffs cannot show a clear likelihood of success on the merits of this claim and injunctive relief should be denied.

E.    *The Claims of Unreasonable Delay of Notices of Awards and Grant Application Review Are Not Justiciable Under the APA.*

Plaintiffs' claims pertaining to unlawful agency action in withholding applications from review and delaying Notices of Awards ("NOA") is also unlikely to succeed on the merits.  Mem. at 35-37.  It must be pointed out that the plaintiffs' claim of unreasonable delay is bottomed on the relatively brief pause in its processes that NIH instituted following the change in administrations. NIH has since resumed, before the instant lawsuit was filed, its processes attendant to approving grant applications.  G.E.1 at 6-7, ¶¶ 21-22.

Importantly, the plaintiffs' claim of "unreasonable delay" does not implicate a discrete or mandatory action that NIH was required to undertake to support a proper APA challenge.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (stating standard for APA-based claim challenging agency inaction).  NIH retains the discretion to continue reviewing an application and to defer deciding on an application.  42 C.F.R. § 52.5(b).  This discretionary authority is not subject to judicial review.  Given that no statute mandates a decision on an application, plaintiffs cannot seek to have this Court compel one and the regulation therefore requires no action that is "discrete." An analysis under *Telecomms. Rsch & Action Ctr. v. FCC*, 750 F.2d 70 (D.C.Cir. 1984) is therefore unnecessary.

F.    *The Agency Directives and Challenged Actions Are Not Violative of the Constitution.*

For the reasons set forth in Sections IV and VI of the Argument, the Agency Directives and Actions are not in violation of either the Equal Protection Clause of the Fifth Amendment or the separation of powers doctrine.

## VIII.  <u>Plaintiffs Do Not Face Irreparable Harm.</u>

Plaintiffs' alleged injuries in this case do not involve irreparable harm because they can be

remedied through the payment of money damages.  "[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief."  Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d ed.).  "Thus, for example, the termination of business agreements or of employment typically are not found to result in irreparable injury because, if wrongful, damages will provide adequate compensation for any losses."  *Id.*  Injuries "in terms of money, time and energy necessarily expended in the absence of a stay" do not constitute irreparable harm.  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  While irreparable harm involving money damages can be shown "when loss 'threatens the very existence' of a plaintiffs' business," *RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46–47 (D.D.C. 2009), such extreme circumstances are not present here.  As discussed *supra*, Plaintiffs' claims are governed by the Tucker Act and money damages is their appropriate remedy (if any).

## IX.    **The Balance of Equities and Public Interest Favor the Defendants.**

The balance of equities does not favor Plaintiffs.  *Winter*, 555 U.S at 20.  An injunction here would effectively disable the Secretary from assessing program effectiveness and consistency with program goals and agency priorities for a program where the statutes authorizing and funding the program give him significant discretion to set those goals and priorities.  *See* 2 C.F.R. 200.340(a)(4).  Further, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funds, such funds are unlikely to be retrievable afterwards.  *See Sustainability*, 2025 WL 1587100, at *2 (observing that the government faces "irreparable harm because" an injunction issued by the district court below required the government "to disburse funds from a finite appropriation" that it would "not be able to recoup . . . once expended").  Those harms will irreparably harm the

sovereign and pecuniary interests of the United States.  *See California*, 145 S. Ct. at 969 (in staying preliminary injunction entered by district court, noting that "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed").

Thus, the balance of the equities weighs in favor of Defendants and relief should be denied.

**X.**     **<u>The Court Should Require a Bond if the Motion Is Granted.</u>**

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  To the extent that the Court grants relief to Plaintiffs, Defendants respectfully request that the Court require Plaintiffs to post security for any taxpayer funds distributed during the pendency of the Court's Order.  *See Nat'l Treas. Emplys. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (noting that the requirement to post an injunction bond "applies no less" when the defendant is the government and expresses "doubt that $0 was the 'appropriate bond'" in that case).

<b><u>CONCLUSION</u></b>

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction and Stay should be denied.

Dated:  June 13, 2025

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:    _____
Michael Wilson (Bar No. 18970)
Tarra DeShields (Bar No. 07749)
Assistant United States Attorneys
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800 (direct)
(410) 962-2310 (fax)

*Counsel for Defendants*