**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF PHYSICIANS FOR HUMAN RIGHTS, INC., *et al.*, | ) ) ) ) | Civil Action No. 25-cv-01620-LKG |
| Plaintiffs, | ) ) | Dated:  August 14, 2025 |
| v. | ) ) | |
| NATIONAL INSTITUTES OF HEALTH, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

In this civil action, the Plaintiffs, American Association of Physicians for Human Rights, Inc., doing business as GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA"); and Dr. Carl Streed, Jr.; Dr. Sean Arayasirikul; Dr. Michelle Birkett; Dr. Gregory Phillips, II; Dr. Kurt Ribisl; Dr. Noel Brewer; Dr. Seth Noar; Dr. Kristen Hassmiller; Dr. Laura Graham Holmes; Dr. Heather Littleton; Dr. Gabriel Murchison; Dr. Sarah Peitzmeier; Dr. Debra Umberson; Dr. Phoebe Poe; Dr. Rachel Roe; and Dr. Susana Soe (collectively, the "Individual Plaintiffs"), bring various claims against the Defendants, the National Institutes of Health ("NIH"); Jay Bhattacharya, in his official capacity as NIH Director; the United States Department of Health and Human Services ("HHS"); and Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS, challenging certain NIH agency directives (the "Agency Directives"), and other agency actions (the "Challenged Agency Actions"), that have resulted in the termination of the Plaintiffs' research grants (the "Grants"), and the exclusion of new grant applications, because of the Grants' relationship to LGBTQI+ health topics.  *See generally* ECF No. 1.  The Plaintiffs have filed a motion for a preliminary injunction and stay pending judicial review, pursuant to Fed. R. Civ. P. 65 and 5 U.S.C. § 705, seeking to enjoin the Defendants from: (a) implementing, enforcing, or effectuating the Agency Directives, or any agency guidance setting forth "agency priorities" prohibiting federal funding, or (b) taking any of the Challenged Agency Actions,

because the research relates to "gender identity," "transgender issues," "diversity," "equity,"
"equity objectives," "inclusion," "accessibility," "DEI," "LGBTQI+ health," "sexual
orientation," and/or "gender ideology."  ECF No. 64.  The Plaintiffs' motion is fully briefed.
ECF Nos. 64, 70, 79, 84, 85, 86 and 87; *see also* ECF Nos. 65, 71, 75, 76, 77, 80 and 88.

The Court held hearings on the motion on July 2, 2025, and August 1, 2025.  ECF Nos.
82 and 91.  For the reasons that follow, and stated during the July 2, 2025, and August 1, 2025,
hearings, the Court: (1) **GRANTS-in-PART** and **DENIES-in-PART** the Plaintiffs' motion for a
preliminary injunction and stay pending judicial review (ECF No. 64); (2) **HOLDS** that the
Plaintiffs are likely to succeed on their claims that the Agency Directives and Challenged
Agency Actions violate Section 1557 of the Affordable Care Act and the Equal Protection
component of the Due Process Clause of the Fifth Amendment; and (3) **ENTERS** a
**PRELIMINARY INJUNCTION** in this case and **ENJOINS** the Defendants from: (a)
implementing, enforcing, or effectuating the Agency Directives or any agency guidance setting
forth "agency priorities" prohibiting federal funding, or (b) taking any of the Challenged Agency
Actions, because the research relates to "gender identity," "transgender issues," "diversity,"
"equity," "equity objectives," "inclusion," "accessibility," "DEI," "LGBTQI+ health," "sexual
orientation," and/or "gender ideology."  Fed. R. Civ. P. 65.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### A. Factual Background

In this civil action, the Plaintiffs challenge the decisions of the NIH to terminate their
Grants, and to exclude new grant applications, because of the Grants' relationship to LGBTQI+
health topics.  ECF No. 1.  Specifically, the Plaintiffs assert the following claims in the
complaint: (1) violation of the equal protection component of the Fifth Amendment, against all
the Defendants (Count I); (2) violation of Section 1557 of the Affordable Care Act, against
Defendants NIH and HHS (Count II); (3) violation of the Fifth Amendment's Due Process

---

[1] The facts recited in this memorandum opinion are taken from the complaint; the Plaintiffs' motion for a
preliminary injunction and stay pending judicial review; the memorandum in support thereof; the exhibits
attached thereto; and the Defendants' response in opposition thereto.  ECF Nos. 1, 64, 65 and 70.

Clause deprivation of protected interests without required procedure, against all the Defendants (Count III); violation of the Fifth Amendment's Due Process Clause void for vagueness, against all the Defendants (Count IV); (5) violation of the APA – arbitrary and capricious agency action, against all the Defendants (Count V); violation of the APA – contrary to law, against all the Defendants (Count VI); violation of the APA – contrary to regulation, against all the Defendants (Count VII); violation of the APA – unlawfully withheld or unreasonable delay, against all the Defendants (Count VIII); violation of the APA – contrary to constitutional right, against all the Defendants (Count IX); and violation of the separation of powers, against all the Defendants (Count X). *Id*. at ¶¶ at 119-185. As relief, the Plaintiffs request, among other things, that the Court: (1) declare that the Agency Directives and Challenged Agency Actions are unconstitutional and unlawful, because they prohibit research related to the LGBTQI+ topics; (2) enjoin the Defendants' implementation and enforcement of the Agency Directives and Challenged Agency Actions; (3) vacate the terminations of the Plaintiffs' NIH-funded Grants and order such Grants immediately reinstated with full access to withheld funds; (4) order the Defendants to review all properly submitted applications as required by law; and (5) enjoin the Defendants from imposing any negative consequences on the Plaintiffs or on GLMA's members for involvement in this litigation. *Id*. at Prayer for Relief.

The Parties

Plaintiff GLMA is a national nonprofit organization whose mission is to ensure health equity for LGBTQI+ people and equality for LGBTQI+ health professionals in their work and learning environments. *Id.* at ¶ 20. GLMA's members include physicians, researchers and academics, health-profession students and other health professionals, who have had their Grants, or other funding, terminated by the Defendants, or who have had their applications for grants denied, delayed, or withheld from review. *Id.*

Plaintiff Dr. Carl Streed, Jr. is the Research Director for the Gender Care Center at Boston Medical Center, an Associate Professor at Boston University School of Medicine and a member of GLMA, who has had three Grants terminated by the NIH. *Id.* at ¶ 21. Dr. Streed is also a healthcare provider to LGBTQI+ patients. *Id.*

3

Plaintiff Dr. Sean Arayasirikul is an Associate Professor in the Department of Health, Society and Behavior at University of California, Irvine and a member of GLMA, who has had three Grants terminated by the NIH. *Id.* at ¶ 22.

Plaintiff Dr. Michelle Birkett is an Associate Professor in the Department of Medical Social Sciences at Northwestern University, who has had one Grant terminated by the NIH. *Id.* at ¶ 23.

Plaintiff Dr. Gregory Phillips, II is an Associate Professor in the Department of Medical Social Sciences at Northwestern University and a member of GLMA, who has had two Grants terminated by the NIH. *Id.* at ¶ 24.

Plaintiff Dr. Kurt M. Ribisl is the chair and a Professor in the Department of Health Behavior at the Gillings School of Global Public Health at the University of North Carolina at Chapel Hill ("UNC") and a member of GLMA, who has had one Grant terminated by the NIH. *Id.* at ¶ 25.

Plaintiff Dr. Noel Brewer is the Gillings Distinguished Professor of Public Health at the Gillings School of Global Public Health and a member of GLMA, who has had one Grant terminated by the NIH. *Id.* at ¶ 26.

Plaintiff Dr. Seth Noar is a Professor at the UNC Hussman School of Journalism and Media, a member of UNC's Lineberger Comprehensive Cancer Center, and the director of the Communicating for Health Impact Lab, who has had one Grant terminated by the NIH. *Id.* at ¶ 27.

Plaintiff Dr. Kristen Hassmiller is a Professor in the Department of Health and Policy Management at the UNC Gillings School of Global Public Health, who has had one Grant terminated by the NIH. *Id.* at ¶ 28.

Plaintiff Dr. Laura Graham Holmes is an Assistant Professor at the Silberman School of Social Work at Hunter College at CUNY and a member of GLMA, who has had one Grant terminated by the NIH. *Id.* at ¶ 29.

Plaintiff Dr. Heather Littleton is a Professor of Psychology at the University of

4

Colorado, Colorado Springs, and Director of Research Operations at the Lyda Hill Institute for Human Resilience, who has had one Grant terminated by the NIH. *Id.* at ¶ 30.

Plaintiff Dr. Gabriel Murchison is an Assistant Professor at Boston University School of Public Health and a member of GLMA, who has had one Grant terminated by the NIH. *Id.* at ¶ 31.

Plaintiff Dr. Sarah Peitzmeier is an Assistant Professor of Behavioral and Community Health at the University of Maryland School of Public Health and a member of GLMA, who has had one Grant terminated by the NIH. *Id.* at ¶ 32.

Plaintiff Dr. Debra Umberson is a Professor of Sociology and Director of the Center on Aging and Population Sciences at The University of Texas at Austin, who has had one Grant terminated by the NIH. *Id.* at ¶ 33.

Plaintiff Dr. Phoebe Poe is a Professor and researcher in the field of LGBTQI+ health at a higher education institution in Tennessee, who has had one Grant terminated by the NIH. *Id.* at ¶ 34.

Plaintiff Dr. Rachel Roe is a physician and a researcher at a hospital and higher education institution in Virginia, who has had one Grant terminated by the NIH. *Id.* at ¶ 35.

Plaintiff Dr. Susana Soe is a psychologist and an executive at a health-related nonprofit and a member of GLMA, who has had one Grant terminated by the NIH. *Id.* at ¶ 36.

Plaintiffs Dr. Streed, Dr. Roe and other unnamed healthcare providers are members of GLMA. *Id.* at ¶ 37.

Defendant NIH is an agency of the United States within HHS and is the primary federal agency responsible for conducting and supporting biomedical and health research in the United States. *Id.* at ¶ 39.

Defendant Dr. Jay Bhattacharya is the Director of the NIH. *Id.* at ¶ 40.

Defendant HHS is an executive department of the United States Government and it is responsible for the administration of federal health programs, including research funding. *Id.* at ¶ 41.

Defendant Robert Kennedy, Jr., is the Secretary of HHS. *Id.* at ¶ 42.

5

<u>The NIH Statutory Framework</u>

Congress authorizes the NIH's funding of extramural research through statutory directives and appropriations. ECF No. 1 at ¶ 54. Specifically, the Public Health Service Act of 1944, 42 U.S.C. § 201, *et seq.*, directs the Secretary of HHS to conduct and sponsor research, including by providing "grants-in-aid to universities, hospitals, laboratories, and other public or private institutions." *See* 42 U.S.C. § 241(a), (a)(1) and (a)(3); 42 U.S.C. § 284(b). Congress has also imposed certain directives to the Director of the NIH related to grants. *See* 42 U.S.C. §§ 282(b) and 284(b). Relevant to this case, NIH research must "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities." *See* 42 U.S.C. § 282(b)(8)(D)(ii); *see also* ECF No. 1 at ¶ 55. The NIH must also fund research to "encourage efforts to improve research related to the health of sexual and gender minority populations," including by "increasing participation of sexual and gender minority populations in clinical research" and by "facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations." 42 U.S.C. § 283p; ECF No. 1 at ¶ 56.

The NIH is also required to develop and publish a Strategic Plan ("Strategic Plan") every six years. 42 U.S.C. § 282(m)(1). The purpose of the Strategic Plan is to "provide direction to the biomedical research investments" made by the NIH, "to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine." 42 U.S.C. § 282(m)(1). Congress required that the NIH's Strategic Plan "shall . . . consider [among other things] . . . biological, social, and other determinants of health that contribute to health disparities." 42 U.S.C. § 282(m)(2)(A), (m)(2)(B)(iii); ECF No. 1 at ¶ 57. In this regard, the Plaintiffs allege that the NIH and its Institutes and Centers solicit applications for grants in accordance with research priorities set out in their Strategic Plans. ECF No. 1 at ¶ 66.

<u>The NIH Grant Program</u>

When awarding grants, the NIH follows, among other things, the grantmaking procedures set forth by the Public Health Service Act, the NIH Grants Policy Statement, and the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards. *Id.* at ¶

6

65; *see also* 45 C.F.R. § 75.  The NIH and its Institutes and Centers solicit applications for grants through notices of funding opportunities—public announcements that outline the conditions for applying for grant funding.  ECF No. 1 at ¶ 66.  Applicants then submit proposals that discuss the proposal's objectives, its methodology, the significance of the research to be performed, and how the proposal conforms to HHS and NIH budget and policy requirements.  *Id.*  Proposals to the NIH are reviewed in a two-stage review process, first by peer-review groups and then by the relevant Institute and Center's National Advisory Council or Board.  *Id.* at ¶ 67.  Once a grant has been awarded, recipients are authorized to recover their actual costs for the research conducted.  *Id.* at ¶ 69.

Grant terminations are governed by HHS regulations, which permit terminations: (i) due to non-compliance with award terms, (ii) for cause, or (iii) if mutually agreed between the researcher and NIH staff.  *Id.* at ¶ 70.  HHS regulations also set forth a formal process to terminate a grant.  *See* 2 C.F.R. §§ 200.340-200.343; ECF No. 1 at ¶ 71.  In this regard, the NIH must provide written notice to the grant recipient stating the reasons for termination and the effective date.  45 C.F.R. § 75.373; 2 C.F.R. § 200.340(a)(3); ECF No. 1 at ¶ 71.  Grant recipients then can object and provide information challenging the termination decision.  2 C.F.R. § 200.342; ECF No. 1 at ¶ 72.  Grant recipients also have the right to appeal adverse decisions to the NIH official specified in the termination notice within 30 days of receipt, and then to the Departmental Appeals Board, which provides an independent review.  ECF No. 1 at ¶ 72.

The Executive Orders

On January 20, 2025, President Donald J. Trump issued Executive Order 14168 ("EO 14168"), which  defined "gender ideology" as, among other things, "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."  Exec. Ord. 14168 at § 2(f); ECF No. 1 at ¶ 75.  EO 14168 directed agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."  Exec. Ord. 14168 at § 3(e),(g); ECF No. 1 at ¶ 76.

On January 20, 2025, President Trump also issued Executive Order 14151 ("EO 14151"),

which, among other things, directed agencies to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Exec. Ord. 14151 at § 2(a); ECF No. 1 at ¶ 79. EO 14151 requires the termination of "'equity-related' grants or contracts." Exec. Ord. 14151 at § 2(b)(i); ECF No. 1 at ¶ 79.

On January 21, 2025, President Trump issued Executive Order 14173 ("EO 14173"), which, among other things, requires that the Director of the Office of Management and Budget "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." Exec. Ord. 14173 at § 3(c)(ii)-(iii); ECF No. 1 at ¶ 80.

<u>The Agency Directives</u>

On February 10, 2025, the Acting HHS Secretary issued a Secretarial Directive on DEI-Related Funding (the "February 10, 2025, Directive") stating that "grants that support DEI and similar discriminatory programs" were now "inconsistent with the Department's policy of improving the health and well-being of all Americans." ECF No. 1 at ¶ 84; ECF No. 1-2. The Acting Secretary then directed all agency personnel to "pause all payments" to "grantees related to DEI and similar programs." ECF No. 1 at ¶ 84.

On February 12, 2025, the NIH issued a memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals," which states that the NIH would soon provide "additional details on future funding actions related to the agency's goals" through separate memoranda. *Id.* at ¶ 85. The next day, NIH's Deputy Director for Extramural Research provided "supplemental guidance" placing "hard restrictions on awards . . . where the program promotes or takes part in [DEI] initiatives." *Id.* These restrictions applied to "new and continuation awards made on or after February 14, 2025," and were to "remain in place until the agency conducts a review" of whether "funding of the activities/programs are . . . consistent with

8

current policy priorities." *Id.*

On February 21, 2025, the NIH Director issued a Directive on NIH Priorities (the "February 21, 2025, Directive"), which states that NIH's mission requires it "to ensure that it is not supporting low-value and off-mission research programs, including but not limited to studies based on diversity, equity, and inclusion (DEI) and gender identity" and that "this description of NIH's mission is consistent with recent Executive Orders issued by the President." *Id.* at ¶ 86; ECF No. 1-3. The February 21, 2025, Directive also states "that it is the policy of NIH not to prioritize such research programs" and directed the "NIH personnel . . . [to] ensur[e] NIH grants, contracts, cooperative agreements, and other transactions do not fund or support . . . DEI and gender identity research activities and programs." ECF No. 1 at ¶ 86; ECF No. 1-3.

On February 28, 2025, the NIH Director issued a "Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025" (the "February 28, 2025, Guidance"), which stated that the NIH would "no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI)" and that NIH personnel must "completely excise all DEI activities" from grant awards. ECF No. 1-4; ECF No. 1 at ¶ 87. Pursuant to the February 28, 2025, Guidance, NIH grant awards must not be issued if the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity)." ECF No. 1-4. For grants which only "partially support[] DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope)," the NIH requires that such grants be reworked to remove DEI-related content or be terminated. *Id.*; ECF No. 1 at ¶ 87. For projects that do "not support DEI activities, but may contain language related to DEI," the award may only proceed "[o]nce the language is removed." ECF No. 1-4.

On March 25, 2025, the NIH issued the NIH Grants Management Staff Guidance – Award Assessments or Alignment with Agency Priorities-March 2025 (the "March 25, 2025, Guidance"), which states that the NIH would "no longer prioritize research and research training programs that focus on [DEI]." ECF No. 1-5; ECF No. 1 at ¶ 90. And so, NIH officials were directed to, among other things, tell grantees whose awards were being terminated that "it is the

policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g. China or South Africa, etc.]."  ECF No. 1-5 at 3; ECF No. 1 at ¶ 90.

### The Grant Terminations And Challenged Agency Actions

Each of the Individual Plaintiffs received a grant termination letter (the "Termination Letters") from the NIH, either personally or through their institutions, that terminated the funding for their Grants related to LGBTQI+ populations.  ECF No. 1 at ¶¶ 105-117.  Several of the Individual Plaintiffs have appealed their Grant terminations.  *Id.* at ¶¶ 105, 106, 107, 108, 110, 112, 114 and 117.  But, the Plaintiffs allege that any such appeal would be futile, because several Termination Letters contained the following language: "[N]o corrective action is possible here.  The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities."  *Id.* at ¶¶ 94 and 105-117.

The Plaintiffs also allege that the Termination Letters contained no justification for the termination of the Grants, other than that the awards no longer aligned with agency priorities, because they related to either "gender identity" or "diversity, equity, and inclusion (DEI)."  *Id.* at ¶ 118.  In this regard, the Plaintiffs allege that the justifications provided in the Termination Letters are nonspecific and include generalized descriptions of their research as "antithetical to the scientific inquiry," as having "little identifiable return on investment," as "ignor[ing] . . . biological realities," and as failing to "enhance health, lengthen life, or reduce illness."  *Id.* at ¶ 95.  Given this, the Plaintiffs allege that the Termination Letters do not explain how the specific research project at issue fails to "effectuate agency priorities."  *Id.*  And so, the Plaintiffs challenge the terminations, suspensions, or withholding of grant funds, and the denial, delay, refusals to consider, or withholding from review of applications for grants related to LGBTQI+ health.  *Id.* at 99.

### The Plaintiffs' Allegations

In the complaint, the Plaintiffs contend that the Agency Directives and Challenged Agency Actions violate the Equal Protection component of the Fifth Amendment and Section 1557 of the Affordable Care Act, because these actions discriminate upon the basis of sex, sexual

orientation and transgender status.  *Id.* at ¶¶ 119-137.  The Plaintiffs further contend that the Defendants committed substantive and procedural due process violations, by depriving them of protected liberty and property interests using unconstitutionally vague grant termination notices. *Id.* at ¶¶ 138-150.

In addition, the Plaintiffs allege that the Agency Directives and Challenged Agency Actions violate the Administrative Procedure Act ("APA"), because they are arbitrary, capricious, and contrary to law.  *Id.* at ¶¶ 151-181.  Lastly, the Plaintiffs contend that the Defendants' decision to not administer Grants involving the LGBTQI+ health topics, violates the separation of powers, because this decision is contrary to the NIH's statutory mandates.  *Id.* at ¶¶ 182-185. And so, as relief, the Plaintiffs request that, among other things, the Court: (1) declare that the Agency Directives and Challenged Agency Actions are unconstitutional and unlawful, because they prohibit research related to the LGBTQI+ topics; (2) enjoin the Defendants' implementation and enforcement of the Agency Directives and Challenged Agency Actions; (3) vacate the terminations of the Plaintiff's NIH-funded grants and order such grants immediately reinstated with full access to withheld funds; (4) order the Defendants to review all properly submitted applications as required by law; and (5) enjoin the Defendants from imposing any negative consequences on the Plaintiffs or on GLMA's members for involvement in this litigation.  *Id.* at Prayer for Relief.

### B.  Procedural History

On May 20, 2025, the Plaintiffs filed the complaint.  ECF No. 1.  On May 28, 2025, the Plaintiffs filed a motion for a preliminary injunction and stay pending judicial review, pursuant to Fed. R. Civ. P. 65 and 5 U.S.C. § 705.  ECF No. 64.  On June 13, 2025, the Defendants filed a response in opposition to the Plaintiffs' motion.  ECF No. 70.  On June 24, 2025, the Plaintiffs filed a reply brief.  ECF No. 36.  On July 2, 2025, the Court held a hearing on this motion.  ECF No. 82.

On July 14, 2025, the Plaintiffs filed a supplemental brief on the issues of standing and the relief requested in their motion for a preliminary injunction.  ECF No. 84.  On July 14, 2025, the Defendants filed a supplemental brief.  ECF No. 85.  On July 18, 2025, the parties filed

supplemental responsive briefs.  ECF Nos. 86 and 87.  On August 1, 2025, the Court held a
hearing on the Plaintiffs' motion.  ECF No. 91.

The Plaintiffs' motion having been fully briefed, the Court resolves the pending motion.

## III.    LEGAL STANDARDS

### A.  Preliminary Injunctions

To obtain a preliminary injunction, the party seeking the relief must show that: (1) there
is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable
harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and
(4) the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20
(2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).
In certain cases, "the prospect of an unconstitutional enforcement 'supplies the necessary
irreparable injury.'"  *Air Evac EMS Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting
*Winter*, 555 U.S. at 20).  When the Government is the opposing party, the balance of equities and
public interest prongs merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  And so, a preliminary
injunction cannot issue unless all of these factors are satisfied.  *See Pashby v. Delia*, 709 F.3d
307, 320 (4th Cir. 2013).

### B.  Standing

Standing is a "threshold question" to be resolved before turning to the merits of a case.
*See Linda R. S. v. Richard D.*, 410 U.S. 614, 616 (1973).  To establish Article III standing, a
plaintiff must demonstrate (1) an injury in fact (2) that is fairly traceable to the challenged
conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision.
*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  In this regard, an injury in fact must be
"concrete," meaning that it must be real and not abstract.  *FDA v. All. for Hippocratic Med.*, 602
U.S. 367, 381 (2024).  The injury also must be particularized, meaning it must affect "the
plaintiff in a personal and individual way" and not be a generalized grievance.  *Lujan*, 504 U.S.
at 560, n.1.

Relevant to the pending motion, typically, "a litigant must assert his or her own legal
rights and interests, and cannot rest a claim to relief on the legal rights or interests of third

parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). But, third-party standing exists when the litigant has shown that: (1) the litigant has suffered an injury in fact; (2) the litigant has a close relation to the third party; and (3) there exists some hinderance to the third party's ability to protect his or her own interests. *Id.* at 411. In this regard, courts have long recognized the ability of health care providers to bring claims on behalf of their patients. *See, e.g.*, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 34-36 (D.D.C. 2020). The Supreme Court of the United States has also recognized associational standing, where "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

### C.  Title IX And Section 1557 Of The Affordable Care Act

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In addition, Section 1557 of the Affordable Care Act provides that "an individual shall not," on the basis of any ground prohibited by Title IX of the Education Amendments of 1972, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). For the purposes of remedying a Section 1557 violation, the "enforcement mechanisms provided for and available under . . . [T]itle IX . . . shall apply." *Id.*; *see Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 430 (4th Cir. 2021).

The Court "look[s] to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (applying the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020), to a Title IX case). In this regard, the United States Court of Appeals for the Fourth

Circuit has held that discrimination on the basis of transgender status is discrimination "on the basis of sex" for claims brought under Title IX.  *See Grimm*, 972 F.3d at 616.  And so, to succeed on a Section 1557 claim asserting Title IX discrimination upon the basis of sex, a plaintiff must show: (1) the defendant is a health program or activity, any part of which is receiving Federal financial assistance; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination on the basis of sex; and (3) the plaintiff's claim is enforceable under Title IX.  *See* 42 U.S.C. § 18116(a).

### D.  The Equal Protection Component Of The Due Process Clause

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups."  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  The "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."  *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975); *see also Strickland v. United States*, 32 F.4th 311, 357-58 (4th Cir. 2022).  And so, when evaluating an Equal Protection claim based upon the Due Process Clause of the Fifth Amendment, the Court "appl[ies] different levels of scrutiny to different types of classifications."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

In this regard, the Supreme Court has recently declined to consider whether classifications based upon transgender status warrant a heightened level of scrutiny under the Equal Protection Clause.  *See United States v. Skrmetti*, 145 S. Ct. 1816, 1834 (2025).  But, the Fourth Circuit has held that "heightened scrutiny applies to . . . sex-based classifications" and that "transgender people constitute at least a quasi-suspect class."  *Grimm*, 972 F.3d at 607.  Given this, classifications based upon transgender status "must be 'substantially related to a sufficiently important governmental interest.'"  *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985).  And so, the Government "must provide an 'exceedingly persuasive justification' for its classification."  *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 534 (1996)).

### E.  The Interplay Between The APA And The Tucker Act

Lastly, the Fourth Circuit has long recognized that "[t]he interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996).  In this regard, courts have held that the Tucker Act applies if the issue in a case is "at its essence" a contract claim. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).  To determine the essence of a claim, the Court considers: (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *Id.* at 968.  The Fourth Circuit has also held that a plaintiff primarily seeks injunctive relief when the relief requested is "not . . .  an incident of, or collateral to, a monetary award." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 818 (2024) (quoting *Randall*, 95 F.3d at 347).  And so, the Court looks to the complaint, with "an eye toward 'the true nature of the action,'" to determine whether the exercise of jurisdiction is appropriate under the APA or the Tucker Act.  *Am. Ass'n of Colls. for Teacher Educ. v. McMahon*, No. 25- cv-00702, 2025 WL 863319, at *3 (D. Md. Mar. 19, 2025) (quoting *Williams v. Roth*, No. 21-cv- 02135, 2022 WL 4134316, at *4 (D. Md. Sept. 12, 2022)).

The Supreme Court has also recently addressed the question of whether jurisdiction is properly found under the APA or the Tucker Act in a challenge to the Government's decision to freeze the funding for certain grants to teachers awarded through programs authorized by a federal statute.  *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025).  In that case, the Supreme Court stayed the district court's temporary restraining order pending appeal, because, among other things, the Supreme Court found that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968 (citing *Sampson v. Murray*, 415 U.S. 61, 87 (1974)).  More recently, the Fourth Circuit, relying upon the Supreme Court's reasoning in *California*, stayed a district court's preliminary injunction, in a case challenging the termination of federal grants, pending appeal.  *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025); *see also Am. Association of Colleges for Teacher Educ.*, 2025 WL 1232337, at *1 (relying on *California* to

15

grant the Government's motion to stay the district court's injunction requiring the reinstatement of certain grant awards).

## IV.    ANALYSIS

The Plaintiffs have moved for a preliminary injunction and stay pending judicial review in this civil action, seeking to enjoin the implementation of the Agency Directives and the Challenged Agency Actions, pursuant Fed. R. Civ. P. 65 and 5 U.S.C. § 705.  ECF No. 64. Specifically, the Plaintiffs argue that the Agency Directives and Challenged Agency Actions violate, among other things, Section 1557 of the Affordable Care Act, the Equal Protection component of the Fifth Amendment's Due Process Clause and the APA.  ECF No. 64-1 at 18-28. And so, the Plaintiffs request that the Court enjoin the "Defendants' implementation and enforcement of their discriminatory guidance, their discriminatory grant terminations, and their discriminatory suspension of application processes for grants related to LGBTQI+ health research."  ECF No. 64 at 1-2.

In the response in opposition to the Plaintiffs' motion, the Government counters that the Court should deny the Plaintiffs' request for preliminary injunctive relief, because: (1) the United States Court of Federal Claims has exclusive jurisdiction over the Plaintiffs' claims challenging the termination of the Grants; (2) the Plaintiffs lack standing to pursue their claims for prospective relief; (3) the termination of the Grants does not violate the Equal Protection component of the Fifth Amendment; (4) the Agency Directives and Challenged Agency Actions do not violate Section 1557 of the Affordable Care Act; (5) the Agency Directives and Challenged Agency Actions do not violate the separation of powers; (6) neither the Agency Directives, nor the Challenged Agency Actions violate the APA; (7) the Plaintiffs cannot show irreparable harm; and (8) the balance of equities and public interest favor denying the Plaintiffs' motion for preliminary injunctive relief.  ECF No. 70 at 12-37.  And so, the Government requests that the Court deny the Plaintiffs' motion.  *Id.* at 37.

For the reasons that follow, the Plaintiffs have met their burden to show a likelihood of success upon the merits of their Section 1557 and Equal Protection claims set forth in Counts I and II of the complaint.  The Plaintiffs have also shown that they will suffer irreparable harm

absent the requested preliminary injunctive relief and that the balance of the equities favors granting such relief. And so, for the reasons stated below, and those stated during the July 2, 2025, and August 1, 2025, hearings, the Court: (1) GRANTS-in-PART and DENIES-in-PART the Plaintiffs' motion for a preliminary injunction and stay pending judicial review (ECF No. 64); (2) HOLDS that the Plaintiffs are likely to succeed upon the merits of their claims that the Agency Directives and Challenged Agency Actions violate Section 1557 of the Affordable Care Act and the Equal Protection component of the Due Process Clause of the Fifth Amendment; and (3) ENTERS a PRELIMINARY INJUNCTION in this case and ENJOINS the Defendants from: (a) implementing, enforcing, or effectuating the Agency Directives or any agency guidance setting forth "agency priorities" prohibiting federal funding, or (b) taking any of the Challenged Agency Actions, because the research relates to "gender identity," "transgender issues," "diversity," "equity," "equity objectives," "inclusion," "accessibility," "DEI," "LGBTQI+ health," "sexual orientation," and/or "gender ideology." Fed. R. Civ. P. 65.

### A. The Plaintiffs Have Standing To Bring Their Equal Protection And Section 1557 Claims

As an initial matter, the Plaintiffs have shown that they have standing to pursue their Equal Protection and Section 1557 claims against the Defendants. To establish Article III standing, the Plaintiffs must demonstrate (1) an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision, as to each form of relief sought. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Trans Union LLC v. Ramirez*, 594 U.S. 413, 431 (2021). The Plaintiffs have satisfied this requirement here, because they have shown that the Individual Plaintiffs have suffered an injury in fact due to the loss of the Grant funds, and/or the inability to apply for new Grants, related to LGBTQI+ health. *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) ("[L]os[ing] out on federal funds" is "a sufficiently concrete and imminent injury to satisfy Article III."); *see also Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) ("[F]inancial harm is a classic and paradigmatic form of injury in fact." (citation omitted)); Aug.

1, 2025, Hr'g Tr. at 16:8-10 and 17:4-7[2] ("Every Plaintiff here has had a research project that they work on . . . that has been terminated.").[3]

The Plaintiffs also persuasively argue that they have third-party standing to assert their Equal Protection and Section 1557 claims on behalf of members of the LGBTQI+ community. Third-party standing exists when the litigant has shown that: (1) the litigant has suffered an injury in fact; (2) the litigant has a close relation to the third party; and (3) there exists some hinderance to the third party's ability to protect his or her own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991). As discussed above, the Plaintiffs have shown that they suffered an injury in fact, due to the termination of their Grants, and/or the inability to apply for new grants, related to LGBTQI+ health. Aug. 1, 2025, Hearing Tr. at 16:8-10 and 17:4-7. The Plaintiffs have also shown that they have a close relationship to the LGBTQI+ community, due to their research and work in the area of LGBTQI+ health. *See Powers*, 499 U.S. at 413 (stating that healthcare providers have a close relationship to their patients, "such that the former is fully, or very nearly, as effective a proponent of the right [asserted] as the latter." (quoting *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) and citing e.g., *Griswold v. Connecticut*, 381 U.S. 479 (1965))); *see also Scott v. Greenville County*, 716 F.2d 1409, 1415 (4th Cir. 1983) (holding that "standing to assert that discriminatory government action violated the equal protection clause is not lacking simply because the plaintiff is not a member of a minority" and that such plaintiffs "in [their] own stead suffered injury to [their] right to be free from discrimination").

In addition, the Plaintiffs argue with persuasion that members of the LGBTQI+ community experience hinderances to their ability to assert their own rights in this matter, due to historical sex discrimination. *See* Aug. 1, 2025, Hr'g Tr. at 21:24-23:4; *see also* ECF No. 1 at ¶ 37 (alleging that their LGBTQI+ patients "face barriers to asserting their own claims and

---

[2] Citations to the August 1, 2025, Hearing Transcript are to the unofficial transcript.

[3] The subset of Plaintiffs in this case who are healthcare providers have also shown that they have standing to bring their Equal Protection claims on behalf of their LGBTQI+ patients. *Powers v. Ohio*, 499 U.S. 400, 413 (1991) (It is well-established that healthcare providers have a close relationship to their patients, "such that the former is fully, or very nearly, as effective a proponent of the right [asserted] as the latter." (citations omitted)).

protecting their own interests"). And so, the Court is satisfied that the Plaintiffs may pursue their Equal Protection claim in this case.

The Plaintiffs have also shown that they have third-party standing with regards to their Section 1557 claim. In this regard, the Supreme Court has held that a statutory cause of action "extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129 (2014). And so, if the Plaintiffs are "the sort of person [Section 1557] intended to protect, [they] can press [their] claim." *See Krakauer v. Dish Network, L.L.C*., 925 F.3d 643, 656 (4th Cir. 2019). In this case, the plain language of Section 1557 makes clear that the zone of interests that this statute seeks to protect includes any "individual" who was "excluded from participation in . . . denied the benefits of, or . . . subjected to discrimination under" a certain health program or activity that is receiving federal funding. *See* 42 U.S.C. § 18116(a).

The Plaintiffs allege in this case that they were: (1) excluded from participation in the Grants; (2) denied the benefits of NIH grant funding; and (3) discriminated against, through the termination of their Grants, and/or the inability to obtain new grants, because their research relates to LGBTQI+ health. *See* ECF No. 1 at ¶¶ 129-137; ECF No. 64-1 at 26-27; ECF No. 84 at 13. Given this, the Plaintiffs fall within the zone of interests that Section 1557 seeks to protect. And so, the Court is also satisfied that the Plaintiffs have standing to pursue their Section 1557 claim in this case.[4]

---

[4] GLMA has also shown that it has associational standing to bring claims on behalf of its researcher and healthcare provider members. As discussed above, GLMA's members have standing to bring the Equal Protection and Section 1557 claims at issue, and GLMA's claims on behalf of its members seek to protect interests that are directly related to the organization's purpose—to "promote specifically health equity with regard to LGBTQI people, as well as to attend to and promote equity for LGBTQI health professionals." *See* Aug. 1, 2025, Hr'g Tr. at 25:18-26:6; *see also* ECF No. 1 at ¶ 20 ("GLMA's mission is to ensure health equity for LGBTQI+ people and equality for LGBTQI+ health professionals in their work and learning environments."). In addition, the claims asserted in this case do not require the participation of GLMA's members. *See United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members." (citation omitted)).

### B.  The Plaintiffs Have Shown A Likelihood Of Success Upon The Merits Of Their Section 1557 And Equal Protection Claims

#### 1.  The Plaintiffs Are Likely To Succeed On Their Section 1557 Claim

Turning to the merits of the Plaintiffs' claims, the Plaintiffs have shown that they are likely to succeed upon the merits of their Section 1557 claim in Count II of the complaint.  To succeed on their Section 1557 claim, the Plaintiffs must show: (1) the NIH is a health program or activity, any part of which is receiving Federal financial assistance; (2) the Plaintiffs were excluded from participation in, denied the benefits of, or subjected to discrimination on the basis of sex, with respect to the NIH Grant Program; and (3) the enforcement mechanisms provided for and available under Title IX may provide relief.  *See* 42 U.S.C. § 18116(a).  The Plaintiffs are likely to succeed in making this showing for several reasons.

First, there is no dispute in this case that the NIH, as a component of HHS, is a covered entity that falls within the scope of Section 1557.  *See* 45 C.F.R. § 92.4 (defining "covered entity" to include "The Department," and defining "Department" to mean "U.S. Department of Health and Human Services" and defining "health program or activity" to mean, "[e]ngage in health or clinical research").  Second, the Plaintiffs have shown that they have been excluded from participation in the NIH Grant Program and, thus, denied federal funding, because their Grants have been terminated, and/or they have been excluded from consideration with regards to new grant applications, because the Grants relate to LGBTQI+ health.  *See* ECF No. 1 at ¶¶ 100-118; *see also* Aug. 1, 2025, Hr'g Tr. at 17:14-18.  In addition, the Plaintiffs have shown that they are being denied the benefits of the NIH Grant Program and federally funded research, due to the Agency Directives and Challenged Agency Actions, thereby satisfying the second element of their Section 1557 claim.  ECF No. 64-1 at 27-28.

Lastly, the Plaintiffs have also shown that they have been discriminated against, upon the basis of sex, due to the Agency Directives and Challenged Agency Actions.  In this regard, the evidence currently before the Court shows that the Plaintiffs' Grants have been terminated, and/or their grant applications will be excluded from consideration by the NIH, because they relate to LGBTQI+ health.  Aug. 1, 2025, Hr'g Tr. at 16:8-10 and 17:4-18.  The Fourth Circuit

has held that governmental policies that discriminate upon the basis of gender identity and sexual orientation violate Title IX.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020).  Given this, the Plaintiffs have shown that the enforcement mechanisms provided for under Title IX will enable them to succeed on their challenge to the Agency Directives and Challenged Agency actions pursuant to Section 1557.  And so, the Plaintiffs have shown that they are likely to succeed upon the merits of their Section 1557 claim.

### 2.   The Plaintiffs Are Likely To Succeed On Their Equal Protection Claim

The Plaintiffs have also shown that they are likely to succeed upon the merits of their Equal Protection claim in Count I of the complaint.  In the complaint, the Plaintiffs allege that the Agency Directives and Challenged Agency Actions violate the equal protection component of the Fifth Amendment's Due Process Clause, because they are "rooted in prejudice and animus" against the LGBTQI+ community.  ECF No. 1 at ¶ 124.  In this regard, the Supreme Court has recognized that "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  The Supreme Court has also made clear that the equal protection component does not forbid classifications; rather it simply "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citation omitted).

Given this, the Court "appl[ies] different levels of scrutiny to different types of classifications," when evaluating an equal protection claim.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  And so, the Court approaches its analysis to the Plaintiffs' Fifth Amendment equal protection component claim here in the same manner as it would approach an equal protection claim brought under the Fourteenth Amendment.  *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975); *see also Strickland v. United States*, 32 F.4th 311, 357-58 (4th Cir. 2022).

Relevant to this dispute, the Supreme Court recently declined to consider whether classifications based upon transgender status warrant a heightened level of scrutiny under the Equal Protection Clause.  *See United States v. Skrmetti*, 145 S. Ct. 1816, 1834 (2025).  But the Fourth Circuit has held that "heightened scrutiny applies to . . . sex-based classifications" and

"transgender people constitute at least a quasi-suspect class." *Grimm*, 972 F.3d at 607. Given this, classifications based upon transgender status "must be 'substantially related to a sufficiently important governmental interest.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). And so, the Government "must provide an 'exceedingly persuasive justification' for its classification." *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 534 (1996)).

In this case, the Plaintiffs persuasively argue that the Agency Directives and Challenged Agency Actions create a facial classification upon the basis of sex, by excluding all LGBTQI+-related health research from the NIH Grant Program. Notably, the evidence currently before the Court shows that the February 10, 2025, Directive from HHS Secretary Kennedy directed Agency personnel to "briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs," to review whether such grants should be terminated. ECF No. 65-4 at 1. The February 21, 2025, Directive from the Director of the NIH also states that "research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. . . . It is the policy of NIH not to prioritize these research programs either." ECF No. 65-5 at 1. Given this, the Director of the NIH directed NIH personnel to "conduct an internal review of all contract solicitations and notices of funding opportunities; applications pending Type 1 and Type 2 awards; existing awards; cooperative agreements; and other transactions" to "ensur[e] NIH grants, contracts, cooperative agreements, and other transactions do not fund or support . . . DEI and gender identity research activities and programs." *Id.* at 2.

The evidentiary record currently before the Court also shows that, on February 28, 2025, the NIH released a Guidance, "[i]n accordance with" the February 10, 2025, Directive, that outlines the process for terminating all grant awards identified as being related to DEI and transgender issues. ECF No. 65-6 at 1. Notably, Appendix 2 to this Guidance requires that grant terminations include the following language: "This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or

Transgender issues] no longer effectuates agency priorities.  It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated." *Id.* at 5.

The Court also observes that the evidence shows that each of the Individual Plaintiffs' Termination Letters contains the language from the February 28, 2025, Guidance, stating that the Grants were terminated because the research was "based on gender identity" and that it "is the policy of NIH not to prioritize these research programs." *See, e.g.*, ECF No. 64-4 at 17; ECF No. 64-6 at 25-26.  And so, taken together, the aforementioned Agency Directives make clear the NIH's policy to terminate any research grant funding on transgender or gender identity issues, because the research relates to such issues.

The evidence currently before the Court also shows that the Government will not be able to show that the aforementioned classification upon the basis of sex in the Agency Directives and the Challenged Agency Actions are substantially related to a sufficiently important governmental interest.  In this regard, the Fourth Circuit has held that government classifications based upon gender identity are subject to heightened scrutiny.  *Grimm*, 972 F.3d at 607.  Given this, the Government's classifications based upon gender identity at issue here "must be 'substantially related to a sufficiently important governmental interest.'"  *Id.* (quoting *City of Cleburne*, 473 U.S. at 441).  And so, the Government "must provide an 'exceedingly persuasive justification' for its classification" with regards to the Agency Directives and Challenged Agency Actions at issue in this case.  *Id.* (quoting *Virginia*, 518 U.S. at 534).

But, in this case, the Government has not identified an important governmental interest that is served by excluding all research related to LGBTQI+ health from the NIH Grant Program. While the Government argues that the Secretary of HHS has an "important interest," in "reprioritizing research grants to ensure that federal funds are being directed towards research that is consistent with science and that benefits the population at large," ECF No. 70 at 24, there can be no genuine dispute that the wholesale exclusion of federal funding for Grants related to LGBTQI+ health is inconsistent with Congress's directives to the NIH to fund research related to sexual and gender minority populations.  *See* 42 U.S.C. § 283p (directing the NIH to fund research to "encourage efforts to improve research related to the health of sexual and gender

23

minority populations," including by "increasing participation of sexual and gender minority populations in clinical research" and by "facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations"); *see also* Aug. 1, 2025, Hr'g Tr. at 47:24-48:9.  The Court also observes that the undisputed evidence currently before the Court shows that the NIH and its related components have previously funded more than one thousand unique grants related to sexual and gender minority health, during the period 2012–2022.  *See* ECF No. 65-21.  In fact, the Government provides no scientific studies or scientific justification for terminating all Grant funding related to LGBTQI+ health.  *See* ECF No. 70 at 24-25; *see also* ECF Nos. 65-4, 65-5, 65-6, 65-7 and 65-8,  Given this, the Government simply has not shown that it has a sufficiently important interest in a classification that excludes from federal funding all NIH Grants related to LGBTQI+ health.

The Government has also not shown that the Agency Directives and the Challenged Agency actions are substantially related to its stated interest in "reprioritizing research grants to ensure that federal funds are being directed towards research that is consistent with science and that benefits the population at large."  ECF No. 70 at 24.  Notably, the evidence currently before the Court shows that the NIH terminated the Plaintiffs' Grants based upon a key word search for LGBTQI+-related words.  *See* Aug. 1, 2025, Hr'g Tr. at 34:10-16.  There is also no evidence currently before the Court to show that the NIH performed any individual review of the Plaintiffs' Grants, to determine if they were actually unscientific.  And so, the Government also has not shown that the Agency Directives and the Challenged Agency Actions substantially relate to its interest in reprioritizing research grants.

The Government's arguments to show that the Plaintiffs will not succeed upon the merits of their Equal Protection claim are also not persuasive.  First, the Government argues that the Plaintiffs fail to state an Equal Protection claim, because they "do not claim they were discriminated against based on their sex or gender identity; [but rather, ] they claim discrimination based on the subject matter of their research."  ECF No. 70 at 21.  But, as discussed above, the Court construes the Plaintiffs Equal Protection claim to allege sex discrimination, based upon the sex of the members of the LGBTQI+ community and the denial

24

of federal funding for grant research that studies the health of this community.  And so, as also discussed above, the Plaintiffs do not themselves need to be members of the LGBTQI+ community to pursue this claim.  *See Scott*, 716 F.2d at 1415; *see also RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1055 (9th Cir. 2002) ("We find no bar to standing under the Equal Protection Clause where an individual alleges a personal injury stemming from his or her association with members of a protected class.").

The Government also argues without persuasion that the Plaintiffs' Equal Protection claim must fail, because the Plaintiffs do not explain how the termination of their Grants treated men and women differently.  ECF No. 70 at 21-22.  But, again, the Plaintiffs' Equal Protection claim is based upon alleged sex discrimination arising from the gender identity and sexual orientation of members of the LGBTQI+ community.  ECF No. 1 at ¶¶ 84-99 and 119-128. Given this, the Plaintiffs have shown that this claim is based upon discrimination and disparate treatment due to sex.  For these reasons, the Court is satisfied that the Plaintiffs are also likely to succeed upon the merits of their Equal Protection claim.[5]

### C.  The Plaintiffs Have Shown Irreparable Harm

Having determined that the Plaintiffs are likely to succeed upon the merits of their Section 1557 and Equal Protection claims, the Court next considers whether the Plaintiffs have

---

[5] The Plaintiffs have also moved for a preliminary injunction and stay based upon their APA and separation of powers claims in Counts V, VI, VII, VIII, IX and X of the complaint.  ECF No. 64 at 28-37. For the reasons stated during the July 2, 2025, hearing, the Plaintiffs have not shown a likelihood of success on the merits of their APA claim challenging the termination of the Grants, because they have not established that this Court possesses subject-matter jurisdiction to consider this claim.  *See* July 2, 2025, Hr'g Tr. at 87:23-88:12 (ECF No. 89); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) (To determine the essence of the Plaintiffs' APA claims, the Court considers: (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)."); *see also Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015)); *see also Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025) (staying injunction in a similar case raising APA claims and "mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers, and ultra vires claims").  The Court also reads the relevant provisions of the Public Health Service Act to grant the NIH broad discretion regarding the Grant Program.  *See* 42 U.S.C. §§ 282p and 283; *see also* July 2, 2025, Hr'g Tr. at 14:4-15 (ECF No. 89). And so, the Plaintiffs have also not shown that they are likely to succeed upon the merits of their separation of powers claim.

shown irreparable harm absent the requested injunctive relief in this case.  To establish irreparable harm, the Plaintiffs must show they are likely to suffer harm that is "actual and imminent" and that the harm "cannot be fully rectified by the final judgment."  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted).  In this regard, the Fourth Circuit has held that "a deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (cleaned up).

In this case, the Plaintiffs have met their burden to show they will suffer irreparable harm in the absence of a preliminary injunction for several reasons.  First, the Plaintiffs persuasively argue that the wholesale exclusion of the LGBTQI+ community from the NIH Grant Program irreparably harms them and the LGBTQI+ community, because the lack of funding will make it very difficult for the Plaintiffs to provide adequate healthcare to this community.  ECF No. 64-1 at 39 (quoting Roe Decl. ¶ 17.); Aug. 1, 2025, Hr'g Tr. at 19:6-18.  The abrupt termination of the Grants, and the withholding of all federal funding for LGBTQI+-related health research, also irreparably harms the LGBTQI+ participants in the Plaintiffs' research.  *See, e.g.*, ECF No. 64-11 at ¶¶ 10 and 14 (Spinelli Decl); ECF No. 64-5 at ¶¶ 10, 22 and 26 (Streed Decl.); ECF No. 64-18 at ¶ 14 (Littleton Decl.).

The Individual Plaintiffs will also be irreparably harmed, because the loss of Grant funds for LGBTQI+ health-related research topics will prevent them from continuing and completing their research projects, thereby adversely impacting the Plaintiffs' ability to publish studies and to secure tenured positions in academia.  *See* Aug. 1, 2025, Hr'g Tr. at 18:11-19:5; *see also* ECF No. 64-20 at ¶ 9 (Roe Decl.); ECF No. 64-3 at ¶ 21 (Sheldon Decl.); ECF No. 64-4 at ¶ 24 (Beccia Decl.).  Given these concerns, the Plaintiffs have shown they will suffer irreparable harm absent the requested preliminary injunctive relief.

### D.  The Balance Of The Equities Favors Injunctive Relief And A Nominal Bond

The balance of the equities also favors awarding injunctive relief in this case.  The Fourth Circuit has recognized that protecting constitutional rights weighs in favor of the Court providing preliminary injunctive relief.  *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th

330, 346 (4th Cir. 2021) ("[I]t is well-established that the public interest favors protecting constitutional rights."); *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[W]e agree with the district court that upholding constitutional rights surely serves the public interest."). The Plaintiffs have also shown that their LGBTQI+-related health research greatly benefits the millions of LGBTQI+ individuals in our Nation. *See* ECF No. 64-3 at ¶ 9 (Sheldon Decl.). And so, the Court is also satisfied that the balance of the equities weighs in favor of awarding preliminary injunctive relief in this case.[6]

## V.    CONCLUSION

For the foregoing reasons, the Court:

1.  **GRANTS-in-PART** and **DENIES-in-PART** the Plaintiffs' motion for a preliminary injunction and stay pending judicial review (ECF No. 64);

2.  **HOLDS** that the Plaintiffs are likely to succeed on their claims that the Agency Directives and Challenged Agency Actions violate Section 1557 of the Affordable Care Act and the Equal Protection component of the Due Process Clause of the Fifth Amendment; and

3.  **ENTERS** a **PRELIMINARY INJUNCTION** in this case and **ENJOINS** the Defendants from: (a) implementing, enforcing, or effectuating the Agency Directives or any agency guidance setting forth "agency priorities" prohibiting federal funding, or (b) taking any of the Challenged Agency Actions, because the research relates to "gender identity," "transgender issues," "diversity," "equity," "equity objectives," "inclusion," "accessibility," "DEI," "LGBTQI+ health," "sexual orientation," and/or "gender ideology."

The Court issued a separate Order consistent with this memorandum opinion on August

---

[6] The Court will impose a nominal bond of zero dollars in this matter, because the Plaintiffs in this case seek to uphold a fundamental constitutional right under the Equal Protection component of the Fifth Amendment's Due Process Clause. *See Nat'l Assoc. of Diversity Offs. In Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (imposing a nominal bond of zero dollars under Fed. R. Civ. P. 65(c)).

1, 2025 (ECF No. 92).

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge